1  MICHELE L. MARYOTT, SBN 191993
       mmaryott@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   3161 Michelson Drive
3  Irvine, CA  92612-4412
   Telephone:  949.451.3800 | Facsimile:  949.451.4220

4  JASON C. SCHWARTZ (admitted *pro hac vice*)
       jschwartz@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
6  Washington, DC  20036-5306
   Telephone:  202.955.8500 | Facsimile:  202.467.0539
7
   KARL G. NELSON (admitted *pro hac vice*)
8      knelson@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
9  2001 Ross Avenue, Suite 2100
   Dallas, TX  75201-2923
10 Telephone:  214.698.3100 | Facsimile:  214.571.2900

11 KATHERINE V.A. SMITH, SBN 247866
       ksmith@gibsondunn.com
12 HELEN AVUNJIAN, SBN 300284
       havunjian@gibsondunn.com
13 GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
14 Los Angeles, CA  90071-3197
   Telephone:  213.229.7000 | Facsimile:  213.229.7520

15 Attorneys for Defendants GOLDEN STATE FC LLC
   (now known as AMAZON.COM SERVICES LLC),
16 AMAZON.COM, INC. and AMAZON FULFILLMENT
   SERVICES, INC. (now known as AMAZON.COM
17 SERVICES LLC)

18                    UNITED STATES DISTRICT COURT

19                    EASTERN DISTRICT OF CALIFORNIA

20                         FRESNO DIVISION

| | |
|---|---|
| 21  JUAN TREVINO, CHRISTOPHER WARD, LINDA QUINTEROS, ROMEO PALMA, BRITTANY HAGMAN, ALBERTO GIANINI, and JUAN C. AVALOS, on behalf of themselves and all others similarly situated, | **LEAD CASE NO. 1:18-cv-00120-DAD (BAM)** Member Case No: 1:18-cv-00121-DAD-BAM Member Case No: 1:18-cv-00567-DAD-BAM Member Case No: 1:18-cv-01176-DAD-BAM Member Case No: 1:17-cv-01300-DAD-BAM |
| 23                Plaintiffs, | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| 24        v. | |
| 25  GOLDEN STATE FC LLC, a Delaware Limited Liability Company; AMAZON.COM INC., a Delaware Corporation, AMAZON FULFILLMENT CENTERS, INC. a Delaware Corporation, and Does 1 through 10, inclusive, | **Hearing:** Date:    April 17, 2020 Time:    9:00 AM Place:   Courtroom 8 Judge:   Honorable Barbara A. McAuliffe |
| 27                Defendants. | |

Defendants respectfully submit this Notice to advise the Court of two recent Ninth Circuit decisions that squarely rebut Plaintiffs' contentions that Article III standing is irrelevant to their wage statement claim under California Labor Code section 226 at the class certification stage, and which support Defendants' argument that there is no feasible mechanism to manage the individualized issues of injury associated with the wage statement claim (or any of Plaintiffs' other claims).

The first, *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 2020 WL 946973 (9th Cir. Feb. 27, 2020), attached as **Exhibit A**, holds that "every member of a class certified under Rule 23 must satisfy the basic requirements of Article III standing at the final stage of a money damages suit." *Id.* at *2. The Ninth Circuit also expressly endorsed Chief Justice Roberts' view that "'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *Id.* at *8 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring)). Any other rule would "directly contravene the Rules Enabling Act" because it would "transform the class action—a mere procedural device—into a vehicle for individuals to obtain money judgments in federal court even though they could not show sufficient injury to recover those judgments individually." *Id.* And because Article III standing must be proven at trial for all class members, the Ninth Circuit instructed that there must be "a mechanism for identifying class members who lack standing at the damages phase." *Id.* at *8 n.6. *Ramirez* also held that, in cases where the plaintiffs are claiming harm as a result of a procedural violation, courts must assess the "sever[ity]" of the claimed harm. *Id.* at *10. In *Ramirez*, for example, the plaintiffs brought claims under the Fair Credit Reporting Act because the defendant had incorrectly identified and labeled them as potential terrorists and drug traffickers on their credit reports, a procedural violation that the Ninth Circuit found to be "severe" and materially distinct from other violations such as failing to accurately report a zip code or similar "minor discrepanc[ies]." *Id.*

The second case, *Mays v. Wal-Mart Stores, Inc.*, 2020 WL 1277642 (9th Cir. Mar. 17, 2020) (unpublished), attached as **Exhibit B**, reversed an order certifying a class of employees bringing claims under California Labor Code section 226. The named plaintiff had argued, and the district court agreed, that she had standing to seek monetary relief on behalf of the class because she had been "confus[ed]" about whether her employer was Wal-Mart Stores, Inc., or a related entity, Wal-

NOTICE OF SUPPLEMENTAL AUTHORITY –
1:18-CV-00120-DAD (BAM)

Gibson, Dunn &
Crutcher LLP

1 Mart Associates, Inc. *Id.* at *2. The Ninth Circuit ruled that section 226's "deemed to suffer injury"

2 provision "does not automatically confer Article III standing." *Id.* The Ninth Circuit further

3 concluded that the plaintiff had failed to demonstrate a "meaningful nexus to the concrete interests

4 safeguarded by § 226" because the sole injury she claimed to have suffered—confusion—did not

5 have "any real-world consequences flowing, or even potentially flowing, from the violation." *Id.*

6 The Ninth Circuit also noted that the "relatively trivial nature of the violation" at issue did not "pose

7 a clear threat of harm." *Id.*

8          These cases confirm that Plaintiffs' proposed wage statement class should not be certified.

9 Defendants contended that class certification should be denied as to this class because thousands of

10 individualized inquiries would be required to determine whether anyone was actually injured by the

11 purported violation of Labor Code section 226. Dkt. 119 at 21–23. Plaintiffs responded in their reply

12 brief with arguments that the Ninth Circuit has now rejected. Specifically, Plaintiffs argued that

13 "since employees are 'deemed to suffer injury' for purposes of Section 226(e)(1), Defendants' Article

14 III argument is meritless and does not prevent certification." Dkt. 128 at 15. But *Ramirez* and *Mays*

15 make clear that Article III standing (a) must be proven at trial before any monetary award can be

16 made to any class members, and (b) demands a showing of actual injury even for claims brought

17 under section 226.

18          Because they erroneously believed that Article III had no application here, Plaintiffs have

19 made no attempt to show that there is a "mechanism" for determining at a class trial whether class

20 members suffered any actual harm, and what the severity of that harm was. *Ramirez*, 2020 WL

21 946973, at *8 n.6. Given that any harm resulting from the alleged wage statement violations (and, for

22 that matter, all of the alleged violations) would turn on the individual circumstances of each class

23 member, Defendants submit there is no feasible and manageable mechanism for proving Article III

24 standing for all class members at a class trial. *See* Dkt. 119 at 21–24.

25 Dated: March 26, 2020

26                                          GIBSON, DUNN & CRUTCHER LLP

27                                          By: */s/ Katherine V.A. Smith*
                                                    Katherine V.A. Smith
28

                                            Attorneys for Defendants

# Exhibit A

KeyCite Yellow Flag - Negative Treatment

Distinguished by Maria Calvillo, Plaintiff v. Experian Information Solutions, Inc., Defendant, D.Nev., March 23, 2020

951 F.3d 1008
United States Court of Appeals, Ninth Circuit.

Sergio L. RAMIREZ, Plaintiff-Appellee,

v.

TRANSUNION LLC, Defendant-Appellant.

No. 17-17244
|
Argued and Submitted February
14, 2019 San Francisco, California
|
Filed February 27, 2020

**Synopsis**

**Background:** Consumer who was denied credit based on credit report containing "terrorist alert" indicating he potentially matched name of person on United States government's list of Specially Designated Nationals (SDNs), that is, terrorists, drug traffickers, and others with whom persons in the United States are prohibited from doing business pursuant to Treasury Department's Office of Foreign Assets Control (OFAC) regulation, filed putative class action against consumer credit reporting agency, alleging that agency violated the Fair Credit Reporting Act (FCRA) by placing false OFAC alerts on consumers' credit reports and later sending misleading and incomplete disclosures about the alerts. Following certification of class, 301 F.R.D. 408, and denial of agency's motions to decertify class, 2016 WL 6070490, for summary judgment, 2017 WL 1133161, and for leave to file motion for reconsideration, 2017 WL 2403812, trial was held, after which jury returned a verdict in consumer's favor, awarding statutory and punitive damages of more than $60 million for three willful violations of the statute. Agency moved for judgment as matter of law, or in the alternative, for a new trial, remittitur, or an amended judgment. The United States District Court for the Northern District of California, Jacqueline Scott Corley, United States Magistrate Judge, 2017 WL 5153280, denied agency's motions. Agency appealed.

**Holdings:** The Court of Appeals, Murguia, Circuit Judge, held that:

as a matter of first impression in the circuit, every member of a class certified under Rule 23 must satisfy the basic requirements of Article III standing at the final stage of a money damages suit when class members are to be awarded individual monetary damages;

in the present case, each of the 8,185 class members had standing on the "reasonable procedures" claim;

each of the 8,185 class members had standing on the "disclosure" claim;

each of the 8,185 class members had standing on the "summary-of-rights" claim;

sufficient evidence supported the jury's willfulness findings;

class representative's claims were typical of the class's claims, as required for Rule 23 certification;

there was no basis to disturb the district court's statutory damages award of about $8 million class-wide, or $984.22 per class member; but

the punitive-damages award totaling approximately $52 million was excessive in violation of constitutional due process, and so would be reduced from $6,353.08 per class member to $3,936.88 per class member.

Affirmed in part, reversed and vacated in part, and remanded with instructions.

McKeown, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Attorneys and Law Firms**

Paul D. Clement (argued), Erin E. Murphy, Robert M. Bernstein, and Matthew D. Rowen, Kirkland & Ellis LLP, Washington, D.C.; Julia B. Strickland, Stephen J. Newman, Christine E. Ellice, and Jason Yoo, Stroock & Stroock & Lavan LLP, Los Angeles, California; for Defendant-Appellant.

James A. Francis (argued), John Soumilas, David A. Searles, and Lauren KW Brennan, Francis & Mailman P.C., Philadelphia, Pennsylvania; Andrew J. Ogilvie and Carol

McLean Brewer, San Francisco, California; for Plaintiff-
Appellee.

Andrew J. Pincus, Archis A. Parasharami, and Daniel E.
Jones, Mayer Brown LLP, Washington, D.C.; Steven P.
Lehotsky and Warren Postman, U.S. Chamber Litigation
Center Inc., Washington, D.C.; for Amicus Curiae Chamber
of Commerce of the United States of America.

Appeal from the United States District Court for the Northern
District of California, Jacqueline Scott Corley, Magistrate
Judge, Presiding, D.C. No. 3:12-cv-00632-JSC

Before: M. Margaret McKeown, William A. Fletcher, and
Mary H. Murguia, Circuit Judges.

Partial Concurrence and Partial Dissent by Judge McKeown

## OPINION

MURGUIA, Circuit Judge:

 *2 This case asks us to resolve whether a class of consumers
may sue and recover damages from a credit reporting
agency pursuant to the Fair Credit Reporting Act ("FCRA"),
where the agency—aware that its practice was unlawful
—incorrectly placed terrorist alerts on the front page of
the consumers' credit reports and subsequently sent the
consumers confusing and incomplete information about the
alerts and how to get them removed.

The United States Department of the Treasury's Office
of Foreign Assets Control ("OFAC") maintains a list of
Specially Designated Nationals ("SDNs"), i.e., individuals
who are prohibited from transacting business in the United
States for national security reasons. Because merchants who
transact with an SDN can face harsh fines, TransUnion LLC
("TransUnion"), one of the three largest credit reporting
agencies, saw a business opportunity in developing a product
for its clients that "matched" consumers' names to individuals
on the OFAC list.

In producing these purported matches, TransUnion
coordinated with a third-party vendor and used a software
that conducted basic first-and-last-name searches—despite
having the capability to conduct more accurate searches
and despite having been put on notice by another circuit
court in 2010 that this practice violated the FCRA. As a
result, TransUnion inaccurately added OFAC alerts to the

front page of the credit reports of thousands of consumers.
When consumers began discovering the alerts and trying to
have them removed, TransUnion both sent them confusing
information falsely suggesting that the alerts had been
removed and withheld information about how to dispute the
alerts. TransUnion's practice triggered significant concern
among affected consumers, such that a number of them
contacted the Department of the Treasury directly to inquire
about the terrorist labels.

The consumers brought this class action against TransUnion
pursuant to the FCRA, and a jury assessed $60 million
in damages for three willful violations of the statute. In
this appeal, TransUnion claims that the verdict cannot
stand because only Sergio Ramirez, the representative
plaintiff, suffered a concrete and particularized injury as
a result of TransUnion's unlawful practice. According to
TransUnion, the other thousands of class members whose
credit reports contained the inaccurate terrorist alerts and
received the confusing and incomplete mailings did not
suffer the irreducible constitutional minimum showing of
harm that Article III standing requires. Ramirez, on the
other hand, argues that the class members do not need to
demonstrate standing at all because, in a class action, only the
representative plaintiff must have standing. The issue of who
must show standing in a class action at the final stage of a
damages suit is a question of first impression in this circuit.

For the reasons explained below, we hold that every member
of a class certified under Rule 23 must satisfy the basic
requirements of Article III standing at the final stage of
a money damages suit when class members are to be
awarded individual monetary damages.[1] Therefore, the
dispositive question in this case is whether each of the 8,185
class members had standing on each of the class claims.
We conclude that they did. We also reject TransUnion's
arguments regarding the sufficiency of the evidence, Rule
23 certification, and statutory damages. However, we hold
that the punitive damages award is excessive in violation of
constitutional due process. We reduce the punitive-damages
award from $6,353.08 per class member to $3,936.88 per
class member, but otherwise affirm the verdict and judgment.

[1]     Our holding does not alter the showing required at the
        class certification stage or other early stages of a case,
        and it does not apply to cases involving only injunctive
        relief.

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1754, 2020 Daily Journal D.A.R. 1600

Case 1:18-cv-00120-DAD-BAM   Document 140   Filed 03/26/20   Page 7 of 29

## I. Background

### A. Factual History

 **\*3**  In February 2011, Sergio Ramirez went to a Nissan car dealership with his wife and father-in-law to purchase a car. After the Ramirezes selected a car and negotiated the terms, the dealership ran a joint credit check on Ramirez and his wife. But once the dealership obtained the credit reports, the salesman told Ramirez that Nissan would not sell the car to Ramirez because he was on "a terrorist list."

The credit report had been prepared by TransUnion, one of the nation's three largest consumer reporting agencies ("CRA"). The report contained the following statement on the first page: "\*\*\*OFAC ADVISOR ALERT - INPUT NAME MATCHES NAME ON THE OFAC DATABASE[.]" The report also listed the names and birthdates of the two prohibited Specially Designated Nationals who purportedly "matched" Ramirez: Sergio Humberto Ramirez Aguirre (born 11/22/1951) and Sergio Alberto Cedula Ramirez Rivera (born 01/14/196\*). The report indicated that Ramirez's middle initial was "L" and his birth year was 1976.

The salesman refused to take further steps to verify whether Ramirez was in fact on the OFAC list. He also refused to provide Ramirez a copy of his credit report, instead recommending to Ramirez that he contact TransUnion directly. Eventually, however, the salesman agreed to sell the car to Ramirez's wife. Ramirez's wife completed a credit application on her own behalf, and, after another hour, she was able to purchase the car.

Ramirez testified that he was embarrassed, shocked, and scared when he learned his name was on a terrorist watch list. Ramirez was also disappointed and embarrassed that he was unable to purchase the car because he and his wife always made major purchases jointly. Confused and not knowing what to do, Ramirez began researching what the alert meant and how to have it removed. Ramirez first called the Department of the Treasury, but they advised him that he would need to contact TransUnion. When Ramirez called TransUnion, he was repeatedly told that there was no OFAC alert on his credit report. Ultimately, Ramirez requested a copy of his credit report so he could verify whether it contained an OFAC alert.

On February 28, 2011, TransUnion sent Ramirez a copy of his credit report. The first page of the mailing stated:

> Enclosed is the TransUnion Personal Credit Report that you requested. As a trusted leader in the consumer credit information industry, TransUnion takes the accuracy of your credit information very seriously. We are committed to providing the complete and reliable credit information that you need to participate in everyday transactions and purchases.
>
> If you believe an item of information to be incomplete or inaccurate, please alert us immediately. We will investigate the data and notify you of the results of our investigation.

The remainder of the page included information about and instructions for an online request for investigation. The following pages contained a copy of Ramirez's credit report, information regarding how to dispute inaccurate information, and a "Summary of Rights" under the FCRA. The credit report contained no mention of OFAC. Ramirez was confused by the report's lack of any information regarding OFAC, but he thought perhaps the problem had been resolved.

The next day, on March 1, 2011, TransUnion sent Ramirez a separate letter (the "OFAC Letter"). The OFAC Letter stated:

> Thank you for contacting TransUnion. Our goal is to maintain complete and accurate information on consumer credit reports.
>
>  **\*4**  Our records show that you recently requested a disclosure of your TransUnion credit report. That report has been mailed to you separately. As a courtesy to you, we also want to make you aware that the name that appears on your TransUnion credit file "SERGIO L RAMIREZ" is considered a potential match to information listed on the United States Department of Treasury's Office of Foreign Asset Control ("OFAC") Database.
>
> The OFAC Database contains a list of individuals and entities that are prohibited by the U.S. Department of Treasury from doing business in or with the United States. Financial institutions are required to check customers' names against the OFAC Database, and if a potential name match is found, to verify whether their potential customer is the person on the OFAC Database. For this reason, some financial institutions may ask for your date of birth, or they may ask to a see a copy of a government-issued form of identification .... Some financial institutions will search names against this database themselves, or they may ask

another company, such as TransUnion, to do so on their behalf. We want you to know that this information may be provided to such authorized parties.

The OFAC record that is considered a potential match to the name on your credit file is:

[OFAC records for the two prohibited SDNs who purportedly matched Ramirez, which include first, middle, and last names, dates of birth, and passport information]

For more details regarding the OFAC Database, please visit [the U.S. Department of the Treasury's website].

If you have additional questions or concerns, you can contact TransUnion at [phone number and mailing address].

Unlike the credit-report mailing, there was no summary-of-rights form attached to the OFAC Letter.

Ramirez testified that he was confused by the two mailings. The lack of any OFAC information in the credit-report mailing suggested the alert had been removed, but the OFAC Letter mailing suggested otherwise. Ramirez also did not know how to remedy the issue because the OFAC Letter did not include instructions for initiating a dispute. Concerned about possible consequences of the OFAC match, Ramirez canceled an international vacation he had planned with his family.

Finally, Ramirez consulted with a lawyer and, at the lawyer's advice, wrote a letter to TransUnion in March 2011 requesting that the OFAC alert be removed from his report. TransUnion responded in writing that the alert had been removed.

Ramirez was not the only consumer who TransUnion incorrectly labeled as a prohibited SDN. TransUnion sent the same OFAC Letter to 8,184 other consumers who also requested copies of their credit reports between January 2011 and July 2011. In February 2012, Ramirez sued TransUnion on behalf of himself and the 8,184 other consumers who were falsely labeled as prohibited SDNs. Ramirez alleged that TransUnion violated the FCRA by placing the false OFAC alerts on their credit reports and later sending misleading and incomplete disclosures about the alerts.

**B. TransUnion's "OFAC Advisor" Product**

The class's claims trace back to TransUnion's launch of a new product in 2002 and its erroneous belief that the new product was exempt from the FCRA. TransUnion saw a business opportunity because its clients—who purchase consumer credit reports from TransUnion because they are deciding whether to offer credit to consumers—are legally obligated to ensure they are not offering credit to a prohibited SDN appearing on the OFAC list. TransUnion therefore developed a product it called "OFAC Advisor," which added an alert to a consumer's credit report indicating whether the consumer was a prohibited SDN on the OFAC list.

**\*5** TransUnion obtained the information about whether consumers were OFAC matches from a third-party company, Accuity, Inc. Accuity's software conducted a "name-only" search, running a consumer's first and last name against the names on the OFAC list. A search would result in a match if the consumer's first and last name were either identical or similar to a name on the OFAC list (*e.g.*, "Cortez" would match with "Cortes"). [2]

> [2]
>
> In collecting other types of data for use on consumer reports—such as tax liens or bankruptcy judgments—TransUnion used at least one additional identifier other than the consumer's name (*e.g.*, address, date of birth, or social security number). OFAC information was the only consumer-report data that TransUnion collected using name alone.

When TransUnion first began offering the OFAC Advisor product, it determined that the OFAC alerts being placed on consumer credit reports were exempt from the FCRA, including the FCRA's requirement that TransUnion "follow reasonable procedures to assure maximum possible accuracy of the information" it placed on consumer credit reports. 15 U.S.C. § 1681e(b). Specifically, TransUnion determined the OFAC alerts were not governed by the FCRA because the OFAC list was not stored in TransUnion's database; the data was stored in a separate file and software supplied by TransUnion's third-party vendor, Accuity. Therefore, TransUnion did not follow its normal procedures to ensure accuracy.

TransUnion also adopted a policy of not disclosing OFAC matches to affected consumers when the consumers requested a copy of their credit reports. Although TransUnion received a number of consumer complaints after it launched OFAC Advisor and adopted these policies, TransUnion remained mostly unscathed for these practices until 2005 when a consumer sued.

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1754, 2020 Daily Journal D.A.R. 1600

Case 1:18-cv-00120-DAD-BAM Document 140 Filed 03/26/20 Page 9 of 29

### C. The *Cortez* Litigation

In 2005, Sandra Cortez, a consumer, sued TransUnion in the Eastern District of Pennsylvania under circumstances similar to Ramirez's. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 696–706 (3d Cir. 2010). Cortez attempted to purchase a car but was delayed for hours because TransUnion sent the car dealership a credit report with a false OFAC alert on it. *Id.* at 697–99. When Cortez attempted to resolve the issue, TransUnion repeatedly told her that there was no OFAC alert on her report and refused to investigate or remove the alert. *Id.* at 699–700.

A jury found in Cortez's favor on four FCRA claims: (1) TransUnion negligently failed to follow reasonable procedures to ensure maximum possible accuracy in producing Cortez's credit report, in violation of 15 U.S.C. § 1681e(b); (2) TransUnion willfully failed to provide Cortez all information in her file despite her requests, in violation of § 1681g(a); (3) TransUnion willfully failed to reinvestigate the OFAC alert after Cortez informed TransUnion of the false alert, in violation of § 1681i(a); and (4) TransUnion willfully failed to note Cortez's dispute on subsequent reports, in violation of § 1681i(c). *Id.* at 705. The jury awarded Cortez $50,000 in actual damages and $750,000 in punitive damages. *Id.* The district court remitted the punitive damages to $100,000, but otherwise upheld the verdict. *Id.* at 705–06.

On appeal, TransUnion argued that OFAC information was not covered by the FCRA because it was not part of the "consumer report" as defined by the statute. *Id.* at 706.[3] In August 2010, the Third Circuit flatly rejected this argument, noting that it was "difficult to imagine an inquiry more central to a consumer's 'eligibility' for credit than whether federal law prohibits extending credit to that consumer in the first instance." *Id.* at 707–08 (quoting 15 U.S.C. § 1681a(d)(1)). The court upheld the jury's verdict on the reasonable procedures claim, explaining: "The jury could reasonably conclude that [TransUnion] could have taken steps to minimize the possibility that it would erroneously place an OFAC alert on a credit report, such as checking the birth date of the consumer against the birth date of the person on the SDN List." *Id.* at 709.

[3]  Under the FCRA, a consumer report is defined as "any written, oral, or other communication of any information by a [CRA] bearing on a consumer's credit

worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit, employment, or another purpose authorized by the statute. 15 U.S.C. § 1681a(d)(1). We use the terms "consumer report" and "credit report" interchangeably in this Opinion.

**\*6** With respect to Cortez's second claim, that TransUnion willfully failed to disclose all of the information in Cortez's file when she requested it, TransUnion argued that OFAC information was not part of the consumer "file" because TransUnion did not store OFAC information in its usual database; rather, it contracted with Accuity to store the information separately. *Id.* at 711. Again, the Third Circuit emphatically rejected this argument: "We do not believe that Congress intended to allow credit reporting companies to escape the disclosure requirement in § 1681a(g) by simply contracting with a third party to store and maintain information that would otherwise clearly be part of the consumer's file and is included in a credit report." *Id.*

Finally, the court upheld Cortez's reinvestigation and dispute claims, and affirmed the district court's rulings as to damages. *Id.* at 712–24. However, the court expressed concern over the district court's reduction of the punitive-damages award because "the record certainly support[ed] a jury becoming 'incensed' over [TransUnion's] 'insensitivity' to Cortez's claim[.]" *Id.* at 718 n.37.

### D. TransUnion's OFAC Practices After the *Cortez* Litigation

After being slammed with an $800,000 jury verdict (subsequently remitted to $150,000) in *Cortez*, TransUnion made surprisingly few changes to its practices regarding OFAC alerts. In November 2010, TransUnion changed the language of the OFAC alert used on credit reports. Instead of stating that a consumer was a "match" to the OFAC list, the reports would state that a consumer was a "potential match." TransUnion also made some adjustments to its matching algorithm, including requiring an exact match between first and last names, reducing the false-positive rate from about 5 percent to about 0.5 percent.[4] TransUnion requested additional software enhancements from Accuity, but these were not implemented until 2013.

4     TransUnion presented no data showing that any of its
      name matches through OFAC Advisor were correct. In
      other words, TransUnion could not confirm that a single
      OFAC alert sold to its customers was accurate.

Within the timeframe of the *Cortez* litigation, TransUnion received warnings about its OFAC practices from officials at the Department of the Treasury's OFAC. In an October 2010 letter to TransUnion, OFAC officials noted that they continued to hear from TransUnion customers and individual consumers who had been adversely affected by false OFAC alerts on TransUnion credit reports. OFAC officials expressed concern that a product "that does not include rudimentary checks to avoid false positive reporting can create more confusion than clarity and cause harm to innocent consumers." OFAC officials were particularly worried by OFAC alerts being "disseminated broadly in conjunction with credit reports."

As a result of these warnings from OFAC officials and the *Cortez* litigation, TransUnion also changed how it communicated with consumers about the OFAC alerts on their credit reports. Beginning in January 2011, when consumers flagged as OFAC matches requested copies of their credit reports, TransUnion would send them two mailings: (1) the consumer's credit report *with the OFAC alert redacted*, and (2) a separately mailed OFAC Letter. The OFAC Letters were sent within one day of the credit reports. These letters were substantially similar to the one described above that Ramirez received. TransUnion did not include a summary-of-rights form in the mailings containing the OFAC Letters. In July 2011, TransUnion finally stopped sending OFAC Letters and began including OFAC alerts directly on the credit reports it sent to consumers.

### E. Procedural History

In February 2012, Ramirez filed a putative class action against TransUnion alleging that TransUnion's OFAC practices violated multiple provisions of the FCRA. The district court certified a class action under [Rule 23 of the Federal Rules of Civil Procedure](#) over TransUnion's objection and denied TransUnion's motion to decertify the class.

**\*7**  The class included "all natural persons in the United States and its Territories to whom TransUnion sent a letter similar in form to the March 1, 2011 [OFAC Letter] TransUnion sent to [Ramirez] ... from January 1, 2011-July 26, 2011." In other words, everyone in the class: (1) was

falsely labeled by TransUnion's name-only software as a potential OFAC match; (2) requested a copy of his or her credit report from TransUnion; and (3) in response, received a credit-report mailing with the OFAC alert redacted and a separate OFAC Letter mailing with no summary of rights.

Based on TransUnion's records, the parties stipulated that there were 8,185 consumers, including Ramirez, who fell within this class. Out of those 8,185, the records reflected that 1,853 had their credit reports requested by a potential credit grantor during the class period (January 2011 to July 2011). TransUnion did not furnish credit reports to third parties during the class period for the remaining 6,332 class members.

The case proceeded to a jury trial on three claims. First, the class alleged that TransUnion willfully failed to follow reasonable procedures to assure accuracy of the OFAC alerts because TransUnion used rudimentary name-only matching software without any additional checks to avoid false positives. *See* [15 U.S.C. § 1681e(b)](#). Second, the class alleged that TransUnion willfully failed to disclose to the class members their entire credit reports by excluding the OFAC alerts from the reports. *See id.* § 1681g(a)(1). Third, the class alleged that TransUnion willfully failed to provide a summary of rights as required under the FCRA when it sent consumers the OFAC Letters. *See id.* § 1681g(c)(2).

The jury found in favor of the class on all three claims and awarded each class member $984.22 in statutory damages (about $8 million classwide) and $6,353.08 in punitive damages (about $52 million classwide). TransUnion filed a renewed motion for judgment as a matter of law, and moved alternatively for a new trial, remittitur, or an amended judgment, all of which the district court denied. TransUnion appealed, raising four arguments. We have jurisdiction pursuant to [28 U.S.C. § 1291](#). We address each argument in turn.

### II. Article III Standing

TransUnion first argues that the verdict cannot stand because none of the class members—other than Ramirez—had standing under Article III of the United States Constitution. We review the district court's rulings regarding standing *de novo*. [*Fair Hous. of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002)](#).

Standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional minimum" of standing requires a plaintiff to establish three elements: (1) "the plaintiff must have suffered an 'injury in fact' " that is "concrete and particularized" and "actual or imminent;" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 560–61, 112 S.Ct. 2130 (citations omitted).

### A. Who Needs Standing

The parties first dispute *who* must demonstrate standing to recover damages—only the class representative (i.e., only Ramirez) or every class member. This court has previously held that only the representative plaintiff need allege standing at the motion to dismiss and class certification stages, *see In re Zappos.com, Inc.*, 888 F.3d 1020, 1028 n.11 (9th Cir. 2018); *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015),[5] and even at the final judgment stage in class actions involving only injunctive relief, *see Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *Casey v. Lewis*, 4 F.3d 1516, 1519–20 (9th Cir. 1993). But we have never addressed the question of who must have standing at the final stage of a money damages suit when class members are to be awarded individual monetary damages.

[5]   See also *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 362 (3d Cir. 2015) (holding that "unnamed, putative class members need not establish Article III standing" in damages action at class certification stage).

**\*8** We address that question today and hold that each member of a class certified under Rule 23 must satisfy the bare minimum of Article III standing at the final judgment stage of a class action in order to recover monetary damages in federal court. Although this is an issue of first impression for this Court, our holding today clearly follows from Supreme Court precedent, as well as the fundamental nature of our judicial system.[6]

[6]   Our holding does not apply to class actions involving only injunctive relief. Nor does our holding alter the showing required at the class certification stage or other early stages of a case. We address only the circumstances

of this case: court-awarded, individual monetary awards for class members at the final judgment stage of a class action. We note that, although the standing inquiry in the early stages of a case focuses on the representative plaintiffs, district courts and parties should keep in mind that they will need a mechanism for identifying class members who lack standing at the damages phase. *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) ("[F]ortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." (citing 1 W. Rubenstein, Newberg on Class Actions § 2:3 (5th ed. 2019))).

The Supreme Court has held, albeit in a different context, that all parties seeking to recover a monetary award in their own name must show Article III standing. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, ––– U.S. ––––, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017) (holding that "an intervenor of right" under Federal Rule of Civil Procedure 24(a)(2) "must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing[,]" including where "both the plaintiff and the intervenor seek separate money judgments in their own names."); *see also Tyson Foods, Inc. v. Bouaphakeo*, ––– U.S. ––––, 136 S. Ct. 1036, 1053, 194 L.Ed.2d 124 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. The Judiciary's role is limited 'to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm.' " (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996))).

The same rule applies here. To hold otherwise would directly contravene the Rules Enabling Act, because it would transform the class action—a mere procedural device—into a vehicle for individuals to obtain money judgments in federal court even though they could not show sufficient injury to recover those judgments individually. *See* 28 U.S.C. § 2072(b) ("[Rules of procedure] shall not abridge, enlarge or modify any substantive right.").

### B. Merits of the Standing Inquiry

Having concluded that each class member must have standing to recover damages, we turn to the dispositive and more difficult question in this case: Did each of the 8,185 class

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1800

Case 1:18-cr-00120-DAD-BAM Document 140 Filed 03/26/20 Page 12 of 29

members have standing? TransUnion challenges only the first standing requirement—injury in fact. Because a "plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006), we address standing for each of the class's three claims. Plaintiffs bore the burden of proving standing through evidence at trial. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

### 1. Reasonable Procedures Claim

**\*9** Under § 1681e(b) of the FCRA, "[w]henever a [CRA] prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). The class's first claim is that TransUnion willfully failed to follow reasonable procedures to assure maximum possible accuracy when it collected OFAC information using rudimentary name-only searches and placed the inaccurate information on the class members' credit reports without further verification.

TransUnion argues that, to have suffered a concrete injury from the § 1681e(b) violation, each class member must show that TransUnion disclosed his or her credit report to a third party. In other words, TransUnion argues no injury results from a false OFAC alert until someone other than TransUnion and the consumer sees it. For support, TransUnion relies on the Supreme Court's decision in *Spokeo, Inc. v. Robins* (*Spokeo II*), —— U.S. ——, 136 S. Ct. 1540, 194 L.Ed.2d 635 (2016).

Prior to *Spokeo II*, we held that the violation of a "statutory right"—including an FCRA violation—"is usually a sufficient injury in fact to confer standing" without any showing of actual harm. *See Robins v. Spokeo, Inc.* (*Spokeo I*), 742 F.3d 409, 412 (9th Cir. 2014), *vacated and remanded*, —— U.S. ——, 136 S. Ct. 1540, 194 L.Ed.2d 635 (2016). The Supreme Court granted certiorari and reversed, explaining that "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo II*, 136 S. Ct. at 1547–48 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549.

The Supreme Court recognized, however, that an injury may still be concrete even if intangible. *Id.* And there is sufficient injury in fact when a defendant's statutory violation creates a "risk of real harm" to a plaintiff's concrete interest. *Id.* In determining whether an intangible harm constitutes an injury in fact, we look to historically recognized injuries and Congress's judgment. *Id.* We look to history to determine "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* And we are guided by Congress's judgment because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements[.]" *Id.*

*Spokeo* also involved a consumer's claim against a CRA under § 1681e(b). Robins, a consumer, alleged that Spokeo, a CRA that operated a people-search website, published a profile about him on its website that contained inaccurate information regarding his age, marital status, wealth, employment, and education. *Robins v. Spokeo, Inc.* (*Spokeo III*), 867 F.3d 1108, 1111 (9th Cir. 2017). With respect to injury in fact, Robins alleged that the presence of the false information on Spokeo's website "harmed his employment prospects at a time when he was out of work" and caused him emotional distress. *Id.*

The Supreme Court declined to decide whether Robins sufficiently alleged a concrete injury, but it provided the following guidance:

> On the one hand, Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk. On the other hand, Robins cannot satisfy the demands of Article III by alleging a bare procedural violation. A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a [CRA] fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect

zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*10 *Spokeo II*, 136 S. Ct. at 1550.

On remand, we held that Robins alleged a material risk of harm to his concrete interests sufficient to satisfy Article III standing. *Spokeo III*, 867 F.3d at 1118. We adopted a two-part inquiry for determining whether the violation of a statutory right constitutes a concrete injury: "(1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged ... actually harm, or present a material risk of harm to, such interests." *Id.* at 1113.

In Robins's case, we held at step one that § 1681e(b) was enacted to protect consumers' concrete interests in avoiding the very real-world harms that result from inaccurate credit reporting—such as the inability to obtain credit and employment and "the uncertainty and stress" that consumers experience when they discover inaccurate information in their credit reports. *Id.* at 1114. We noted that "the interests that [the] FCRA protects also resemble other reputational and privacy interests that have long been protected in the law." *Id.* At step two, we concluded that Robins had been exposed to a material risk of harm to that concrete interest because Spokeo published inaccurate information on its website that was far more material than a mere incorrect zip code. *Id.* at 1116–17.

Applying the test to the facts of this case, we conclude that all 8,185 class members suffered a material risk of harm to their concrete interests protected by § 1681e(b) as a result of TransUnion's failure to follow reasonable procedures to assure maximum possible accuracy of OFAC information.

Step one is clear. Congress enacted the FCRA, including § 1681e(b), "to protect consumers' concrete interests." *Id.* at 1113. "[G]iven the ubiquity and importance of consumer reports in modern life—in employment decisions, in loan applications, in home purchases, and much more—the real-world implications of material inaccuracies in those reports seem patent on their face." *Id.* at 1114. The FCRA's reasonable procedures requirement is particularly important because the "threat to a consumer's livelihood is caused by the very existence of inaccurate information in his credit report

and the likelihood that such information will be important to one of the many entities who make use of such reports[.]" *Id.* at 1114; *see also* 15 U.S.C. § 1681(a)(4) (explaining that Congress enacted the FCRA "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy"). "Courts have long entertained causes of action to vindicate intangible harms caused by certain untruthful disclosures about individuals, and we respect Congress's judgment that a similar harm would result from inaccurate credit reporting." *Spokeo III*, 867 F.3d at 1115.

At step two, standing is also clear for all class members for a number of reasons. First, the nature of the inaccuracy is severe. TransUnion inaccurately identified and labeled all class members as potential terrorists, drug traffickers, and other threats to national security; it did not inaccurately report a zip code or a minor discrepancy. As a result of its careless procedures for identifying OFAC "matches," TransUnion sent all class members a letter informing them that they were considered potential SDNs. This practice ran a real risk of causing the uncertainty and stress that Congress aimed to prevent in enacting the FCRA. *See Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012) ("The FCRA permits 'recovery for emotional distress and humiliation.'" (quoting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)).

*11 In *Spokeo III*, we stated that it was "clear" that the plaintiff was exposed to a material risk of harm because a CRA made inaccurate information about his age, marital status, education, and wealth available to third parties. 867 F.3d at 1117. The risk here was far graver. The OFAC labels are the type of information that risks triggering significant concern, confusion, and even potential contact with a federal intelligence agency. And the record here shows this risk is far from hypothetical; indeed, the Department of the Treasury informed TransUnion that it "continue[d]" to hear from a number of concerned individuals who had been inaccurately labeled as OFAC matches by TransUnion, and that TransUnion's practice was "creating unnecessary confusion" among affected consumers. As Ramirez testified at trial: "[I]if somebody tells you you're on a terrorist list, what are you going to do?"

Second, TransUnion engaged a third-party vendor—Accuity, Inc.—to develop the software and database containing the underlying information for the OFAC alerts. As a result, TransUnion and Accuity communicated about the database

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1800

Case 1:18-cv-00120-DAD-BAM Document 140 Filed 03/26/20 Page 14 of 29

information and OFAC matches. And TransUnion concedes that OFAC matches were not housed by TransUnion; the OFAC list was stored in a separate database operated and maintained by Accuity. It is precisely for this reason that TransUnion purportedly determined that the OFAC alerts were not governed by the FCRA. [7] This type of access to and information sharing with a third party certainly compounds the risk of harm to all class members' privacy and reputational interests. The practice created a significant risk that third parties other than the affected consumers would learn about the inaccurate and highly embarrassing OFAC matches.

[7]     In an effort to avoid the FCRA's reach to its unlawful conduct, TransUnion similarly argued in *Cortez* that the OFAC information was maintained and stored by Accuity and, therefore, the information was not part of consumers' "file[s]" in TransUnion's control. *See Cortez*, 617 F.3d at 711. The Third Circuit unequivocally rejected that argument. *Id.* at 711 ("We do not believe that Congress intended to allow credit reporting companies to escape the disclosure requirement in § 1681a(g) by simply contracting with *a third party* to store and maintain information that would otherwise clearly be part of the consumer's file and is included in a credit report.") (emphasis added); *see also id.* at 703 (noting that "TransUnion decided not to include the underlying information for its OFAC product in TransUnion's own database" and "decided to use Accuity rather than maintain the information itself.").

Finally, TransUnion—one of the nation's largest consumer reporting agencies—made all class members' reports available to potential creditors or employers at a moment's notice, even without the consumers' knowledge in some instances. *See* 15 U.S.C. §§ 1681b(b)(2)(A) (requiring notice to the consumer only when a credit report is requested for employment purposes), 1681b(c)(1)(B) (allowing credit reports to be furnished before the consumer has initiated a transaction in certain circumstances). Credit reports exist for the very purpose of being disseminated to third parties. Like in *Spokeo*, where false information was made available to third parties on the Internet, TransUnion created a risk of harm to all class members by allowing third parties to readily access the reports.

Indeed, the 1,853 class members whose reports were disseminated to potential creditors have shown even greater injuries because we know those third parties, which are in the business of denying or approving credit-related requests, actually accessed those class members' reports containing the false OFAC alerts. It is difficult to conceive of information

on a credit report that is more damaging to a consumer than a statement that the consumer is potentially prohibited from transacting business in the United States because the consumer is a criminal or a threat to national security. This is not to mention the reputational harm that inevitably results from disseminating this information to a potential creditor.

**\*12**  As to the remaining 6,332 class members, TransUnion argues these class members cannot show any injury because their reports were not disseminated to third parties. However, this reading of the injury-in-fact requirement is too narrow. True, *Spokeo III* did not "consider whether a plaintiff would allege a concrete harm if he alleged only that a materially inaccurate report about him was prepared but never published." 867 F.3d at 1116 n.3 (emphases omitted). But that situation is not this case. Here, the fact that TransUnion made the reports available to numerous potential creditors and employers—coupled with the highly sensitive and distressing nature of the OFAC alerts disclosed to the consumers, the risk of third-party access TransUnion created through its dealings with Accuity, and the federal government's awareness of the alerts—is sufficient to show a material risk of harm to the concrete interests of all class members. [8]

[8]     Our dissenting colleague argues that the risk of harm to class members other than Ramirez is too speculative. According to the dissent, "counsel presented no evidence about the consequences of dissemination of the reports for any class member other than Ramirez" and could have offered "expert testimony, representative class members, and credit agency protocol to fill this gap." To the extent the dissent suggests that there is no evidence about dissemination of any of the class members' reports other than Ramirez's, that is inaccurate; indeed, as the dissent recognizes, the parties stipulated that at least a portion of the class had their credit reports requested by a potential credit grantor. As noted above, this evidence coupled with other evidence shows that the remainder of the class members were subject to a material risk of harm. To the extent the dissent suggests that class counsel had to show that all class members suffered adverse consequences as a result of dissemination of their reports, this is also incorrect. *See Spokeo III*, 867 F.3d at 1118 ("[I]n the context of [the] FCRA, [an] intangible injury is itself sufficiently concrete. It is of no consequence how likely [the plaintiff] is to suffer *additional* concrete harm as well (such as the loss of a specific job opportunity).").
The dissent offers no support for the proposition that counsel was required to introduce expert testimony and

the other type of evidence that the dissent identifies, precisely because none exists.

This case is distinguishable from *Owner-Operator Independent Drivers Ass'n, Inc., et al., v. United States Department of Transportation et al.*, 879 F.3d 339 (D.C. Cir. 2018), a case relied on heavily by the dissent. There, the plaintiffs argued that they were injured "by the mere existence of inaccurate information" in a database operated by the Federal Motor Carrier Safety Administration, but they conceded that their information was not at risk of dissemination, and record showed that any risk of future disclosure of inaccurate information was "virtually eliminated by the Department's adoption of an interpretive rule." *Id.* at 343, 346. The court held that, although "it is possible that the mere existence of inaccurate information in a government database could cause concrete harm depending on how that information is to be used," no such harm or risk of future harm existed because the record showed there was no risk of disclosure for the absent class members. *Id.* at 347. Here, by contrast, the class's claim of injury does not simply rest on TransUnion's maintenance of an inaccurate database, with conclusive evidence that there is no risk of dissemination. [9]

[9] The other out-of-circuit cases cited by the dissent are similarly distinguishable. *See Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 912 (7th Cir. 2017) ("Had [plaintiff] reason to believe the company intends to release any of that information or cannot be trusted to retain it, he would have grounds for obtaining injunctive relief; but he doesn't even argue that there is a *risk* of such leakage."); *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) (holding that plaintiff had no standing to sue under the Cable Communications Policy Act, where he merely alleged that defendant failed to destroy plaintiff's personally identifiable information and retained certain information longer than the company should have kept it). This case is also distinguishable from *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776 (9th Cir. 2018). *Bassett* involved a vendor that printed the expiration date of the plaintiff's credit card on the plaintiff's receipt for a one-time transaction, in violation of another FCRA provision. *Id.* at 777. There was no material risk of harm because only the cardholder himself ever saw the receipt. *Id.* at 783. This case involves credit reports, not receipts. Credit reports, unlike receipts, exist for the purpose of being disseminated to third parties. Moreover, the risk of harm is much more direct here. An OFAC alert placed on a credit report runs an almost inevitable risk of reputational harm, emotional distress, and/or denial of credit or employment if disclosed to a third party—real-world harms. In contrast, printing

the expiration date of a credit card does not pose such inevitable risk; rather, harm would only materialize if a number of other contingencies occurred. *Bassett* also did not involve a third-party vendor with access to the inaccurate information or evidence that the defendant's practice created confusion and interaction with an intelligence agency among consumers receiving the inaccurate information. This case is more analogous to *Spokeo III*, 867 F.3d 1108, and *Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) (holding that the plaintiff had standing where credit reporting agency included a debt the plaintiff did not owe in the plaintiff's consumer report).

**\*13** We are not faced with a mere technical or procedural FCRA violation here. There may be a case where the nature of the inaccurate information is such that no risk of harm arises until the credit report information of all class members is actually disseminated to a third party, but this is not it. On the facts of this case, we hold that a real risk of harm arose when TransUnion prepared the inaccurate reports and made them readily available to third parties, and certainly once TransUnion sent the inaccurate information to the class members and some class members' reports were disseminated to third parties. This risk of harm was directly caused by TransUnion's failure to follow reasonable procedures to ensure maximum possible accuracy of its OFAC information, and an award of damages would redress the harm caused by the risk.

## 2. Disclosure and Summary-of-Rights Claims

The class's second and third claims were that TransUnion failed to: (a) disclose that the class members had been identified as potential OFAC matches when the consumers requested their credit reports, in violation of § 1681g(a); and (b) include a summary-of-rights form when TransUnion mailed the separate OFAC Letters, in violation of § 1681g(c)(2). Although we must analyze standing on a claim-by-claim basis, the injuries produced by these two violations are closely intertwined.

Subsections (a) and (c)(2) work together to protect consumers' interests in having access to the information in their credit reports upon request and understanding how to correct inaccurate information in their credit reports upon receipt. 15 U.S.C. §§ 1681g(a), (c)(2). These interests can only be fulfilled together; one without the other is meaningless. And they go to the core of Congress's purpose in enacting the FCRA: "to protect consumers from

the transmission of inaccurate information about them[.]" *Guimond*, 45 F.3d at 1333; *see also Gillespie v. Equifax Info. Servs., LLC*, 484 F.3d 938, 941 (7th Cir. 2007) ("A primary purpose of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under § 1681i.... In writing § 1681g(a)(1), Congress requires disclosure that is both 'clearly and accurately' made. An accurate disclosure of unclear information defeats the consumer's ability to review the credit file, eliminating a consumer protection procedure established by Congress under the FCRA."). We have previously acknowledged that the rights created by the FCRA to accomplish this purpose "resemble other reputational and privacy interests that have long been protected in the law." *Spokeo III*, 867 F.3d at 1114.

These are not mere procedural or technical requirements. They protect consumers' concrete interest in accessing important information about themselves and understanding how to dispute inaccurate information before it reaches potential creditors. *Cf. Syed v. M-I, LLC*, 853 F.3d 492, 499–500 (9th Cir. 2017) (holding that the FCRA provision requiring prospective employers to obtain a consumer's consent before obtaining a credit report in a standalone document protected a concrete informational and privacy interest); *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 490–93 (9th Cir. 2019) (holding that every violation of the FCRA provision that prohibits obtaining a credit report for an unauthorized purpose violates the consumer's substantive privacy interest, and the consumer has standing "regardless whether the credit report is published or otherwise used by [a] third-party" and "need not allege any further harm" (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983–84 (9th Cir. 2017))). And although the FCRA's disclosure requirements may seem "procedural" in nature, Congress enacted them because they are the only practical way to protect consumers' interests in fair and accurate credit reporting. *See Spokeo III*, 867 F.3d at 1113. Therefore, step one of the *Spokeo III* framework is satisfied for both claims.

**\*14** At step two, we have no trouble concluding that TransUnion's disclosure violations exposed all class members to a material risk of harm to their concrete informational interests. TransUnion sent the class members a document that purported to be their entire credit report, containing no mention of OFAC. This put every class member at a risk of real harm: not knowing that they were falsely being labeled as terrorists, drug dealers, and threats to national security.

Then, TransUnion sent the class members the separate OFAC Letter without a summary-of-rights form. This conduct posed a serious risk that consumers not only would be unaware that this damaging label was on their credit reports, but also would be left completely in the dark about how they could get the label off their reports. [10] TransUnion's conduct therefore exposed every class member to a material risk of harm to the core interests the FCRA was designed to protect—their interests in being able to monitor their credit reports and promptly correct inaccuracies. [11]

---

[10] The dissent suggests that, to establish standing for these two claims under Section 1681g, every class member must have shown evidence of shock or confusion. However, all members of the class were falsely labeled by TransUnion as terrorists and national security threats and requested a copy of their credit reports, and TransUnion sent the confusing mailings to all class members. The mailings that TransUnion provided to class members were inherently shocking and confusing, and Ramirez, as the class representative, testified to that effect. To require further individualized evidence of shock or confusion would defeat the purpose of class actions. And while there may exist a case where additional evidence would be required to ascertain whether the absent class members were indeed shocked or confused, this case is not it. *See also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) ("[T]his Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (holding that failure to obtain information subject to disclosure under Federal Advisory Committee Act was sufficient injury to confer standing); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (holding that disclosure of false information about housing availability was sufficient injury to confer standing under the Fair Housing Act, even where plaintiff "may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home").

[11] We note that in many instances a violation of §§ 1681g(a) or 1681g(c)(2) might pose no risk of harm. For example, there likely would be no risk of harm if the information excluded from the file disclosure were an inaccurate zip code rather than an inaccurate OFAC alert. And a failure to include a summary of rights might pose no risk of harm

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1600

Case 1:18-cv-00120-DAD-BAM  Document 140  Filed 03/26/20  Page 17 of 29

if there was no inaccurate information in the consumer's
file to begin with.

## C. Standing Conclusion

We agree with TransUnion that every class member needs
standing to recover damages at the final judgment stage. But
we also agree with Ramirez and the class that every class
member has standing on each of the claims in this case. We
therefore affirm the district court's denial of TransUnion's
motion to decertify the class for lack of standing and
TransUnion's post-trial motions based on the same grounds.

## III. Willfulness

TransUnion next contends that it was entitled to judgment as a
matter of law or to a new trial because Ramirez failed to prove
that any of TransUnion's FCRA violations were *willful*.[12]
TransUnion argues that its conduct complied with the statute
as a matter of law, or, in the alternative, that its conduct
was based on reasonable but mistaken interpretations of the
statute.[13] The district court rejected these arguments and
found that substantial evidence supported the jury's findings.

[12]     Ramirez and the class pursued only a willfulness theory
         for each of their three claims, presumably because
         statutory and punitive damages are available for willful,
         but not negligent, FCRA violations. *See* 15 U.S.C. §§
         1681n, 1681*o*.

[13]     TransUnion does not challenge the verdict form or jury
         instructions, which closely tracked the text of the FCRA.

**\*15** We review the denial of a motion for judgment as a
matter of law *de novo*, *Josephs v. Pac. Bell*, 443 F.3d 1050,
1062 (9th Cir. 2006), and we review the denial of a motion for
a new trial for abuse of discretion. *Guy v. City of San Diego*,
608 F.3d 582, 585 (9th Cir. 2010). We affirm the district court.

Judgment as a matter of law is appropriate only when
the evidence—viewed in the light most favorable to the
non-moving party—permits a reasonable jury to reach only
one conclusion, and that conclusion is contrary to the
jury's verdict. *Martin v. Cal. Dep't of Veterans Affairs*, 560
F.3d 1042, 1046 (9th Cir. 2009). Similarly, a new trial is
appropriate only if "the verdict is against the clear weight of
the evidence[.]" *Id.*

An FCRA violation is willful when a CRA either knowingly
violates the statute or recklessly disregards its requirements.
*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–
57, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). A CRA
recklessly disregards the statute if it adopts an objectively
unreasonable interpretation that runs "a risk of violating
the law substantially greater than the risk associated with
a reading that [is] merely careless." *Id.* at 69, 127 S.Ct.
2201. When "conduct is so patently violative" of the FCRA
that any reasonable person would know without guidance
that its interpretation was erroneous, "closely analogous pre-
existing" guidance from the courts is unnecessary. *Syed*, 853
F.3d at 504 (quoting *Boyd v. Benton Cty.*, 374 F.3d 773, 781
(9th Cir. 2004)).

## A. Reasonable Procedures Claim

Plaintiffs presented evidence that—despite being told in 2010
by another circuit court that OFAC alerts were covered by
the FCRA and subject to § 1681e(b)'s reasonable procedures
requirement—TransUnion continued to utilize name-only
searches to produce OFAC "matches." Most notably, the
Third Circuit specifically reprimanded TransUnion for failing
to use an additional identifier such as date of birth to verify
the accuracy of OFAC matches. *See Cortez*, 617 F.3d at 723
("Given the severe potential consequences of [associating a
consumer with an SDN, TransUnion's] failure to take the
utmost care in ensuring the information's accuracy—at the
very least, comparing birth dates when they are available—is
reprehensible."). Nonetheless, TransUnion continued to use
only first and last names to identify OFAC matches until 2013.
A reasonable jury could conclude that this was objectively
unreasonable and ran a risk of error substantially greater
than a merely careless interpretation. *See Safeco Ins. Co. of
Am.*, 551 U.S. at 70, 127 S.Ct. 2201 (noting that a finding
of recklessness is more appropriate when the defendant had
"guidance from the courts of appeals ... that might have
warned it away from the view it took").

## B. Disclosure Claim

Section 1681g(a) required TransUnion to "clearly and
accurately" disclose "[a]ll information in the consumer's file"
when the class members requested their reports. 15 U.S.C.
§ 1681g(a)(1). Plaintiffs presented evidence that TransUnion
adopted a policy of not including OFAC information on the
credit reports it sent to consumers who requested their files,

even though TransUnion included the OFAC information on the credit reports it sent to third parties regarding those same consumers. Instead, TransUnion sent the class members vague "courtesy" letters informing them that their names were "considered a potential match" to names on the OFAC list. Nowhere did the OFAC Letter disclose that the version of the class members' credit reports sent to third parties contained an OFAC alert on the first page.

**\*16** TransUnion's interpretation of § 1681g(a) as allowing this conduct is "unambiguously foreclose[d]" by the language of the statute itself, *Syed*, 853 F.3d at 505, which required TransUnion to *clearly and accurately* disclose *all* information in the consumers' reports. 15 U.S.C. § 1681g(a)(1). TransUnion did not disclose *all* information. It left out the OFAC alerts. TransUnion argues that it did not omit the OFAC alerts from the reports, but simply mailed the OFAC alerts in separate envelopes. This contention is belied by the record. The reports themselves had a clearly indicated beginning and end, and the OFAC Letters explicitly stated that they were "separate[ ]" from the reports. And even if the OFAC Letters did sufficiently disclose that the OFAC alerts were part of the consumers' reports (which they did not), no reasonable person could conclude that the OFAC Letters were a *clear and accurate* method of disclosure. *See Syed*, 853 F.3d at 504–06.

Moreover, the jury also heard evidence that the Third Circuit had told TransUnion in 2010 that it could not continue to treat OFAC information as somehow separate from the other information included on consumer reports. Accordingly, TransUnion had "guidance from the courts of appeals" suggesting that its interpretation was erroneous. *Safeco Ins. Co. of Am.*, 551 U.S. at 70, 127 S.Ct. 2201.

In sum, a reasonable jury could find that TransUnion was objectively unreasonable and ran a risk of error substantially greater than mere carelessness when it excluded arguably the most important piece of information in the class members' files—the OFAC alerts—from the reports it sent to them and instead sent this information in a separate, confusing "courtesy" letter.

### C. Summary-of-Rights Claim

Under 15 U.S.C. § 1681g(c)(2), TransUnion was required to provide a summary of rights "with each written disclosure" it sent to consumers pursuant to a consumer file request. TransUnion argues that it was reasonable to send the

summary of rights with the first mailing, the consumer report, and assume that the class members would understand that the summary of rights also applied to the second mailing, the OFAC Letter. But as explained above, the two mailings clearly indicated that they were separate, rather than components of one disclosure. And the language of the statute is clear: A summary of rights must be sent with *each* written disclosure. Therefore, there was sufficient evidence to find a willful violation of § 1681g(c)(2) because any reasonable CRA would have known that TransUnion's interpretation was in error. *See Syed*, 853 F.3d at 504–06.

### D. Willfulness Conclusion

Had this case been filed before the Third Circuit's decision in *Cortez*, we might have been faced with a difficult question as to willfulness. But in light of *Cortez*, we have no difficulty upholding the verdict. TransUnion was provided with much of the guidance it needed to interpret its obligations under the FCRA with respect to OFAC alerts in 2010 when *Cortez* was decided. 617 F.3d at 695. Despite this warning, TransUnion continued to use problematic matching technology and to treat OFAC information as separate from other types of information on consumer reports. In doing so, it ran an unjustifiably high risk of error. The jury's verdict is consistent with the law and supported by substantial evidence. Accordingly, we affirm the district court's denial of TransUnion's motion for judgment as a matter of law or a new trial. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002))).

### IV. Rule 23

TransUnion next contends that the district court should not have certified the class in this case because Ramirez's claims were not typical of the class's claims, as required by Federal Rule of Civil Procedure 23(a)(3). We review the district court's certification of a class action for abuse of discretion. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010). Our review is limited to "whether the district court correctly selected and applied Rule 23's criteria." *Parra v. Bashas', Inc.*, 536 F.3d 975, 977 (9th Cir. 2008).

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1800

Case 1:18-cv-00120-DAD-BAM Document 140 Filed 03/26/20 Page 19 of 29

**\*17** TransUnion argues that Ramirez was not typical of the class because his injuries were more severe than the injuries suffered by the rest of the class. Ramirez's credit report with the false OFAC alert was sent to a third party; Ramirez's alert stated that he was a match instead of a *potential* match; Ramirez was denied credit because of the alert; he canceled a vacation because of the alert; and he spent significant time and energy trying to remove the alert, including hiring a lawyer. In contrast, only a quarter of the other class members had their credit reports sent to a third party during the class period, and there was no evidence regarding whether other class members had experiences similar to Ramirez's as a result of the alerts.

But these differences do not defeat typicality. The typicality inquiry focuses on "the nature of the claim ... of the class representative, and not ... the specific facts from which it arose." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Even if Ramirez's injuries were slightly more severe than some class members' injuries, Ramirez's injuries still arose "from the same event or practice or course of conduct that [gave] rise to the claims of other class members and [his claims were] based on the same legal theory." *Lacy v. Cook Cty., Ill.*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." (quoting *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001))).

Ramirez's injuries were not so unique, unusual, or severe to make him an atypical representative of the class. A class representative satisfies typicality when his "personal narrative is somewhat more colorful" than other class members' experiences, as long as his claim "falls within the common contours of" the class-wide theory of liability. *Torres*, 835 F.3d at 1142; *see also Ellis*, 657 F.3d at 985 n.9 ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality."). Nor were the unique aspects of Ramirez's claims significant to the point that they "threaten[ed] to become the focus of the litigation[.]" *Torres*, 835 F.3d at 1142 (quoting *Hanon*, 976 F.2d at 508). Accordingly, the district court did not abuse its discretion in certifying (and refusing to decertify) the class. [14]

[14] The dissent suggests that "the district court made compounding errors regarding class certification and standing" at earlier stages of the case. Indeed, TransUnion moved to decertify the class nearly a year before trial commenced, primarily on the basis that individualized issues of Article III standing predominated. The district court properly denied the motion, however, because only the class representative must show standing at the class certification stage. *See Melendres*, 784 F.3d at 1262; *see also Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("[T]he need for individual damages calculations does not, alone, defeat class certification."). More importantly, the differences between Ramirez's injuries and those of other class members are a matter of degree, not standing. In fact, the district court attempted to distinguish between the class members' degrees of injury at the final pretrial conference. Specifically, the district court suggested to TransUnion that it could object at the charging conference to the aggregation of damages in the verdict form, such that if the jury found TransUnion liable, it could award damages proportional to the number of class members who suffered certain injuries, such as disclosure of their consumer reports to third parties. But TransUnion did not object to the verdict form at the charging conference, allowing the court to instruct the jury to award the same amount of damages to all class members—regardless of their degree of injury.

## V. Damages

**\*18** Finally, TransUnion argues that the jury's statutory and punitive damages awards were grossly excessive in violation of the U.S. Constitution. We review *de novo* the constitutionality of punitive damages, *Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and we review a district court's denial of a motion for a new trial on damages for abuse of discretion, *Guy*, 608 F.3d at 585. We agree with the district court that there is no basis to disturb the statutory damages award, but we conclude that the punitive damages were unconstitutionally excessive.

### A. Statutory Damages

Under the FCRA, a plaintiff is entitled to statutory damages between $100 and $1,000 for any willful violation. 15 U.S.C. § 1681n(a)(1)(A). Here, the jury awarded $984.22 per class

member for a total of about $8 million class-wide. TransUnion argues that this amount violates due process because it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67, 40 S.Ct. 71, 64 L.Ed. 139 (1919)). [15]

[15]    TransUnion also argued below for remittitur on the theory that the damages were "clearly not supported by the evidence, or only based on speculation or guesswork." *Guy*, 608 F.3d at 585 (internal quotation marks and citation omitted).

TransUnion's argument is somewhat of a moving target, but it relies primarily on this Court's decision in *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990). There, we reduced a district court's award of statutory damages to class members in an action under the Farm Labor Contractor Registration Act ("FLCRA"). *Id.* at 1303, 1312. We explained that the "individual awards exceeded what was necessary to compensate any potential injury from the violations," *id.* at 1309, and the "aggregate amount of [the] award was unprecedented,"*id.* at 1309–10.

*Six (6) Mexican Workers* is distinguishable from this case for a number of reasons. First, it involved a district court's determination of damages, which we reviewed for abuse of discretion—rather than a jury's determination, to which we owe "substantial deference." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996), *aff'd*, 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). Second, it involved analysis that was specific to the now-repealed FLCRA, and it contained no discussion of constitutional due process. Third, it involved an award of damages within the statutory range for *each* FLCRA violation, rather than one award within the statutory range for all violations combined.

In any event, the jury's award—which falls within the statutory range—is proportionate to TransUnion's offenses and reasonable in light of the evidence. Indeed, if we were to envision a case that might warrant the high end of the statutory-damages range, we might envision something like this case. TransUnion recklessly labeled thousands of consumers as potential terrorists and other sanctioned individuals without taking even basic steps to verify the accuracy of these labels. And then it hid the ball from these consumers when they asked for their files and withheld important information about their right to dispute the labels.

Congress provided for a set range of damages for FCRA violations because the "actual harm that a willful violation of [the FCRA] will inflict on a consumer will often be small or difficult to prove." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010). We need not determine whether courts have the authority to disturb a jury's statutory-damages award when it falls within Congress's prescribed range because in this case the jury's award is clearly proportionate to the offense and consistent with the evidence. [16]

[16]    TransUnion does not seriously argue that the aggregate award—representing about a half percent of TransUnion's total net worth—is "oppressive." *See Citrin*, 972 F.2d at 1051.

### B. Punitive Damages

**\*19** The FCRA also permits an award of punitive damages in an amount "as the court may allow[.]" 15 U.S.C. § 1681n(a) (2). The jury awarded each class member $6,353.08 in punitive damages for a class-wide total of about $52 million. TransUnion argues that this award is constitutionally infirm because: (1) it is duplicative, (2) it punishes for injuries to third parties not involved in this suit, and (3) it is excessive in violation of due process.

TransUnion's first argument is that the statutory damages were sufficient to accomplish deterrence, so the punitive damages, which also aim to deter, were duplicative. But the statute explicitly allows for both types of damages: statutory damages to compensate plaintiffs for their intangible injuries that are difficult to quantify, and punitive damages to punish and deter willful FCRA violations. TransUnion does not challenge the jury instructions regarding damages, nor does TransUnion point to anything specific in the record suggesting that the jury might have misunderstood the distinct purposes of statutory and punitive damages. We will not disturb the jury's award on this basis.

TransUnion next argues that the jury awarded punitive damages because it wanted to punish TransUnion for injuring nonparties, which violates due process. *See Philip Morris USA v. Williams*, 549 U.S. 346, 353–55, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). But "[a] jury may consider evidence of actual harm to nonparties as part of its reprehensibility determination," even though it "may not 'use a punitive damages verdict to punish a defendant directly' " for injury

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1600

Case 1:18-cv-00120-DAD-BAM   Document 149   Filed 03/26/20   Page 21 of 29

inflicted upon non-parties. *White v. Ford Motor Co.*, 500 F.3d 963, 972 (9th Cir. 2007) (quoting *Williams*, 549 U.S. at 355, 127 S.Ct. 1057). "Where there is a significant risk that jurors will misapprehend the distinction, the court must upon request protect against that risk by 'avoid[ing] procedure that unnecessarily deprives juries of proper legal guidance.' " *Id.*

To begin with, TransUnion does not challenge, or even discuss, the jury instructions regarding punitive damages. Nor did TransUnion object to the instructions or class counsel's arguments regarding punitive damages below. Our review of the record reflects nothing that would lend support to TransUnion's argument beyond very limited references to nonparties in counsel's arguments. We reject this challenge.

Finally, TransUnion argues that $6,353.08 in punitive damages per class member is "grossly excessive" in violation of constitutional due process. *State Farm*, 538 U.S. at 416, 123 S.Ct. 1513. In reviewing the constitutionality of punitive damages, we consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418, 123 S.Ct. 1513 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

### 1. Reprehensibility

The reprehensibility of TransUnion's conduct is the most important guidepost. *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. We must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional

malice, trickery, or deceit, or mere accident.

**\*20** *Id.*

Here, there was no physical harm, and TransUnion's conduct did not evince an indifference to health or safety. However, "the gravity of harm that could result from [TransUnion's matching] of [a consumer] with an individual on a 'terrorist' list cannot be over stated." *Cortez*, 617 F.3d at 723. The class members were also financially vulnerable in the sense that their ability to obtain credit depended on the care that TransUnion—a billion-dollar company—took in gathering data about them.

But most importantly, TransUnion's misconduct was repeated and willful. TransUnion used name-only OFAC searches for more than a decade, resulting in thousands of false positives and not a single known actual match identified. TransUnion's conduct probably was not "the result of intentional malice, trickery, or deceit," but it was far from "mere accident." *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. TransUnion began receiving consumer complaints regarding false OFAC alerts in 2006; a jury found it liable for hundreds of thousands of dollars for a false OFAC alert in 2007; and the Third Circuit told TransUnion in 2010 that false OFAC alerts were a serious matter and that its "cavalier[ ]" reliance on a name-only screening software and treatment of OFAC information as exempt from the FCRA were inexcusable. *Cortez*, 617 F.3d at 710. TransUnion's conduct demonstrated a disregard for the gravity of an OFAC match and what a false positive would mean, emotionally and practically, for each consumer.

### 2. Ratio

There is no bright-line rule about the maximum ratio due process permits between the harm suffered by the plaintiff (i.e., the compensatory damages) and the punitive damages. *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. However, the Supreme Court has noted that punitive "awards exceeding a single-digit ratio" will rarely satisfy due process, and punitive awards exceeding four times the amount of compensatory damages "might be close to the line of constitutional impropriety." *Id.* A ratio higher than 4 to 1 may be upheld where "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (quoting *Gore*, 517 U.S.

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1600

Case 1:18-cv-00120-DAD-BAM  Document 140  Filed 03/26/20  Page 22 of 29

at 582, 116 S.Ct. 1589). But "[w]hen compensatory damages are substantial," a ratio lower than 4 to 1 may be the limit. *Id.*

In this case, the ratio between the punitive and statutory awards is 6.45 to 1. Although TransUnion's conduct was egregious for the reasons explained above, the jury's compensatory award was substantial—near the high end of the statutory range. Moreover, when viewed in the aggregate, $8 million in statutory damages is quite substantial. Under the circumstances of this case, we conclude that a ratio of 4 to 1 is the most the Constitution permits.

### 3. Comparable Civil Penalties

We agree with our sister circuits that consideration of civil penalties is not useful in the FCRA context because there is no "truly comparable" civil penalty to an FCRA punitive-damages award. *Cortez*, 617 F.3d at 724; *see Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 152 (4th Cir. 2008); *Bach v. First Union Nat. Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007). Therefore, we do not consider this factor.

### 4. Punitive-Damages Conclusion

**\*21**  We conclude that the punitive-damages award was constitutionally excessive in light of the *Gore* guideposts because, although TransUnion's conduct was reprehensible, it was not so egregious as to justify a punitive award of more than six times an already substantial compensatory award.

"When a punitive damage award exceeds the constitutional maximum, we decide on a case-by-case basis whether to remand for a new trial or simply to order a remittitur." *Southern Union Co. v. Irvin*, 563 F.3d 788, 792 n.4 (9th Cir. 2009). This litigation has already spanned a number of years, and we do not think a new trial would bring to light any new evidence that might permit a ratio higher than 4 to 1. We therefore reverse the district court's judgment regarding punitive damages, vacate the punitive damages award, and remand with instructions to reduce the punitive damages to $3,936.88 per class member, which represents four times the statutory damages.

### VI. Conclusion

We hold that every member of a class action certified under Rule 23 must demonstrate Article III standing at the final stage of a money damages suit when class members are to be awarded individual monetary damages. And we hold that, on this record, every class member had standing because TransUnion's reckless handling of OFAC information exposed every class member to a real risk of harm to their concrete privacy, reputational, and informational interests protected by the FCRA. We also uphold the jury's verdict finding willful violations of sections 1681e(b), 1681g(a)(1), and 1681g(c)(2) of the FCRA because the verdict was supported by substantial evidence. We conclude that the jury's award of statutory damages near the high end of the range was clearly justified.

With respect to punitive damages, we agree with the Third Circuit that it is unsurprising that a jury was "incensed" by TransUnion's flippant placement of terrorist alerts on consumer credit reports and its consistent refusal to take responsibility or acknowledge the harm it has caused. Indeed, even on appeal, TransUnion continues to take the position that labeling someone a terrorist *causes them no harm*. Nonetheless, despite the reprehensibility of TransUnion's conduct, we are compelled to reduce the punitive damages in this case because the jury's award is unconstitutionally excessive. We conclude that a ratio of 4 to 1 between the statutory and punitive damages is the most the Constitution permits on this record. We vacate the punitive damages and remand for a reduction, but otherwise affirm the district court.

**REVERSED** and **VACATED** as to the amount of punitive damages; **REMANDED** with instructions to reduce the punitive damages to $3,936.88 per class member; **AFFIRMED** in all other respects. The parties shall bear their own costs on appeal.

McKEOWN, Circuit Judge, concurring in part and dissenting in part:

A class action jury trial is a high-stakes affair more common in cinema than an actual courtroom. But no screenwriter would feature the complex issue raised in this appeal: a standing infirmity during a time of flux in the doctrine. In its otherwise deft handling of a difficult case, the district court made compounding errors regarding class certification and standing, leading to a jury verdict of nearly $60 million based on the unenviable experience of a single, atypical class representative. The bottom line is that for judgment at trial, every member of the class must have Article III standing.

Ramirez v. TransUnion LLC, 951 F.3d 1008 (2020)
2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1800

Case 1:18-cv-00120-DAD-BAM Document 140 Filed 03/26/20 Page 23 of 29

Conjecture based on an unrepresentative plaintiff does not meet the constitutional minimum.

**\*22** The majority paints a dramatic story of corporate indifference. And, indeed, Sergio Ramirez was the victim of unforgivable circumstances at the hands of TransUnion. But his misfortune alone cannot justify damages for the entire class. At trial each member of the class must establish standing. Except for a limited number of class members whose credit report was disclosed to third parties, there was no evidence of any harm or damages to remaining class members. Instead, the trial focused on Ramirez and his unique circumstances. Missing at trial was evidence related to other members of the class, a deficiency that cannot be cured by speculation. Unfortunately, neither the district court nor the parties followed this dictate.

Let me first note my points of agreement with the majority. It is well established that Article III and the Rules Enabling Act require all members of a damages class to have standing at trial, so here the 1,853 class members whose inaccurate information was disclosed to a third party had standing to assert a reasonable procedures claim. I also agree that the punitive damages award was impermissibly excessive. In my view, however, no one but Ramirez and the class members whose information was disclosed to a third party had standing to assert a reasonable procedures claim, and only Ramirez had standing to bring the disclosure and summary of rights claims. I therefore respectfully dissent in part.

### I. Class Certification

The standing issues at trial germinated from seeds sown during class certification. The only asserted uniform classwide experience was the existence of TransUnion's internal terrorist watch list alerts and the mailing of separate letters—faint allegations that strain Rule 23's typicality requirements. Absent class members simply rode Ramirez's coattails, while his stark atypicality as the lone class representative ensured that he would " 'become the focus of the litigation.' " *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted); *see also Melendres v. Arpaio*, 784 F.3d 1254, 1263 (9th Cir. 2015) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 265, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (named plaintiffs were adequate class representatives because their "claims do not 'implicate a significantly different set of concerns' than the unnamed plaintiffs' claims"). When it came time for trial, the certification error was only compounded.

### II. Ramirez and the Class

The majority declares that "each member of a class certified under Rule 23 must satisfy the bare minimum of Article III standing at the final-judgment stage of a class action in order to recover monetary damages in federal court." This principle, though, does not square with what happened at the trial, which opened with class counsel telling jurors that they would learn "the story of Mr. Ramirez." And indeed they did. Jurors learned that a car dealership refused to grant Ramirez financing because his credit report flagged him as a "match" to a terrorist watch list, and that he was frightened, humiliated, and confused. He contacted TransUnion and was informed he was not on the watch list, but then received two separate mailings: one purporting to be his full credit report and making no mention of the terrorist watch list, and a subsequent letter informing Ramirez that he was a potential match for the FTCRA watch list. The second letter omitted the summary of FCRA rights and grievance instructions contained in the first mailing. After closely reviewing both letters, Ramirez was at a loss, and cancelled a planned family vacation to Mexico. Only after consulting with an attorney and the Treasury Department did he finally compel TransUnion to remove his watch list designation.

The story of the absent class members, in contrast, went largely untold. The jury learned class members requested a credit report from TransUnion and were sent separate mailings. The trial featured no evidence that absent class members received, opened, or read the mailings, nor that they were confused, distressed, or relied on the information in any way. There was no evidence that absent class members were denied credit, or expended any time or energy attempting to clear their name. It's possible that other class members —perhaps many others—had these experiences. But the hallmark of the trial was the absence of evidence about absent class members, or any evidence that they were in the same boat as Ramirez. The jury was left to assume that the absent class members suffered the same injury. But such conjecture is insufficient to confer Article III standing.

### III. Claims

#### A. Reasonable Procedures Claim

**\*23** The parties stipulated at trial that, like Ramirez, a quarter of the class had their inaccurate credit reports sent to a third party, affording them clear standing for the claim

that TransUnion failed to follow reasonable procedures to assure maximum accuracy on their credit reports. For the overwhelming majority of the class, though, we face the open question of whether there is "concrete harm" when "a materially inaccurate report ... was *prepared* but never *published*" to a third party. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1116 & n.3 (9th Cir. 2017) ("*Spokeo III*") (emphasis in original). On this record, there is not. Class members do not argue that they have an interest "that [has] long been protected in the law." *Id.* at 1114. And although "publication of defamatory information ... has long provided the basis for a lawsuit," *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017), there is no common law analogue for a suit "absent dissemination," *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344–45 (D.C. Cir. 2018).

Nor is there any indication that Congress sought to protect a consumer's interest in an error-free credit database itself. Rather, Congress's concern was with the "*dissemination* of inaccurate information, not its mere existence in the ... database." *Owner-Operator*, 879 F.3d at 345 (emphasis added). As we have recognized, Congress enacted the reasonable procedures requirements " 'to protect consumers from the transmission of inaccurate information about them.' " *Spokeo III*, 867 F.3d at 1113 (quoting *Guimond v. Trans Union*, 45 F.3d 1329, 1333 (9th Cir. 1995)). Any "concrete interest in accurate credit reporting" is implicated only upon disclosure to a third party. *See Spokeo III*, 867 F.3d at 1115. Nothing in the text, structure, or history of FCRA suggests that Congress sought to afford consumers with plenary police powers over the information contained in credit reporting agencies' internal databases, and "the mere existence of inaccurate database information is not sufficient to confer Article III standing." *Owner-Operator*, 879 F.3d at 345.

The majority does not dispute these points. Instead, it holds that TransUnion's inaccurate reports, once created and stored, were "made available," which—combined with the "distressing nature" of TransUnion's mailings to consumers and the "risk of third-party access" constituted a "material risk" of harm to the entire class. *See Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1550, 194 L.Ed.2d 635 (2016), as revised (May 24, 2016) ("*Spokeo II*"). This statement makes for a good closing argument, but counsel presented no evidence about the consequences of dissemination of the reports for any class member other than Ramirez. The majority observes that a credit report may be divulged "to potential creditors or employers at a moment's notice." This possibility, however, does not amount to a material risk—one of *Spokeo II*'s core teachings is that Article III requires a discernable, non-conjectural likelihood of harm. Without doubt, counsel could have offered expert testimony, representative class members, and credit agency protocol to fill this gap. But none was proffered. This does not mean that evidence must be proffered as to each class member, and I reiterate that the 1,853 individuals whose report was disclosed to third parties have standing. Rather, Ramirez was required to present something other than his own story; not only was he not typical of the class, but without additional testimony, harm as to the bulk of the class was conjectural. In analogous circumstances, other circuits have determined that similar chains of events are too speculative and attenuated to establish a "material risk of harm." *See Owner-Operator*, 879 F.3d at 347 (determining "prospect of future injury" was purely speculative when "nothing in the record indicates that anyone has recently accessed or used the information at issue"); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 910–11 (7th Cir. 2017) (concluding mere retention of customer data, in violation of a federal statute but without dissemination to a third party, did not confer standing); *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930–31 (8th Cir. 2016) (same). Because no evidence in the record establishes a serious likelihood of disclosure, we cannot simply presume a material risk of concrete harm, and three-quarters of the class lacks standing for the reasonable procedures claim.

**B. Disclosure and Summary of Rights Claims**

**\*24** The lack of evidence of concrete harm to absent class members is even more stark when considering the disclosure and summary of rights claims. The first alleges that TransUnion willfully failed to disclose class members' full credit reports by not including the OFAC information when sending consumers' credit files—that is to say, by sending the information in a separate mailing. The second claim relates to TransUnion's failure to include a summary of rights in the envelope containing the OFAC letter.

Notably, TransUnion sent the credit reports and OFAC alerts contemporaneously. Omitting the OFAC information from the credit summary and instead sending it "within hours," may be a technical violation of FCRA's disclosure requirement, and the "shock," that Ramirez testified he felt upon receiving the separate OFAC communication is sufficient to confer Article III standing upon him. There was no evidence, however, that a single other class member so much as opened

the dual mailings, or that anyone other than Ramirez was surprised to receive them.

Similarly, TransUnion's OFAC letter failed to inform him how to dispute being a potential watch list match, an omission that confused Ramirez, who plainly has standing to bring a summary of rights claim. But whether any other absent class member was confused, suffered the adverse consequences that befell Ramirez, or even opened the letter, is pure conjecture. For the absent class members, evidence of disclosure and summary of rights violations were only "a bare procedural violation, divorced from any concrete harm," *Spokeo II*, 136 S. Ct. at 1549, and no common law analogue or clear congressional directive suggests that Article III requirements are satisfied in the face of such an absence of evidence.

**IV. Conclusion**

Trial attorneys understand the importance of a narrative, and "the story of Mr. Ramirez" has all the compelling elements: a sympathetic protagonist, a corporate antihero, and thousands of unseen victims. The purpose of a trial, however, is to evaluate evidence, not produce a satisfying plot. Although the strategy behind presenting only Ramirez's unusually sympathetic case to the jury was self-evident, the nature of his claims likely bore little resemblance to experiences of the absent class members. Or perhaps they did. But based on the evidence at trial, it is impossible to know.

At trial, class members lacking a constitutionally cognizable injury should not have been permitted to recover damages, yet TransUnion now owes 8,185 class members tens of millions of dollars based on the unfortunate and unrepresentative experience of a single plaintiff. TransUnion's procedural violations may well have harmed some class members, but we are limited to the evidence in the record—evidence that fails to establish a concrete injury-in-fact for most class members on most claims. Speculation can complete a story, but it cannot cure this infirmity. I respectfully dissent in part.

**All Citations**

951 F.3d 1008, 2020 WL 946973, 20 Cal. Daily Op. Serv. 1794, 2020 Daily Journal D.A.R. 1600

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

2020 WL 1277642
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

Lerna MAYS, individually and on behalf of all
others similarly situated, Plaintiff-Appellant,

v.

WAL-MART STORES, INC., a Delaware
corporation, Defendant-Appellee.
Lerna Mays, individually and on behalf of all
others similarly situated, Plaintiff-Appellee,

v.

Wal-Mart Stores, Inc., a Delaware
corporation, Defendant-Appellant.

No. 19-55318, No. 19-55627
|
Argued and Submitted March
5, 2020 Pasadena, California
|
FILED March 17, 2020

**Attorneys and Law Firms**

Dale Alan Harris, Priya Mohan, Harris & Ruble, Glendale, CA, for Plaintiff - Appellant

Susan Eileen Coleman, Esquire, Senior Litigation Attorney, Cheryl Johnson-Hartwell, Attorney, Burke, Williams & Sorensen, LLP, Los Angeles, CA, Paloma Peraccchio, Esquire, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Los Angeles, CA, Mitchell Aaron Wrosch, Attorney, Ogletree, Deakins, Nash, Smoak & Stewart, Costa Mesa, CA, Lauren M. Blas, Theane Evangelis, Bradley Joseph Hamburger, Andrew Michael Kasabian, Attorney, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for Defendant - Appellee

Appeal from the United States District Court for the Central District of California, Andre Birotte, Jr., District Judge, Presiding, D.C. No. 2:18-cv-02318-AB-KK

Before: NGUYEN, HURWITZ, and FRIEDLAND, Circuit Judges.

MEMORANDUM [*]

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

**\*1** Lerna Mays appeals a district court order denying class certification to her proposed class of former Wal-Mart employees in California who received MyShare Incentive Award payments after termination, allegedly in violation of California Labor Code § 203. Wal-Mart cross-appeals the district court's certification of a Wage Statement Class of California-based employees who received wage statements listing their employer as "Wal-Mart Associates, Inc." rather than "Wal-Mart Stores, Inc.," allegedly in violation of California Labor Code § 226. We have jurisdiction pursuant to 28 U.S.C. § 1292(e) and Rule 23(f) of the Federal Rules of Civil Procedure. We affirm the district court's denial of class certification to the proposed MyShare Incentive Award Class and reverse the district court's certification of the Wage Statement Class.

1. The proponent of class certification "bear[s] the burden of demonstrating that [she] ha[s] met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). The district court did not abuse its discretion in finding that Mays failed to demonstrate the numerosity of her proposed MyShare Incentive Award Class. *See id.* at 980 (stating standard of review).

The district court "must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23," *Sali v. Corona Reg 'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (citation omitted), and should not uncritically accept the plaintiff's preferred inferences. Mays relied on several bare assertions of numerosity without any clear factual grounding, and the statistics she did proffer were overinclusive—leaving the court with little concrete basis for assessing numerosity. The court was reasonably concerned about the degree of speculation inherent in the opinions of the plaintiff's expert, including his extrapolation from Mays's individual experience to the experiences of others. The court therefore reasonably concluded that Mays's proffered evidence was too thin and her proposed inferential chain too weak to support a finding of numerosity.

2. A plaintiff cannot proceed in federal court absent Article III standing, and "must demonstrate standing for each claim [s]he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). At the class certification stage, our standing analysis focuses solely on the class representative. *Melendres v. Arpaio*, 784 F.3d 1254, 1261–62 (9th Cir. 2015); *see also Ramirez v. TransUnion LLC*, No. 17-17244, ––– F.3d ––––, –––– n.14, 2020 WL 946973, at *7, *17 n.14 (9th Cir. Feb. 27, 2020). Because Mays failed to demonstrate Article III standing to bring her wage statement claim under California Labor Code § 226, the district court erred in certifying the Wage Statement Class.

We use a two-step approach to assess whether a statutory violation causes a concrete injury sufficient to satisfy Article III. *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019). We ask "(1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017).

**\*2** California Labor Code § 226 was established to protect the concrete interests of California's workers, not merely to confer pure procedural rights. [1] The legislative history of the provision clarifies that it was meant to provide workers with transparency about their compensation to protect them from being cheated of their earned wages and to facilitate their application, if needed, for unemployment benefits. *See* S. Judiciary Comm., Bill Analysis A.B. No. 1506, at 2 (2015–16 Reg. Sess.) ("AB 3731 was enacted to ensure that employees were adequately informed of compensation received, that the employees were not being short changed their wages, and to assist employees establish eligibility for unemployment insurance."); Assemb. Comm. on Labor and Emp't, Bill Analysis S.B. No. 1255 (2011–2012 Reg. Sess.) (substantially the same); Assemb. Labor Comm., Bill Analysis A.B. No. 3731 (1975–76 Reg. Sess.) (substantially the same). These objectives are plainly substantive ones, directed at safeguarding employees' concrete interests rather than establishing procedural requirements as an end unto themselves.

[1] Although we struggle to find common law origins to the informational rights protected by California Labor Code § 226, that alone is not dispositive. When "we deal with an 'intangible harm' that is linked to a statutory violation,

we are guided in determining concreteness by 'both history and the judgment of Congress,' or the legislature that enacted the statute." *Campbell v. Facebook, Inc.*, No. 17-16873, ––– F.3d ––––, ––––, 2020 WL 1253030, at *6 (9th Cir. Mar. 3, 2020) (quoting *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1549, 194 L.Ed.2d 635 (2016)).

We next evaluate whether the specific procedural violation alleged in this case implicates the concrete interests that § 226 was designed to protect. Mays alleges that her wage statements misstated one word of her employer's name, and that the alleged inaccuracy caused her confusion. But apart from her confusion, Mays does not allege any real-world consequences flowing, or even potentially flowing, from the violation. Nor does the relatively trivial nature of the violation—swapping "Wal-Mart Associates, Inc." for "Wal-Mart Stores, Inc."—pose a clear threat of harm. *See Robins*, 867 F.3d at 1116 ("[T]he [Supreme] Court suggested that even if Congress determined that inaccurate credit reporting generally causes real harm to consumers, it cannot be the case that every trivial or meaningless inaccuracy does so."). Mays's bare confusion, without more, lacks a meaningful nexus to the concrete interests safeguarded by § 226.

Although Mays may be able to pursue her claim in state court, that does not automatically confer Article III standing, and we conclude that her allegations fail to satisfy Article III's injury-in-fact requirement. *See Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 783 (9th Cir. 2018) (finding no injury-in-fact attendant to a procedural statutory violation when the plaintiff failed to allege facts supporting real-world consequences of the violation, and explaining that the plaintiff's hypothetical "theory of 'exposure'" to danger was "too speculative for Article III purposes" (citation omitted)). We therefore reverse the district court's class certification order as to the Wage Statement Class, and we remand to the district court with instructions to dismiss the wage statement claim without prejudice. *See Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of subject-matter jurisdiction ... must be without prejudice....").

Costs are to be taxed against appellant Mays.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

**All Citations**

--- Fed.Appx. ----, 2020 WL 1277642

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.