UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN TREVINO, CHRISTOPHER WARD, LINDA QUINTEROS, ROMEO PALMA, BRITTANY HAGMAN,[1] ALBERTO GIANINI, and JUAN C. AVALOS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOLDEN STATE FC LLC, a Delaware Limited Liability Company; AMAZON.COM INC., a Delaware Corporation, AMAZON FULFILLMENT SERVICES, INC., a Delaware Corporation, <br><br> Defendants. | **LEAD CASE NO. 1:18-cv-00120-DAD-BAM** <br><br> Member Case No: 1:18-cv-00121-DAD-BAM <br> Member Case No: 1:18-cv-00567-DAD-BAM <br> Member Case No: 1:18-cv-01176-DAD-BAM <br> Member Case No: 1:17-cv-01300-DAD-BAM <br><br> **FINDINGS AND RECOMMENDATIONS REGARDING (1) PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND (2) DEFENDANTS' MOTION IN LIMINE** <br><br> (Docs. 96, 98, 125) |

## Findings and Recommendations

### I.     INTRODUCTION

Plaintiffs Juan Trevino, Christopher Ward, Linda Quinteros, Romeo Palma, Alberto

Gianini and Juan C. Avalos, on behalf of themselves and all others similarly situated, bring this

---

[1]     On December 9, 2019, pursuant to the parties' stipulation, Plaintiff Brittany Hagman was dismissed from this action as a putative class representative without prejudice.  (Docs. 106, 109.)

consolidated class action against defendants Golden State FC, LLC (now known as Amazon.com Services LLC), Amazon.com, Inc., and Amazon Fulfillment Services, Inc. (now known as Amazon.com Services LLC) (collectively, "Amazon"). Plaintiffs move for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Docs. 96, 98.) The motion was referred to United States Magistrate Judge Barbara A. McAuliffe for issuance of findings and recommendations in accordance with 28 U.S.C. § 636(b)(1)(B) and (C). (Doc. 112.)

Subsequent to the motion for class certification, Amazon moved to exclude the testimony and opinions of Plaintiffs' expert, Dr. Brian Kriegler, submitted in support of Plaintiffs' motion for class certification. (Doc. 125.) That motion also was set to be heard in conjunction with Plaintiffs' motion for class certification.

A hearing on the motions was held via video conference on May 12, 2021, before the Honorable Barbara A. McAuliffe. Counsel Peter Dion-Kindem, Lonnie Blanchard, Isandra Fernandez, Shawn Westrick, Alvin Lindsay and Joshua Haffner appeared via Zoom on behalf of Plaintiffs. Counsel Katherine Smith, Jason Schwartz and Helen Avunjian appeared via Zoom on behalf of Amazon. Having considered the moving, opposition and reply papers and the parties' arguments, it is recommended that Plaintiffs' Motion for Class Certification be GRANTED IN PART and DENIED IN PART, and that Amazon's motion to exclude the testimony and opinions of Dr. Kriegler be DENIED as moot.

## II. BACKGROUND

### A. Factual and Procedural Background

This matter is a consolidated action comprised of five wage and hour lawsuits originally filed in the Central and Eastern Districts of California. On March 28, 2019, Plaintiffs filed a First Amended Consolidated Class Action Complaint (the "Complaint") seeking to bring wage and hour claims on behalf of all current and former non-exempt hourly workers employed by Amazon in California for the period of four (4) years prior to July 12, 2017 to the present. (Doc. 65, Complaint at ¶ 21.)

Amazon.com, Inc. ("Amazon.com") is one of the world's largest and well-known on-line retailers. Amazon.com fills customer orders and ships them based out of a network of fulfillment, sorting, distribution and shipping centers. (Doc. 98-1 at 6.)[2] According to the allegations in the Complaint, Amazon operates at least nine different fulfillment centers for Amazon.com in California, which are located in San Bernardino, Rialto, Eastvale, Tracy, Moreno Valley, Redlands, and Patterson City. They are in San Bernardino, Riverside, San Joaquin, Stanislaus, and Riverside counties. (Complaint at ¶ 17.)

Plaintiff Juan Trevino worked as a Fulfillment Associate in Amazon's fulfillment center located in Tracy, California, from March 14, 2017 through May 6, 2017. (Complaint at ¶ 8.) Plaintiff Christopher Ward worked in various positions at Amazon's fulfillment center located in San Bernardino, California, from May 24, 2015 to November 23, 2016. (*Id.* at ¶ 9.) Plaintiff Linda Quinteros worked in various positions at Amazon's fulfillment center located in Patterson, California, from October 17, 2013 to December 13, 2016. (*Id.* at ¶ 10.) Plaintiff Romeo Palma currently is employed at Amazon's fulfillment center in Patterson, California. (*Id.* at ¶ 11.) Plaintiff Alberto Gianini worked as a Warehouse Associate in Amazon's fulfillment center located in San Bernardino, California from October 2014 through August 2016.[3] (*Id.* at ¶ 13.) Plaintiff Juan C. Avalos worked in the outbound department, processing packages that were going to be shipped out in Amazon's fulfillment center located in Moreno Valley, California from July 2016 through May 2017. (*Id.* at ¶ 14.)

Plaintiffs forward claims for the following wage and hour violations: (1) failure to pay wages for all hours worked, including overtime, (2) meal period violations, (3) rest period violations, (4) wage statement violations, (5) failure to pay wages under California Labor Code § 203, (6) unfair business practices, and (7) violations of the California Business and Professions Code (Private Attorneys General Act claim). (Doc. 65.)

---

[2]     Page number citation is based on the Court's CM/ECF pagination.
[3]     The Complaint alleges that Plaintiff Gianini was employed by Amazon "from October 2104." (Complaint at ¶ 13.) The year "2104" is an apparent typographical error, which the Court construes as "2014."

With regard to the claim for failure to pay for all hours worked, Plaintiffs allege that Amazon instituted a variety of policies resulting in violations. These policies include: (1) scheduling employees for 10-hour shifts, but during pre-holiday periods, requiring Plaintiffs and putative class members to work 11 or 12-hour shifts (Complaint at ¶ 31); (2) a uniform policy of rounding actual time entries down to the nearest total one-tenth hour to conform to shift schedule, not actual time worked (*Id.* at ¶ 32); (3) a uniform policy of providing a five-minute grace period excusing an employee who clocks in late for a work shift if he or she clocked in during that five-minute window, but if the employee was more than five minutes late, not compensating the employee for the remainder of the first hour worked and deducting an hour of unpaid time from the employee's accumulated unpaid time hours (*Id.* at ¶ 34); (4) failing to pay shift premiums to all employees who worked shifts eligible to receive them (*Id.*); (5) an alternative workweek and shift scheduling policy and practice that required a four-day workweek and ten-hour workdays that undercompensated employees for two hours of their working time and systematically reflected fewer overtime hours than they worked (*Id.* at ¶ 36); (6) a policy requiring Plaintiffs and putative class members to routinely work shifts over eight (8) hours in a day and over forty (40) hours in a work week, but not paying appropriate overtime rate for all such hours (*Id.* at ¶ 37); and (7) failing to compensate Plaintiffs and putative class members for time spent going through Amazon's security procedures[4] (*Id.* at ¶ 38).

With regard to the claim for failure to provide lawful meal periods, Plaintiffs allege that Amazon engaged in a number of policies and practices that resulted in violations. These policies and practices include: (1) requiring fulfillment center employees to work shifts greater than five (5) hours without providing them with timely, uninterrupted duty-free meal periods of not less than thirty (30) minutes because they were required to clock-out at the beginning of their meal periods and were then subject to security procedures both to leave the work site and, if they left the work site, were subject to security procedures to re-enter the work site before they could clock-in (Complaint at ¶ 33); (2) failing to provide Plaintiffs and putative class

---

[4] The Court will refer to Amazon's exit security procedures as both "exit security procedures" and "exit security process," as the parties use these terms interchangeably.

members with a second 30-minute meal period on the shifts in which they worked over ten (10) hours and being provided with a purported "California Meal Period Waiver Agreement" that did not clearly state the terms and conditions under which the waiver would apply (*Id.* at ¶ 44); (3) shortening of meal periods due to off-the-clock work and rounding and untimely meal periods after the fifth hour of work on shift (*Id.* at ¶ 45); and (4) failing to compensate employees for each meal period not provided or inadequately provided (*Id.* at ¶ 46).

With regard to the claim for failure to provide rest periods, Plaintiffs allege that Amazon engaged in a number of policies and practices that resulted in violations. These policies and practices include: (1) uniformly failing to authorize and permit Plaintiffs and putative class members to take their required ten (10) minute rest periods for every four (4) hours of work or major fraction thereof or to take a third ten-minute rest break when they worked shifts over ten (10) hours in a day (Complaint at ¶ 48); (2) failing to relieve employees of all duties and relinquish control over how employees spend time during rest periods by requiring them to walk to remote break room locations during rest breaks (*Id.* at ¶ 49); (3) enforcing a uniform policy preventing Plaintiffs and the putative class members from leaving the fulfillment center premises during their rest breaks under a uniformly applied policy that admonished that "leaving company premises without permission during assigned work hours" is "extremely serious" and may result in "termination of employment" (*Id.* at ¶ 50); and (4) failing to compensate employees with an additional hour of pay for each day Amazon failed to provide them with adequate rest breaks (*Id.* at ¶ 53).

With regard to the claim for wage statement violations, Plaintiffs allege that Amazon violated California Labor Code § 226(a) by failing to provide Plaintiffs and putative class members with wage statements that accurately showed (1) gross wages actually earned, (2) total hours worked, (3) net wages actually earned, and (4) applicable hourly rates and the corresponding number of hours worked at each hourly rate (Complaint at ¶¶ 57-60).

With regard to the claim for failure to timely pay wages due at termination, this is a derivative claim. Plaintiffs allege that members of the putative class that were terminated during the relevant time period were not timely paid the wages earned and unpaid that were due

to them, including wages at the appropriate rate for all hours worked and meal and rest period premiums as alleged in the Complaint.  (Complaint at ¶ 68.)

With regard to the unfair business practices and PAGA claims, these also are derivative claims based on the alleged Labor Code violations.  (Complaint at ¶¶ 74, 80.)

On November 22, 2019, Plaintiffs moved to certify eleven classes pursuant to Fed. R. Civ. P. 23(a) and (b).  (Doc. 96 [Sealed].)  Pursuant to a sealing order, Plaintiffs filed redacted briefing on November 26, 2019, and December 10, 2019. (Docs. 98, 110.)  Amazon opposed the motion by redacted briefing on January 13, 2020, and Plaintiffs replied on January 30, 2020. (Docs. 119, 128.)  On January 24, 2020, Amazon filed a separate motion to exclude the testimony of Plaintiffs' expert witness, Dr. Kriegler.  (Doc. 125.)  Plaintiffs opposed the motion to exclude (Doc. 133), and Amazon replied (Doc. 135).

Subsequent to the completed briefing, the parties filed notices of new authority addressing the following opinions:  *Frlekin v. Apple Inc.*, 8 Cal.5th 1038 (2020) (Doc. 137); *Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020) and *Mays v. Wal-Mart Stores, Inc.*, 904 Fed.App'x 641 (9th Cir. 2020) (Doc. 140); *Frlekin v. Apple, Inc.*, 973 F.3d 947 (9th  Cir. 2020), amended and superseded by *Frlekin v. Apple, Inc.*, 979 F.3d 639 (9th Cir. 2020)  (Doc. 149); *Donohoe v. AMN Services, LLC*, 11 Cal.5th 58 (2021) (Doc. 154); *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021) (Doc. 158); and *Magadia v. Wal-Mart Associates, Inc.*, ---F.3d---, 2021 WL 2176584, at *8 (9th Cir. May 28, 2021) (Doc. 163).

**B.  Proposed Classes**

As indicated, Plaintiffs seek certification of eleven classes.  They are as follows:

**Class 1. Unpaid Wages Class (Hours Worked Claim Based on Control of Employees through Mandatory Exit Security Procedures)**

All non-exempt employees employed by Amazon.com Services, Inc.[5] or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise

---

[5]    This class would include Golden State FC, LLC employees as this company merged with Amazon.com Services, Inc.

determined by the Court who were required to go through a metal detector security process to exit the facility.

(Doc. 98-1 at 10.)

**Class 2. Unpaid Wages Class (Controlled Meal Periods)**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who took a meal period and who were required to go through a metal detector security process to leave the facility during such meal period and were not paid for the time of such meal period.

(Doc. 98-1 at 15.)

**Class 3. Meal Period Violations for Controlled Meal Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than six hours and who were required to go through a metal detector security process to leave the facility during such meal periods and were not paid a meal period premium for such shifts.

(*Id.* at 16-17.)

**Class 4. Rest Periods Violations for Controlled Rest Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than three and one-half hours and were subject to a policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination or who were required to go through a metal detector security process to leave the facility during the rest period and were not paid a rest period premium for all such shifts.

(*Id.* at 18.)

**Class 5. Improper Rounding Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were subject to a rounding practice that resulted in them being paid less than they would have received had no such rounding practice been utilized for such employees.

(*Id.* at 19.)

**Class 6.  Invalid Second Meal Period Waiver Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.

(*Id.* at 20.)

**Class 7.  Third Rest Period Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were scheduled to work a 10-hour shift and worked more than 10 hours and who were not authorized or permitted to take a third uninterrupted, duty-free, and control-free 10-minute rest period and did not receive one hour of pay at the class member's regular rate of compensation for such day.

(*Id.* at 20-21.)

**Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked.

(*Id.* at 21.)

**Class 9. Derivative Wage Statement Class**

All members of any of Classes 1 through 7 who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

///

**Class 10. Section 203 Subclass**

All members of any of Classes 1 through 7 who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

**Class 11. UCL Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair.

(*Id.* at 24.)

### C. Challenged Policies

Many of the challenged policies overlap within and among the various classes. The Court provides a summary of the policies along with a reference to the particular class or classes.

#### 1. Payment of Lawful Wages

Exit Security Procedures (Classes 1-4)

Plaintiffs contend that Amazon implemented uniform exit security procedures at all the facilities where Plaintiffs and putative class members workers, which required all of the putative class members to pass through metal detectors and undergo security procedures in order to exit the facilities at the end of their shifts, for their meal periods or to exit for any other reason. Plaintiffs contend that employees were under Amazon's "control" from the time of facility entrance (swipe-in) until the time employees passed through the metal detectors and exited (swipe-out). Plaintiffs further contend that by Amazon's uniform policy, it failed to pay Plaintiffs and putative class members for all hours worked, including the time they were under Amazon's control after clocking out while they were subjected to Amazon's exit security procedures.

///

<u>Rounding Policy (Classes 5 and 7)</u>

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████ (Doc. 119-2 at 343, Ex. X (Sealed)).] Plaintiffs claim that Amazon underpaid putative

class members in the aggregate due to rounding.

### 2. Meal and Rest Periods (Classes 3-7)

Plaintiffs contend that by requiring mandatory security screening exit procedures to leave the facilities, Amazon failed to relinquish all control over employees' activities during meal and rest periods, including control over where such breaks are taken. Plaintiffs second theory of liability is that Amazon's written uniform policies prohibit employees from leaving the premises for rest periods without permission.

Amazon allegedly also failed to authorize and permit a third, 10-minute rest period for many of the shifts worked over 10 hours. Class members were also not provided with a second 30-minute meal period on the shifts they worked over 10 hours. Plaintiffs admit that Amazon obtained meal period waivers from some employees, but claim that certain of those waivers are invalid and unenforceable, as they are ambiguous and self-contradictory, misrepresent and fail to fully disclose class members' rights, and unlawfully purport to waive more than just second meal periods. (Doc. 98 at 7-8.)

### 3. Wage Statements (Class 8)

Plaintiffs' claims regarding Amazon's failure to provide accurate wage statements derive both from the face of the wage statements and from Plaintiffs' substantive claims. As to the wage statements themselves, Plaintiffs assert that Amazon provided wage statements that did not have a line item for "total hours worked" in violation of California Labor Code section

226(a)(2).  As to the derivative claims, they stem from Plaintiffs' assertions of substantive wage violations.

### 4.  Payment of Timely Wages and UCL Claims (Classes 9-11)

Plaintiffs' claims for failure to pay timely wages under Labor Code § 203 at the termination of employment and their claims under the UCL are derivative and based on Amazon's alleged substantive violations.

## III.  MOTION FOR CLASS CERTIFICATION

### A.  Legal Standards

#### 1.  Federal Rule of Civil Procedure 23

Class certification of Plaintiffs' claims is governed by Federal Rule of Civil Procedure 23. Whether or not to certify a class is within the discretion of the Court. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL–CIO CLC v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010).

A class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  These requirements are "commonly referred to as the numerosity, commonality, typicality, and adequacy requirements." *Norris–Wilson v. Delta–T Group, Inc.*, 270 F.R.D. 596, 601 (S.D. Cal. 2010).

In addition to the requirements imposed by Rule 23(a), Plaintiffs bear the burden of demonstrating that the class is maintainable pursuant to Rule 23(b).  *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  In this case, Plaintiffs seek class certification under Rule 23(b)(3).  To certify a class under Rule 23(b)(3), Plaintiffs must demonstrate: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3). Plaintiffs bear the burden of satisfying the elements of Rules 23(a) and 23(b)(3). *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

Rule 23 is not a mere pleading standard. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) ("*Dukes*") (emphasis in original). When considering a motion for class certification, a court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350-51 (citation omitted); *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir. 2011).

### 2.  Wage and Hour Claims

"In California, wage and hour claims are ... governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission ("IWC")]." *Troester v. Starbucks Corp.*, 5 Cal.5th 829, 839 (2018), as modified on denial of reh'g (Aug. 29, 2018) (citation and quotation omitted). "The IWC's wage orders are to be accorded the same dignity as statutes. They are presumptively valid legislative regulations of the employment relationship, regulations that must be given independent effect separate and apart from any statutory enactments." *Id.* (citations and quotations omitted). IWC Order No. 2001-7 defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs., tit. 8, § 11070(2)(G). "Hours worked" by an employee are compensable. *See id.* § 11070(3)(A)(1), 4(B); *see also Troester*, 5 Cal.5th at 840; *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 587 (2000).

### IV.  DISCUSSION

#### A.  Rule 23(a) Numerosity, Typicality and Adequacy

As a preliminary matter, the parties do not dispute the numerosity, typicality and adequacy requirements of Rule 23(a).  The Court briefly addresses these requirements.

### 1.  **Numerosity**

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed. R. Civ. P. 23(a). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (quoting *Advert. Specialty Nat'l Ass'n v. Fed. Trade Comm'n*, 238 F.2d 108, 119 (1st Cir.1956)).  Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir.*, 611 F.Supp. 990, 995 (C.D. Cal. 1984).

Amazon does not dispute that Plaintiffs have met the numerosity requirement, suggesting that Plaintiffs' proposed classes cover "over 200,000 current and former employees who worked in over fifty facilities of various types throughout California."  (Doc. 119 at 6.)

For the security screening classes (Classes 1-4), Plaintiffs posit that there are between 70,000 and 80,000 people who worked at Amazon facilities in California that had mandatory metal detector security exit procedures.  (Doc. 98-1 at 26.)  For the wage statement class (Class 8), Plaintiffs have identified hundreds of thousands of wage statements for the relevant time period.  Further, Plaintiffs have identified Amazon's admission that over 40,000 employees' employment ended during the class period.  (*Id.*) Absent a substantive, compelling dispute regarding numerosity, the Court finds that the numerosity requirement is satisfied.

### 2.  **Typicality**

In order to meet the typicality requirement, Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.*

Plaintiffs contend that the typicality requirement is met because Plaintiffs and the putative class members were subject to the same course of conduct. Plaintiffs also assert that they and the putative class seek recovery based upon the same legal theories and Amazon's course of conduct. The Court notes that Plaintiffs were employed only at Fulfillment Centers and not at Sorting Centers with metal detectors or any other type of Amazon facility in California. (*See* Doc. 98-17, Trevino Decl. at ¶ 2 (Tracy); Doc. 98-18, Ward Decl. at ¶ 2 (San Bernardino); Doc. 98-14, Gianini Decl. at ¶ 2 (San Bernardino); Doc. 98-16, Quinteros Decl. at ¶ 2 (Patterson); Doc. 98-13, Avalos Decl. at ¶ 2 (Moreno Valley); Doc. 98-15, Palma Decl. at ¶ 2 (Sacramento.) Nonetheless, Amazon does not argue that the typicality requirement is not satisfied here.

### 3. <u>Adequacy of Representation</u>

Rule 23(a)(4) provides that the court may certify a class only if "the representative parties will fairly and adequately protect the interests of the class." The two key inquiries are whether: (1) the named plaintiff and their counsel have any conflicts of interest with other class members; and (2) plaintiff and counsel will vigorously prosecute the action on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Plaintiffs contend that the adequacy requirement is met. In particular, Plaintiffs aver that neither they nor their counsel have conflicts of interest with other class members. Plaintiffs also aver that they are fully prepared to take all necessary steps to fairly and adequately represent the classes and have agreed to abide by all the necessary duties of class representatives, including assisting counsel in the litigation. (Doc. 98 at 26-27.) Plaintiffs also state that counsel representing the named Plaintiffs are competent and experienced in handling class action lawsuits and have done extensive factual and legal research regarding the asserted claims. (*Id.* at 27.) Amazon does not challenge that the adequacy requirement has been met.

### B. Rule 23(a) Commonality and Rule 23(b)(3) Commonality - Predominance

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although "any competently crafted class complaint literally raises common questions," commonality "requires the plaintiff to demonstrate that the class members have

suffered the same injury." *Dukes,* 564 U.S. at 349-50. "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (internal citations omitted). A class claim "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In assessing commonality, a court's rigorous analysis may entail some overlap with the merits of the plaintiff's underlying claim, and class determinations generally involve "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351.

Under Rule 23(b)(3), the predominance requirement is similar to the Rule 23(a)(2) commonality requirement, but the standard is much higher. *Dukes,* 564 U.S. at 359; *Amchem v. Windsor,* 521 U.S. 591, 624-25 (1997) (predominance criterion far more demanding that Rule 23(a)'s commonality requirement). "When considering whether to certify a class, it is imperative that district courts 'take a close look at whether common questions predominate over individual ones.'" *Olean*, 993 F.3d at 784 (quoting *Comcast Corp. v Behrend*, 559 U.S. 27, 34 (2013)). "[D]istrict courts must perform a 'rigorous analysis' to determine whether this exacting burden has been met before certifying a class." *Id.* (citation omitted). "This "rigorous analysis" requires "judging the persuasiveness of the evidence presented" for and against certification. *Id.* (citation omitted). "[A] district court must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3)." *Id.*

### 1. Exit Screening Classes

Plaintiffs' proposed classes, 1 through 4, with one limited exception discussed below, are comprised of persons who were subject to a "metal detector security process to exit the facility." The security process, as generally described by Plaintiffs, requires that in order to gain access to the production area of a facility, employees were required to "swipe-in" at a security turnstile near the entrance to the facility using an ID badge. The entrance to the facility did not have a metal detector to gain entry. After "swipe-in," an employee clocked in by walking to a

time clock and clocking in by using their ID badges. After their shifts ended, they were required to clock out and then exit the facility through the mandatory security exit process, which consisted of going through a metal detector and bag check and then "swiping out" at the security turnstile before they could leave the facility. (*See, e.g.*, Doc. 98-14, Gianini Decl. at ¶ 3; 98-15, Palma Decl. at ¶ 3; 98-18, Ward Decl. at ¶ 4 ("In order to gain access to the production area of the facility, I was required to 'swipe-in' at a security turnstile near the entrance to the facility using my ID badge. To clock in, I went to a timeclock and clocked in using my ID badge. After my shift was over, I was required to clock out and then exit the facility through the mandatory security exit process, which consisted of going through a metal detector and bag check, including standing for a wand scanner and having my pockets checked, then 'swiping out' at the security turnstile before I could leave the facility."). Similarly, Amazon's expert, Dr. Michael Ward, generally understood the process as follows:

> [A]t the start of the workday employees entering a facility may have their entry arrival time recorded at a turnstile or other sensing device at the entry to the work facility. They then "punch in" to a separate "clock" that records time for payroll purposes. At the end of the day, the process is reversed, in that the employee first "punches out" ending their workday. They then proceed to exit the facility and, if a turnstile exists at the facility, this time is also recorded.

(Doc. 123 at 10, Ex. A, Expert Report of Michael P. Ward, Ph.D. ("Ward Expert Report")).

According to the evidence, Amazon appears to operate two main types of facilities in California with exit security screening in the form of metal detectors: Sorting Facilities and Fulfillment Centers.[6] (Doc. 119-4, Declaration of Cody Carr ("Carr Decl.") at ¶ 3.)

The Court now turns to the specific proposed exit security screening classes for certification.

**Class 1: All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or**

---

[6] Plaintiffs have not clearly identified the total number of facilities at issue for purposes of class certification, and Plaintiffs' counsel was unable to provide such information when questioned at oral argument. Plaintiffs' expert understood that there were 12 facilities with metal detectors at the security checkpoint: LGB8, OAK3, OAK4, ONT2, ONT6, ONT8, ONT9, PCA1, SJC7 and SMF1. (Doc. 107-1 at 13). Plaintiffs were also unable to account for variations of the exit screening procedures among the facilities, such as variations in the number of lanes, seasonal variations of screening, or which facilities turned off the metal detectors.

**as otherwise determined by the Court who were required to go through a metal detector security process to exit the facility.**

For this class, Plaintiffs first claim that "whether the time spent by employees after entering the secured premises and before leaving the secured premises constitutes 'hours worked' under California law and whether [Amazon] paid for all hours worked are common issues" that the Court can resolve on a class-wide basis. (Doc. 98-1 at 11-12.)  In particular, Plaintiffs assert that the issue of whether "off-the-clock" time spent by class members while they were within Amazon's facilities is compensable under the "control" test of Wage Order No. 7 is a common question that can be resolved on a class-wide basis.

Plaintiffs' specific theory of "control" is that after entering the facilities, class members could not choose to leave without exiting through the mandatory security exit procedures, and employees were therefore under Amazon's "control" once they entered the secured facilities until they left the secured facilities after passing through the metal detectors. Plaintiffs argue they should be compensated for that time under Amazon's "control." (Doc. 98-1 at 14; Doc. 123 at 10, Ex. A, Ward Expert Report ("plaintiffs maintain that all time spent by employees inside of a facility should be compensated—not just the time that they are clocked into and out of work.").

Under this theory, Plaintiffs contend that whether they were under Amazon's control "throughout the entirety of time they were on Amazon's premises is a common issue." (Doc. 98-1 at 12.)  This would include the time from when employees "swiped in" (entry turnstile or other sensing device) to the time they "swiped out" (exit turnstile).  According to Amazon's evidence, Fulfillment and Sorting Centers, which have metal detectors, use turnstiles to enter and exit the facility.  (Doc. 119-4, Carr Decl. at ¶ 3.)

Insofar as Plaintiffs claim they are entitled to compensation for the time spent after swiping in (entering the facility) and <u>before</u> clocking in because they could not exit the facility without completing Amazon's mandatory exit screening process, this claim is not supported by the evidence or record.  (Doc. 98-1 at 10.)  After entering facilities with an exit screening

process, and before clocking in, Plaintiffs and putative class members could access lockers and main breakrooms located outside security screening areas. (*See, e.g.*, Doc. 120, Ex. 1, Declaration of Eric Aceves at ¶¶ 1, 31 (Sacramento (SFM1) Fulfillment Center; need to exit security to access main breakroom); Ex. 2, Declaration of Ana Alcala at ¶¶ 1, 7 (San Bernardino (ONT2) Fulfillment Center; "After putting my personal items and storing my lunch in the cubby area near the Main Breakroom, I walk past the security checkpoint . . . I then immediately walk up to a time clock just past security and check in."); Ex. 4, Declaration of Alma Angeles at ¶¶ 1, 8 (Moreno Valley (ONT6) Fulfillment Center; "Once I go through the turnstiles at the entrance . . . , I go straight to the Main Breakroom without clocking in."); Ex. 5, Declaration of Barbara Arana at ¶¶ 1, 29 (San Bernardino (ONT2) Fulfillment Center; lockers and break room near the East doors); Ex. 6 Declaration of Nancy Aviles at ¶¶ 1, 7 (Newark (OAK5) Sorting Facility; "After dropping off my lunch in the Main Breakroom . . . , I go straight to the time clocks to clock in."); Ex. 10, Declaration of Anmol Bhagal at ¶¶ 1, 6-8 (Fresno (FAT1) Fulfillment Center; lockers and Main Breakroom outside of security checkpoint); Ex. 15, Declaration of Suzan Butler at ¶¶ 1, 21, 23 (Tracy (OAK4) Fulfillment Center; "The Main Breakroom is inside the facility, but outside of the security checkpoint in the side of the building.")). Presumptively, employees could enter and exit the facilities without completing the exit security screening process if they only accessed the lockers, main breakrooms or other areas outside of the security checkpoints. In other words, after swiping in at the entrance turnstiles, employees could access the lockers and main breakrooms outside of the security checkpoints and then swipe out and exit the facilities without passing through the metal detectors, so long as they did not enter the secured area beyond the security checkpoints. As a result, Plaintiffs' theory of control for the time period between swiping-in and clocking-in cannot be certified in the absence of any required exit security screening. Even if employees were required to swipe in and swipe out to access the facilities, such time does not amount to control. *See, e.g., Griffin v. Sachs Elec. Co.*, 390 F.Supp.3d 1070, 1091 (N.D. Cal. 2019) (finding process requiring workers to badge-in and badge-out at security gate "analogous to

scanning or flashing an employee badge to enter a compound or campus" and finding the time spent badging-in and badging-out did not equate to control).

Moreover, there is no uniformity in employee choices made during the time period after entry and <u>before</u> clocking in that would make Plaintiffs' theory appropriate for resolution on a class wide basis. (*See*, *e.g.*, Doc. 120, Ex. 3, Declaration of Michael Allgayer at ¶ 6 ("I usually arrive at ONT8 [Moreno Valley] an hour before my shift starts so I can get a really good parking spot. I usually clock in five minutes before my shift start time. When I arrive early, before I clock in, I hang out in the 'fun zone' in the facility which has ping-pong tables and an arcade with video games." ); Ex. 4, Declaration of Alma Angeles at ¶ 6 ("I arrive at Amazon's ONT6 [Moreno Valley] Fulfillment Center parking lot around 5:00 p.m. for my 6:00 p.m. shift. I arrive early because I prefer to have dinner in the breakroom before I clock in for my shift. I also like to sit and talk with my friends before starting work."); Ex. 13, Declaration of Thomas Bowlin at ¶¶ 1, 6 (San Bernardino (ONT5) Sorting Center; "I usually arrive at ONT5 anywhere between one to three hours before my shift starts because I like to be early and use the breakrooms to watch the news on television. I usually end up clocking in five minutes before my shift start time.").

Similarly, at the end of an employee's workday, the time spent <u>after</u> passing through exit security screening, but prior to swiping out to exit appears to suffer from the same substantive defect. As explained by Amazon's expert, at the end of the workday, the employee clocks out and then may exit the facility through a turnstile, if one exists, where the exit time is recorded. (Doc. 123, Ex. A, Ward Expert Report.) The variability of activities during the time period from clock out to exit the facility suggests to the Court that common issues do not predominate. Amazon has presented evidence that after passing through exit security metal detectors, but before exiting, putative class members engage in a variety of activities. (*See*, *e.g.*, Doc. 120, Ex. 2, Alcala Decl. at ¶ 14 ("After clocking out [at San Bernardino (ONT2) Fulfillment Center], I walk through security . . . [A]fter going through security, I generally do not go right out the entrance doors. Instead, I go to retrieve my lunch bag and any other personal items near the Main Breakroom just inside the Main Entrance. I then exit the building and go home."); Ex. 8,

Declaration of Kenneth Bahena at ¶ 13 ("After clocking out [and going through security screening at Moreno Valley (ONT6) Fulfillment Center], I then go . . .to my locker. Once at my locker, I pick up my keys, cell phone and any other personal items I left and may talk to coworkers. I then exit the building to my car."); Doc. 121, Ex. 43, Declaration of Efrain Gonzalez Decl. ¶ 14 ("After clocking out [at Patterson (OAK3) Fulfillment Center and] . . . after going through security, I generally do not go right out the entrance doors. Instead, I go to the lockers to retrieve my personal belongings. Sometimes, I sit and talk with some co-workers for a few minutes before I leave. I then exit the building and go home."); Doc. 122, Ex. 64, Declaration of Fidel Moya, Jr. at ¶ 17 ("After my work is finished and I clock out [at San Bernardino (ONT2) Fulfillment Center], I usually go the restroom, go through the security area, and then go to the East break room on the other side. In the break room, I talk to a group of friends for a few minutes. Often we wait for our whole group of co-workers to get to the break room, grab our stuff, and then leave the facility together."); Ex. 70, Declaration of Marcus Reed Decl. at ¶¶ 7, 15). (" [O]ften after [clocking out at Eastvale (LGB3) Fulfillment Center and] going through security instead of going out the front doors, I go to the Main Breakroom and get my personal items . . . I will either sit for a few minutes or just leave through the nearby front entrance to the building.").

As to these two time periods—the time spent after swiping in and <u>before</u> clocking in and the time spent <u>after</u> passing through exit security screening, but prior to swiping out to exit—Plaintiffs' reliance on *Morillion v. Royal Packing Co.*, 22 Cal.4th 575 (2000) and *Ridgeway v. Walmart Inc.*, 946 F.3d 1066 (9th Cir. 2020), to argue that an employee subject to an employer's control does not have to be working during that time to be compensated is misplaced. *Morillion* involved the general question of whether the time agricultural employees were required to spend traveling on their employer's buses was compensable because they were subject to control of their employer. 22 Cal.4th at 578. The employees in *Morillion* were required to travel on the buses to and from the fields where they were working and were effectively prohibited from using their travel time for their own purposes. Unlike *Morillion*, Amazon's employees were not confined to the facilities with metal detectors either prior to clocking in or after passing through

the metal detectors and exiting. Instead, employees could decide what activities to engage in and when to leave at any time while outside of security checkpoints.

*Ridgeway* is similarly unpersuasive for the pre-clock-in and post-security screening periods of time. *Ridgeway* involved Wal–Mart's written policy requiring its truck drivers to gain preapproval from management before taking a layover at home and subjecting drivers to disciplinary action for taking an unauthorized layover at home. *Ridgeway*, 946 F.3d at 1079. The Ninth Circuit found that because Wal–Mart's policy dictated what drivers could do on layovers and restricted employees from complete freedom of movement during breaks it constituted control under California law. *Id.* at 1081. Here, Amazon did not constrain employees' freedom of movement while outside of the security checkpoints and there is no indication that they were required to obtain permission before leaving the premises prior to clocking in or while outside of security checkpoints.

Plaintiffs also contend that time spent traveling from the time clocks through the mandatory security exit procedure constitutes "work" under the applicable wage order definition of "suffered or permitted to work." (Doc. 98-1 at 14-15.) Plaintiffs urge that "[w]hether such time constitutes 'hours worked' under California law under the 'suffered or permitted to work' test is also an issue that can be resolved on a class-wide basis." (*Id.* at 15.)

Even if Plaintiffs' proposed exit screening classes were limited to the time spent <u>after</u> clocking out and then traveling to and passing through metal detectors, the Court does not find that the requirements of commonality and predominance have been met. At first blush, the issue of whether time spent between clocking out and exiting through the metal detector/bag check screening constitutes "work" appears capable of class wide resolution. However, Plaintiffs have not presented evidence demonstrating a uniform exit security securing process or that employees suffered any delay in passing through the exit security screening. In contrast, Amazon has demonstrated that there is no uniform exit security process consistently applied at the relevant facilities throughout the class period. Specifically, Amazon has presented persuasive evidence that screening varied substantially at facilities with metal detectors depending upon the number of screening lanes, the facility's layout, the procedures during busy

periods, and whether metal detectors were operational. The absence of a uniform policy consistently applied throughout the class period precludes resolution of Plaintiffs' claims on a class wide basis and a class cannot be certified based on exit screening procedures. *See Heredia v. Eddie Bauer LLC*, No. 16-CV-06236-BLF, 2020 WL 127489, at *4 (N.D. Cal. Jan. 10, 2020) ("It is doubtful that the Court would have certified the class [when it did] had it understood that [Eddie Bauer] did not have a single uniform policy in place" because "[i]t is no longer accurate to say that this case involves 'a uniform policy consistently applied' throughout the class period."); *In re Autozone, Inc. Wage and Hour Employment Practices Litig.*, 2016 WL 4208200 at *10 (N.D. Cal. Aug. 10, 2016) (decertifying a class where no uniform in place throughout the class period); *see also Hubbs v. Big Lots Stores, Inc.*, 2017 WL 2304754 at *9 (C.D. Cal. May 23, 2017) (denying class certification where plaintiffs failed to present "sufficient evidence to show that there was a common and consistent policy among Defendants to subject all employees at all of their stores to off-the-clock bag checks"); *Quinlan v. Macy's Corp. Servs., Inc.*, 2013 WL 11091572, at *4 (C.D. Cal. Aug. 22, 2013) (denying certification of a class of employees who were subject to off-the-clock searches finding plaintiffs had not satisfied the commonality requirement because stores "implement[ed] different strategies," altered their strategies "depending on the time of day, day of the week, season, [and] level of traffic," and some stores had no searches at all).

The record includes critical evidence demonstrating that between 2014 to present, during the proposed class period, the majority of the Sorting Facilities that operated with metal detectors have since turned off those detectors. (*See* Doc. 119-4, Carr Decl. at ¶ 3). The record also includes evidence that there were significant periods of time when the metal detectors at Sorting Facilities in Newark (OAK5) and San Bernardino (ONT5) were not operational. (*See* Doc. 120, Ex. 6, Aviles Decl. at ¶ 19 ("I do not think the 'metal detectors' even work and may not even be turned [on]. For the entire time I have worked at Amazon [Sorting Facility in Newark (OAK5)], I have never hear [sic] the metal detectors go off and it does not even seem to me that a security person is even watching them. Nobody checks our bags when we leave the building."); Ex. 13, Bowlin Decl. at ¶ 12 (beginning two months prior to October 2019 there

had been "no security screening to exit ONT5"); Ex. 29, Declaration of Maria Cruz ¶ 18 ("they turned off the metal detectors about one month" prior to October 2019).

Even if operational throughout the duration of the proposed class period, Amazon's evidence demonstrates that there is no uniformity in application of the screening process among Amazon's facilities that have metal detectors because the numbers of detectors and lanes vary. Some facilities have only two lanes and others have as many as ten lanes. (Doc. 119-4, Carr Decl. at ¶ 5.) For example, Amazon's expert, Dr. Elizabeth Arnold, identified that the OAK3 Fulfillment Center had 5 lanes, the ONT2 Fulfillment Center had 2 entrances with 4 lanes each, the LAX5 Sorting Center had 3 lanes, and the OAK5 Sorting Center—with non-operational metal detectors—had 4 lanes.[7] (Doc. 123, Ex. B, Declaration of Elizabeth Arnold, M.S. ("Arnold Decl."), Table 1.)

Plaintiffs contend that minor variances in how the mandatory screening procedures at facilities with active metal detectors are conducted do not defeat commonality, relying on *Lao v. H&M Hennes & Mauritz*, L.P., 2019 WL 7312623, at *1 (N.D. Cal. 2019). *Lao* involved H&M's "alleged policy of requiring all retail employees to undergo a visual inspection by a manager (or other designated person) after they clock out—either at the end of a shift or at closing—but before they leave the H&M store where they work." *Id.* at *1. H&M reportedly used "two types of security checks: (1) bag inspections, where only retail employees that have a bag must allow a manager to check the bag before leaving, and (2) visual inspections, where every retail employee—regardless of whether they have a bag—must inform a manager of when they leave, allowing the manager to observe their person." *Id.* The plaintiff argued that, under California law, the time taken for the visual inspections and for any waiting prior to the inspections was compensable. H&M argued that the policy's inconsistent application to various class members and across different times precluded a finding of commonality. The district court rejected H&M's argument, finding that whether retail employees were required to tell a

---

[7]     Additional examples: ONT8 Fulfillment Center with 6 lanes (Doc. 120, Ex. 3, Allgayer Decl. at ¶ 16; Ex. 17, Cassino Decl. at ¶ 16); FAT1 Fulfillment Center with at least 8 lanes, some express (Doc. 120, Ex. 10, Bhagal Decl.; Ex. 19. Cathcart Decl. at ¶ 27); and LGB3. Eastvale Fulfillment Center with approximately 10 lanes (Doc. 122, Ex. 70, Reed Decl. at ¶ 23; Ex. 72, Robles Decl. at ¶ 22).

manager that they were leaving allowing the manager to see them, to stand in front of a security camera so they could be inspected remotely, or to be escorted to the exit had no material impact on the commonality analysis. The court found that these purported inconsistencies did not negate plaintiff's allegations that, before they are permitted to leave, all class members must (1) inform a manager that they are leaving, and (2) submit to a visual inspection of their person. The court also found that the purported inconsistencies did not suggest that that the visual inspections were not mandatory. *Id.* at *5.

The instant action is distinguishable from *Lao* in two material respects. First, Amazon has presented cogent evidence that multiple facilities ceased using the metal detectors during the proposed class period. Second, Amazon has demonstrated that facilities did not require mandatory screening of employees during certain periods, such as to account for peak seasons when the lanes were subject to "flushing" to prevent long lines to pass through security. (*See* Doc. 119-6, Declaration of Jimmy Oholt Decl. at ¶ 7 (During 'Peak' season . . . at ONT2 and LGB4 there is a 'flush the line' practice . . . "security officers would "flush" the lanes and push associates through the detectors without requiring them to undergo screening. If associates set off the metal detectors when security was pushing people through, those associates did not have to go through secondary screening.") In short, there were periods of time in which the screening process was not mandatory or was not applied to all putative class members. Unlike in *Lao*, the absence of screening is an inconsistency in substance, not form.

It appears from their reply that Plaintiffs attempt to account for the cessation in use of metal detectors—at least for the Sorting Centers—by arguing that "Defendants do not dispute that employees were required to pass through the security to leave the building at the end of their shifts, during meal periods, or during rest periods at facilities with **working exit metal detectors**." (Doc. 128 at 5) (emphasis added). The Court construes the phrase "facilities with working exit metal detectors" as a proposed modification of the class definition for Classes 1 through 4. The Court may consider class definitions first raised in a plaintiff's reply brief. *See, e.g., Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 161 n. 1 (C.D. Cal. 2002) (court considered amended definition proposed reply brief).

Moreover, the Court has the authority to redefine a class, and there is no reason the Court should not consider the amended definition arguably proposed by a plaintiff. *See Garcia v. Schlumberger Lift Sols.*, 2021 WL 1259737, at *18 (E.D. Cal. Apr. 6, 2021). Nevertheless, the Court finds that the proposed amended definition does not alleviate the problem because it fails to account for periods of time during which metal detectors may have been working or operational, but were not used, e.g., when lanes were "flushed."

Amazon additionally contends that the proposed classes cannot be certified because employees were not required to bring anything that needed screening onto the floor. Amazon argues that this fact matters because whether an associate had a choice in dictating the amount of time spent in screening is highly relevant to, if not dispositive of, the control inquiry. The Court does not find this argument wholly persuasive. In *Frlekin*, 8 Cal.5th 1038, the California Supreme Court, at the request of the Ninth Circuit, decided the following question of California law: "Is time spent on the employer's premises waiting for, and undergoing, required exit searches of packages, bags, or personal technology devices voluntarily brought to work purely for personal convenience by employees compensable as 'hours worked' within the meaning of Wage Order 7?" *Id.* at 1042. The California Supreme Court concluded that the answer to this certified question was yes. *Id.* At issue was Apple's policy, which required all employees to undergo searches of their personal packages and bags by a manager or security team member, having employees remove any type of item sold by Apple, and verification of their personal technology with a personal technology log before leaving the premises for any reason, including break, lunch and end of shift. *Frlekin*, 8 Cal.5th at 1044.

After the California Supreme Court answered the certified question, the Ninth Circuit held that time spent by class members waiting for and undergoing exit searches pursuant to Apple's policy was compensable as "hours worked" under California law. *Frlekin.*, 979 F.3d 639, 644 (9th Cir. 2020). The Ninth Circuit also indicated that disputed facts regarding whether some class members did not bring bags or devices to work, were never required to participate in checks, or worked in stores with remote break rooms where they stored their belongings "pertain solely to individual remedies, not to the main legal question as to class-wide relief."

*Id.*; *see also Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695, at *4 (N.D. Cal. Mar. 30, 2021) (same). The Court recognizes that the bag search policy in *Frlekin* involved more extensive search procedures than those presented by Amazon's use of metal detectors. However, *Frlekin* suggests that the voluntary actions of employees to avoid extensive screening is not dispositive of the main legal question.

Amazon further asserts that predominance cannot be met because the bulk of the putative class are uninjured given that their exit screening experience consisted of walking through a metal detector, as if through a doorway, with virtually no delay. "When considering if predominance has been met, a key factual determination courts must make is whether the plaintiffs' statistical evidence sweeps in uninjured class members." *Olean*, 993 F.3d at 791. As the Ninth Circuit explained, the preponderance standard flows from the Supreme Court's emphasis that the evidence used to satisfy predominance be "sufficient to sustain a jury finding as to [liability] if it were introduced in each [plaintiff's] individual action." *Id.* at 787 (emphasis and citation omitted). Plaintiffs therefore "must establish, predominantly with generalized evidence, that all (or nearly all) members of the class" suffered injury as a result of Amazon's exit screening. *Id.* at 791. Although the Ninth Circuit has not established a threshold for how great a percentage of uninjured class members would be enough to defeat predominance, "it must be *de minimis*." *Id.* at 792. Absent a bright-line or numerical rule, the Ninth Circuit held that if the plaintiffs were "unable to show impact for more than one-fourth of the class members, predominance has not been met." *Id.* at 794.

Plaintiffs counter that *Olean* is inapplicable because it involved anti-trust claims and, under Plaintiffs' theories of liability, all of the putative class members have been injured if liability is established. (Doc. 159 at 3.) Plaintiffs assert that questions of liability and individualized damages issues based on variances in the amount of time taken for bag inspections do not defeat predominance, citing *Lao*, 2019 WL 7312623, at *7. (Doc. 128 at 9-10.)

Although Plaintiffs prefer otherwise, the Court finds *Olean* applicable to the class certification analysis. In *Olean*, the Ninth Circuit made clear that the Court must find by a

preponderance of evidence that Plaintiffs have established predominance under Rule 23(b)(3). This standard "best accords with the Supreme Court's warning that class certification is 'proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Olean*, 993 F.3d at 785 (citation omitted). "[A] 'rigorous analysis' of predominance requires 'judging the persuasiveness of the evidence presented' for and against certification." *Id.* "When considering if predominance has been met, a key factual determination courts must make is whether the plaintiffs' statistical evidence sweeps in uninjured class members." *Id.* at 791.

Plaintiffs also assert that Amazon's arguments that class members whose screening experience consisted of walking through a metal detector without stopping are uninjured is wrong because it ignores the waiting time and the actual time going through the screening process. Plaintiffs contend that waiting time and actual time are compensable under *Frlekin*, 979 F.3d at 644, which found that time spent by class members waiting for and undergoing exit searches is compensable as "hours worked" under California law. However, *Frlekin* did not foreclose consideration on remand of "whether time spent by class members undergoing a search is *de minimis*." *Id.*

Having conducted a rigorous analysis of the evidence, the Court finds that Plaintiffs failed to establish predominantly, that all or nearly all members of the proposed class suffered injury by passing through the metal detectors. As a practical matter, for those facilities without operational metal detectors, there can be no evidence of injury. For those facilities with operational metal detectors, Plaintiffs submitted declarations detailing their own individualized experiences with exit screening but failed to provide the Court with representative or statistical evidence demonstrating that all or nearly all putative class members were injured or suffered any delay. Plaintiffs' declarations are not sufficiently specific to support their theory of injury resulting from any waiting time or actual time spent going through the screening process. Instead, Plaintiffs' statements are ambiguous, referring generally to "minutes" spent from clock out through exit security. Plaintiffs Avalos, Gianini, Palma, Trevino and Ward each declared: "I estimate that it took a few minutes from the time I clocked out until I [went] through the exit

security process depending on the lines at the metal detectors." (Doc. 98-13, Avalos Decl. at ¶ 6; 98-14, Gianini Decl. at ¶ 6; 98-15, Palma Decl. at ¶ 6; 98-17, Trevino Decl. at ¶ 6; 98-18, Ward Decl. at ¶ 6.) Plaintiff Quinteros' declaration is equally unavailing because in alleging that the exit security process "usually took a couple minutes to complete," she lumps together all time spent exiting the facility, including passing through the metal detectors and then proceeding to the break room and lockers, picking up her items and then leaving the facility. (Doc. 98-16, Quinteros Decl. at ¶ 5.) She also vaguely alleged that the security screening process "generally took at least two to three minutes to complete." (*Id.* at ¶ 6.) Plaintiffs' expert, Dr. Kriegler, also provides no representative or statistical evidence reflecting time spent in exit security screening, envisioning only that a sampling of historical surveillance footage could be used to measure how long it takes people to go through the mandatory security check process. (Doc. 107-1, Kriegler Decl. at ¶¶ 53, 54.) He did not see surveillance footage of the facilities. (*Id.* at ¶ 67.)

In contrast, Amazon's expert, Dr. Ward, analyzed the time between clocking out and exiting facilities and found that, over the period from July 12, 2013 to August 11, 2019, 89.5% of all associates had a "minimum exit interval time . . . less than one minute." (Doc. 123 at 14 and Table 5, Ex. A, Ward Expert Report.) Similarly, Amazon's expert, Elizabeth Arnold, following studies of a representative sample of the facilities, found that 81% of the employees walked through the metal detectors with no delay," and the "majority of time, passing through the metal detectors takes seconds." (Doc. 123, Ex. B, Arnold Decl. at ¶¶ 129, 133).

Courts have rejected certification of classes where individual issues predominated, such as whether the amount of time allocated to the security checks was *de minimis*. *See*, *e.g.*, *Hubbs*, 2017 WL 2304754, at *9 (denying certification to proposed security inspection class where individual issues, including whether the amount of time allocated to the bag checks was *de minimis*, predominated); *but see Bebber v. Dignity Health*, 2021 WL 1187268, at *17 (E.D. Cal. Mar. 30, 2021) (finding issue of whether violation was *de minimis* suitable for resolution across the entire class); *Figueroa*, 2021 WL 1232695, at *4 (N.D. Cal. Mar. 30, 2021) (finding that although the *de minimis* doctrine raised individual liability questions around class members

for whom bag inspection was a matter of seconds, the liability question did not preclude class certification), *Lao*, 2019 WL 7312623, at *7 ("Rather ... it raises common questions, such as: (a) under these circumstances, how much time would constitute a non-compensable 'brief' period of time, and (b) whether it be administratively feasible for [the employer] to take additional steps to compensate employees for visual inspections.").

**Class 2. Unpaid Wages Class (Controlled Meal Periods)**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who took a meal period and who were required to go through a metal detector security process to leave the facility during such meal period and were not paid for the time of such meal period.

Plaintiffs contend that during their meal periods, Amazon did not relinquish all control over their activities because Amazon restrained employees from leaving the work premises without passing through the mandatory security exit procedures. (Doc. 98-1 at 15.) Plaintiffs rely on *Bono Enterprises, Inc. v. Bradshaw*, 32 Cal.App.4th 968, 968-72 (1995), to support their position. In *Bono*, the court considered a policy where temporary workers were not given a security clearance and were required to remain on the plant premises during their 30-minute lunch period unless they made prior arrangements to reenter the plant after leaving for lunch. *Id.* at 972. The court determined that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control . . . [and] must be paid." *Id.* at 975.

*Bono* is distinguishable from the instant case. According to the record, Amazon associates clock out for meal breaks, cannot clock back in until 30 minutes have passed, and have a three-minute grace period to clock back in. (Doc. 123, Ex. D, Carr Tr. 67:13–68:6; Ex. C, Frauson Tr. 20:1–17.) Amazon's policies also prohibit "off-the-clock" work by associates. (Doc. 119-2, Ex. Y [Sealed].)

Additionally, there is no evidence that Amazon requires employees to remain within its facilities during meal breaks or otherwise restrict whether those breaks can be taken outside of the facility. Anecdotal evidence bears this out. (*See*, *e.g.*, Doc. 120, Ex. 1., Aceves Decl. at ¶ 25 ("I normally eat my lunch outside . . . I can leave the facility during my meal break if I want to . . . .); Ex. 5, Arana Decl. at ¶ 25 ("many times I will go to my car and go buy food nearby . . . and come back. Sometimes I just go sit outside."); Doc. 121, Ex. 35, Dominguez Decl. at ¶ 13 ("I pick up my lunch from the Break Room where I keep my backpack, heat it up in one of the microwaves, and head outside to the smoking and seating area which right outside the building."); Ex. 36, Dunn Decl. at ¶ 25 ("For my meal break, I spend it outside at the tables . . . ."); Ex. 41, Garay Decl. at ¶ 14 ("I usually grab a snack from the Main Breakroom and take it to my car or hang out outside on the steps and socialize."). Further, Amazon's expert, Dr. Ward, provided evidence that Amazon's associates take fully compliant meal breaks after passing through screening. (Doc. 123 at 430, Ex. A, Ward Expert Report.) Almost all employees exited the facility at least once during lunch, and more than half of the employees in the data had exited the facility for "a full 30 minutes" during at least one of their meal breaks. (*Id.*)

As shown above in Class 1, the Court finds that Plaintiffs have not met their burden of demonstrating common questions predominate for controlled meal period claims premised on exit security screening.

**Class 3. Meal Period Violations for Controlled Meal Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than six hours and who were required to go through a metal detector security process to leave the facility during such meal periods and were not paid a meal period premium for such shifts.

Plaintiffs allege Amazon is liable for meal period premiums for each shift for which a meal period was required under Labor Code § 226.7, i.e., shifts over six hours, by restraining class members from leaving the premises for meal periods without first going through the mandatory security exit and limiting where they can take a meal break. For the reasons

discussed above, the Court finds that this class cannot be certified. Amazon authorizes 30 minutes for meal breaks (with a 3-minute grace period) and associates were not required to remain on the premises during their meal period. Additionally, the Court has found that proposed classes based on exit screening are not appropriate for class certification.

**Class 4. Rest Periods Violations for Controlled Rest Periods**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than three and one-half hours and were subject to a policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination or who were required to go through a metal detector security process to leave the facility during the rest period and were not paid a rest period premium for all such shifts.

The parties do not dispute that under California law, an employer must authorize and permit each non-exempt employee a 10-minute rest period for each four hours of work. Plaintiffs contend, however, that Amazon's use of mandatory security exit procedures prevented employees from taking their rest periods off premises without going through mandatory security exit procedures. Plaintiffs further contend that Amazon uniformly applied a policy and practice of limiting where an employee can take a rest break and requiring employees to remain on premises. Plaintiffs rely on *Augustus v. ABM Security Services, Inc.*, 2 Cal.5th 257, 269 (2016), as modified on denial of reh'g (March 15, 2017), for the proposition that during rest periods employers must relieve employees of all duties and relinquish control over how employees spend their time. (Doc. 98-1 at 18.)

Plaintiffs' arguments are not persuasive. First, representative evidence from Amazon's expert, Elizabeth Arnold, demonstrated that the majority of time passing through the metal detectors takes seconds. (Doc. 123, Ex. B, Arnold Decl. at ¶ 133.) Plaintiffs also do not allege that this process took more than "a few minutes" from the time they clocked out until they went through the exit security process, which included time to walk to the metal detectors. (Doc. 98-13, Avalos Decl. at ¶ 6 ("a few minutes"); 98-14, Gianini Decl. at ¶ 6 (same); 98-15 Palma Decl. at ¶ 6 (same); 98-16, Quinteros Decl. at ¶¶ 5 ("couple minutes;" "two to three minutes");

98-17, Trevino Decl. at ¶ 6 ("a few minutes"); 98-18, Ward Decl. at ¶ 6 ("a few minutes"). This general information, along with the undisputed fact that Amazon provided its employees 15-minute rest breaks undercuts any inference that its exit security screening resulted in liability for failing to provide fully compliant 10-minute rest periods. *Figueroa*, 2021 WL 1232695, at *6.

Second, Plaintiffs' reliance on *Augustus* is misdirected. *Augustus* involved security guards who were required to remain on call even during rest periods. 2 Cal.5th at 260. Unlike the security guards in *Augustus,* and as noted, Amazon provides longer rests break than required by California law, authorizing 15 minutes for rest breaks, (Doc. 123, Ex. D, Carr Tr. 67:7– 9.), there is no evidence that Amazon employees were required to remain on call and, as discussed below, rest breaks can be taken outside the facility. As Amazon argues, even if associates were subject to brief delays while leaving the facility for breaks, individualized questions about which employees did not in fact receive a full rest break or were genuinely limited in what they could do for their breaks, predominate over any common questions.

The Court recognizes, however, that the proposed rest break class is alternatively premised on a purported "policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination." Although Plaintiffs claim that Amazon has not disputed the existence of such a policy, with the exception of Plaintiff Linda Quinteros, the declarations submitted by Plaintiffs do not indicate that employees were required to ask permission to leave the premises during rest periods, only that they had to go through exit security screening. [8] (*See generally* Doc. 98-13, Avalos Decl.; 98-14, Gianini Decl.; 98-15, Palma Decl.; 98-17, Trevino Decl.; 98-18, Ward Decl.).

Plaintiffs have not presented evidence that employees were terminated or otherwise subject to disciplinary action if they left to take their rest breaks outside the facility without first seeking permission. In other words, Plaintiffs have not persuasively demonstrated that any such policy was enforced. At oral argument, Plaintiffs represented that Amazon's person most

---

[8]     Plaintiff Quinteros, who worked at Amazon's Patterson facility (OAK3), claims she was not permitted to leave the facility during rest breaks. (Doc. 98-16, Quinteros Decl. at ¶ 13 ("we were not permitted to leave the facility premises during rest breaks")).

knowledgeable, Michele Frauson, testified that Amazon's policies were provided to employees during the on-boarding process, including its policy that leaving the premises without permission was a serious infraction, and that employees were required to comply with those policies. A review of the relevant testimony does not support Plaintiffs' underlying contention that Amazon's policy regarding leaving the premises without permission was, in fact, enforced for rest breaks. Rather, Ms. Frauson testified only generally that Amazon expects its employees to adhere to its policies. (Doc. 98-3 at 51, Exhibit 4 to Dion-Kindem Decl., Frauson Tr. 62:17-19.)

Critically, Amazon has submitted evidence from putative class members who left the facility during rest breaks with no mention of permission being required or that they were terminated or disciplined for doing so. (*See generally* Doc. 123, Ex. GG.) Amazon also has submitted declarations from putative class members from the Patterson facility (OAK3), where Plaintiff Quinteros worked, who indicated that they could leave the facility during rest breaks with no mention of permission. (*See, e.g.,* Doc. 121, Jensen Decl. at ¶ 16 ("I can also go outside . . . .); 122, Ex. 83, Valencia Decl. at ¶ 16 ("I could also leave the facility for my breaks and go outside and/or to my car, if I wanted to."); Ex. 91, Zamarron Decl. at ¶ 14 ("For my [rest] breaks, I either go to the locker room at the entrance of OAK3 or my car, depending on if I drove or not"). Amazon's expert, Dr. Ward, found evidence that 51.3% of all employees exited the facility outside of meal times for at least 10 minutes and, for those employees with 50 shifts or more, 73.7% of those employees exited for at least 10 minutes at some time during their employment over the period July 12, 2013 through August 11, 2019. Doc. 123 at 16-17, Ex. A, Ward Expert Report).

In the absence of evidence that Amazon uniformly enforced any policy requiring permission to leave the facility during rest breaks, there does not appear to be a question that requires common resolution by the Court. "[T]he mere existence of a facially defective written policy—without any evidence that it was implemented in an unlawful manner—does not constitute significant proof ... that a class of employees was subject to an unlawful practice." *Davidson v. O'Reilly Auto Enterprises, LLC*, 968 F.3d 955, 968 (9th Cir. 2020) (internal

quotation marks and citation omitted). Any suggestion that requiring employees to pass through metal detectors equates with requiring employees to obtain permission before leaving the premises is not persuasive.

### 2. Rounding Classes (5 & 7)

**Class 5. Improper Rounding Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were subject to a rounding practice that resulted in them being paid less than they would have received had no such rounding practice been utilized for such employees.

**Class 7. Third Rest Period Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were scheduled to work a 10-hour shift and worked more than 10 hours and who were not authorized or permitted to take a third uninterrupted, duty-free, and control-free 10-minute rest period and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Plaintiffs contend that Amazon implemented a uniform policy and practice of automatically rounding time-keeping entries, generally to conform to shift schedules, and that such policy resulted in class members being paid less than all hours they worked (Class 5) and denied class members who were scheduled to work 10-hour shifts, but in reality worked more than 10 hours, a third rest period (Class 7).

California does not have a statute or regulation expressly addressing the permissibility of using a rounding policy, but state courts have followed the federal regulatory standard. *See See's Candy Shops, Inc. v. Superior Court*, 210 Cal.App.4th 889, 903 (2012) ("The policies underlying the federal regulation—recognizing that time rounding is a practical method for calculating work time and can be a neutral calculation tool for providing full payment to employees—apply equally to employee-protective policies embodied in California Labor law."). The relevant regulation states:

It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b). "[A]n employer's rounding practices comply with § 785.48(b) if the employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." *Alonzo v. Maximus, Inc*., 832 F.Supp.2d 1122, 1126 (C.D. Cal. 2011) (citations omitted).

Plaintiffs acknowledge that Amazon rounds time punches up and down, which allows associates to both punch in late and punch out early. (Doc. 110-1 at 7). Plaintiffs essentially contend, however, that this rounding policy underpays employees and, in certain instances, deprives employees of a third rest break. Plaintiffs provide a declaration from Brian Kriegler, Ph.D., opining that 88.0% of putative class members had fewer hours on the clock based on rounded timestamps and were potentially underpaid due to rounding (60.1% of employee shifts, 71.4% of employee workweeks, and 88.0% of employees had fewer hours on the clock using rounded timestamps) and that 28.6% of putative class members had a shift length over 10 hours based on rounded timestamps, but was less than or equal to 10 hours based on rounded time stamps. (Doc. 107-1 at 20-21, 23.)

Amazon does not dispute the existence of its rounding policy and instead points out that Plaintiffs' rounding classes (Classes 5 and 7) rely on an assumption that Amazon's "uniform rounding policy" resulted in employees being "routinely underpaid," and deprived of a third rest break when their shift exceeded 10 hours. (Doc. 119 at 21-22.) Citing *See's Candy*, Amazon argues that it is only liable if its policy consistently deprived employees of pay for "time they have actually worked." (*Id.*) Amazon urges that the existence of an unlawful rounding policy requires "foundational evidence" that employees were actually working when they were clocked in and were not being paid due to rounding, thus requiring individualized inquiries. (*Id.* at 22.) Amazon provides evidence that some employees clocked in early, but spent that time engaging

in non-work activities, such as socializing, getting coffee, grabbing a snack or using the restroom.  Similarly, Amazon provides evidence that some employees engaged in a variety of non-work activities at the end of their shifts, but before clocking out, such as socializing or visiting the breakrooms.   (*Id.* at 23.)

Amazon asserts that district courts within this Circuit have denied certification of classes that require similar individualized inquiries.  For example, *In Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516 (C.D. Cal. 2011), the court concluded that individual questions predominated where the evidence showed that associates would log in to their work computers upon arriving at work, but then spend time eating or socializing before accepting calls. *Id.* at 535–36. The *Pryor* court found there appeared to be too many variations to determine if an employee was paid for fewer hours than actually worked, including whether they performed non-work activities.  *Id.* at 536.  Likewise, in *Shiferaw v. Sunrise Senior Living Management, Inc*., 2014 WL 12585796, at *9–11 (C.D. Cal. June 11, 2014), the court denied certification of a rounding class where variation existed as to whether employees were actually working when they had clocked in before their shifts started or had clocked out after their shifts ended, where evidence showed that some employees clocked in early, but spent that time talking to co-workers, drinking coffee, talking on the phone, or waiting for their shifts to start.  *Id.* at *9.

Plaintiffs contend that the Ninth Circuit in *Sali v. Corona Regional Medical Center*, 909 F.3d 996 (9th Cir. 2018), recently rejected an argument similar to Amazon's that employees are not working when engaging in personal activities.  (Doc. 128 at 13.)  In *Sali*, the Ninth Circuit considered certification of a rounding-time class and found that the district court erred by assuming that the only question to be decided was whether employees engaged in work activities even if they were not required to do so.  *Id.* at 1010.  The *Sali* court identified that under California law, time is compensable when an employee is working *or* under the control of his or employer.  Accordingly, employees were also actually working if they were subject to the employer's control even if they were not engaging in work activities.  In so identifying, the *Sali* court determined that the district court failed to consider whether the employees could establish on a classwide basis that they were subject to the employer's control, such as if they were

required to remain on premises during the grace period, even if they were not always engaged in work-related activities during that time. *Id.* The Ninth Circuit indicated that the "employer control" question required "an employer-focused inquiry into whether [the employer] had a policy or practice that restricted [employees] in a manner that amounted to employer control during the period between their clock-in and clock-out times and their rounded shift-start and shift-end times" and that determination of this question did not depend on individualized factual questions. *Id.* at 1010-11.

As to the question of whether employees were actually working, the Court finds that Amazon has demonstrated that individualized inquiries would be required to determine whether its employees were actually working during those times when they clocked-in early or clocked-out late. *See Shiferaw*, 2014 WL 12585796, at *9. Plaintiffs attempt to distinguish *Shiferaw* by asserting that the court found common questions as to rounding. (Doc. 128 at 15.) While Plaintiffs are correct, the *Shiferaw* court ultimately found that individualized inquiries predominated in resolving the claims of the rounding class and denied certification on that basis. *Shiferaw*, 2014 WL 12585796, at *9. Moreover, in this case, Plaintiffs have not demonstrated that the putative class members were working or expected to be working during the time they were clocked in before their shifts began. Indeed, Plaintiffs' own declarations do not provide affirmative evidence that they were working after clocking-in, but before shift start. (See Doc. 98-13, Avalos Decl. at ¶ 4; 98-14, Gianini Decl. at ¶ 3; 98-15, Palma Decl. at ¶ 3; 98-16, Quinteros Decl. at ¶ 4 (indicating that after clocking-in, it would then take "at least five more minutes to walk to my work location and prepare for the shift start-up meeting at the scheduled shift start time"); 98-17, Trevino Decl. at ¶ 3; 98-18, Ward Decl. at ¶ 8 ("In order to be on time for my shift start up meeting, or stand-up meeting, I would have to arrive at the facility early so I could go through the above process [swiping badge to pass through the turnstile to get to the production floor in the facility] and clock in and then walk to my assigned work location. Amazon would not record this at time worked, as my time punches for before my scheduled shift time would be rounded forward to reflect the scheduled shift start time.").

Further, record evidence undermines assertions that employees who clocked-in early were, in fact, working as associates testified that they could not begin work until after the stand-up meeting at shift start because the conveyer belts only begin moving after the meeting, (Doc. 121. Ex. 37, Flores Decl. ¶ 12 ("I do not work before the stand-up starts and we cannot do any because the conveyer belts are not functioning."), or they do not receive their assignment for the day, or receive their scanner, until the stand-up, (Doc.122, Ex. 84, Vazquez Decl. ¶ 6 ("There is no work for me to do until after the stand-up, because my work assignment is posted on a board in the area where the stand-up meeting is held."); Ex. 81, Tilley Decl. ¶ 6 ("There is no work for me to do until after the stand-up, because at the beginning of my shift, I am supposed to go to stand-up first . . . to get my scanner."). The time entries proffered by Plaintiffs are not sufficient on their own to demonstrate that the proposed class members must be paid between timestamps. *Shiferaw* 2014 WL 12585796, at *10 (finding "time entries by themselves do not demonstrate that proposed subclass members must be paid for the time spent between the time punch and the employee's scheduled start time").

As to the "employer control" question, this case is distinct from the example of control cited in *Sali*, i.e., employees required to remain on the premises during the grace period. 909 F.3d at 1010. Here, there is no evidence that employees could not leave during the grace period or were otherwise prevented from using the grace period to clock-in late or clock-out early and leave the premises. Indeed, Amazon has presented evidence that employees used the five-minute rounded grace period to clock in late without consequence. (*See*, *e.g.*, Doc. 122, Ex. 73, Rocha Decl. ¶ 8 (clocking in after shift start "does not affect my pay"); Ex. 92, Zarate Decl. ¶ 6 ("Even though I typically clock in after my 6:30 a.m. shift start time, it is not a big deal. Nobody cares."); Doc.120, Ex. 18, Castelan Decl. ¶ 9 (despite arriving early, "sit in my car until" after shift start)) or to leave early (*See* Doc. 120, Ex. 4, Angeles Decl. ¶ 14 ("My shift officially ends at 4:30 a.m. I almost always leave early." "Because of the 5 minute grace period, I can clock out at 4:25 a.m. and still get credit to working to 4:30 a.m."). In short, there is no indication that Amazon uniformly exercises control over employees during the grace periods or

that the rounding policy had a uniform impact on employees. Accordingly, determination of the employer-control question is not readily capable of class wide resolution.

For these reasons, the Court finds that Plaintiffs have not met their burden of demonstrating common questions predominate for claims premised on its rounding claims.

### 3.  Meal Break Waiver Class

**Class 6.  Invalid Second Meal Period Waiver Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Plaintiffs seek to certify the subclass of employees who executed specific meal break waiver forms and who worked more than 10 hours a day and were not provided with a second 30-minute meal period.  (Doc. 98-1 at 20.)  The specific meal break waiver forms at issue are attached as Exhibit 12 to the declaration of Peter Dion-Kindem in support of the class certification motion, one signed in 2017 and one signed in 2018. (Doc. 98-3, Ex. 12.)  Plaintiffs contend that these meal break waiver forms are facially invalid and unenforceable because, in addition to being ambiguous and self-contradictory, they fail to accurately disclose employees' meal break rights and also purport to waive rights which cannot be waived.  (Doc. 128 at 15.) Plaintiffs assert that whether such waivers are legally effective is a legal issue that the Court can resolve on a class-wide basis simply by examining the waivers and applying applicable meal period waiver requirements.

Amazon counters that whether a waiver is "ambiguous" requires an individualized assessment of the waiver and each associate's interpretation and understanding of it, citing California Labor Code § 512.  Because California law requires only "mutual consent"—not a writing—to waive a meal period, Amazon asserts that determining whether consent was given would necessitate individualized, associate-by-associate and shift-by-shift inquiries. Amazon

further asserts that determining the validity of the waiver is only the first step, and Plaintiffs "must also show that they can prove on a classwide basis who was entitled to, but did not receive, a second meal break—which Plaintiffs do not even attempt to do." (Doc. 119 at 26.) Amazon therefore concludes that these individualized issues preclude certification.

The issue of whether these specific meal break waiver forms are facially valid presents a common question capable of class-wide resolution. *See Garcia v. Wal-Mart Stores, Inc.*, 2018 WL 4959824, at *2 (C.D. Cal. Sept. 28, 2018) (granting certification of class composed of employees who worked a 10-hour shift but were not given a second meal period based on an invalid meal waiver form; "overarching question of law is whether the meal waiver form was valid); *Saechao v. Landry's Inc*, 2016 WL 1029479, at *4 (N.D. Cal Mar. 15, 2016) (rejecting defendant's argument that meal break waiver theory relied on individual questions regarding each employee's understanding of the effect of the meal-break waiver where theory turns on "the facial validity of the meal-break waiver form – a question of law capable of resolution on a class-wide basis."); *cf. Clark v. QG Printing II, LLC,* , 2020 WL 5604290, at *16 (E.D. Cal. Sept. 18, 2020) ("it appears that determinations as to the validity of QG Printing's prospective waivers and QG Printing's failure to provide premium pay automatically will drive resolution of most—if not all—claims for the Meal Break Waiver Subclass and that any individualized inquiries would pertain primarily to damages (based on the number of meal breaks missed based on invalid waivers and the amount of premium payment improperly withheld). This limited question of facial validity does not depend upon an individualized assessment of each employee's understanding of the waiver form.

### 4. **Wage Statement Class**

**Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked.

Plaintiffs allege that Amazon violated this section by failing to provide Plaintiffs and other class members with wage statements that accurately listed the total hours worked. (Doc. 98-1 at 22.) Plaintiff Trevino provides an exemplar: his 4/21/2017 wage statement shows 70 regular hours, 11.53 overtime hours, and 2.6 double time hours. It also reflects that every recorded hour of work qualified for a shift differential. Plaintiffs assert that although Plaintiff Trevino worked a total of 84.13 hours during this pay period, when the hours listed are added together, they add up to 168.26 hours. (Doc. 98-17 at 9, Trevino Decl., Ex. 2.) Plaintiffs argue that the wage statement effectively "double-counted" the total hours worked when it reflected shift pay hours and shift pay overtime hours in addition to regular and overtime hours. (Doc. 98-1 at 23.) Plaintiffs assert that whether Amazon's wage statements comply with Section 226(a)(2) requirements is a legal issue that does not involve individualized issues but can be resolved as a matter of law through an examination of the wage statements.

Amazon counters that Plaintiffs cannot establish commonality and predominance on this claim. Amazon asserts that Plaintiffs' bid to certify this class rests on a false presumption that every class member suffered an injury because some wage statements did not include a "total hours worked" line item. According to Amazon, many associates received wage statements that explicitly listed total hours worked and, as of January 1, 2019, all Amazon wage statements displayed a total hours worked line. (Doc. 119 at 28; Doc. 119-3, Osborne Decl. at ¶ 5.) For those wage statements that did not explicitly list total hours worked, Amazon argues that Labor Code section 226(e)(2)(B) presumes injury only if the employee cannot "promptly and easily" determine from the wage statement the total hours worked. Amazon avers that associates could use simple arithmetic to determine the total hours worked and thus injury cannot be established. (Doc. 119 at 27.) Amazon also claims that Plaintiffs must prove that all class members were actually injured for purposes of Article III standing.

California Labor Code section 226(a) requires an employer to provide his or her employee with an accurate itemized statement in writing showing total hours worked by the employee. Cal. Labor Code § 226(a)(2). An employee who is injured as a result of the employer's "knowing and intentional failure" to comply with these requirements may recover

civil penalties. *Id.* § 226(e). An employee is deemed to suffer injury if the employer fails to provide the required information and the employee cannot "promptly and easily determine" the total amount of hours worked. *Id.* § 226(e)(2)(B)(i).

Plaintiffs' putative class premised on the failure to provide wage statements that accurately identified the total hours worked during the pay period in violation of California Labor Code section 226 implicates common questions of law and fact. *See, e.g., Flores v. Dart Container Corp.*, 2021 WL 107239, at *3, *6 (E.D. Cal. Jan. 12, 2021) (finding class shared common legal questions, including whether defendants' policy of failing to provide wage statements that accurately identified the total hours worked during the pay period violated California Labor Code section 226 and this question predominated over questions affecting only individual class members); *Parker v. Cherne Contracting Corp.*, 2020 WL 6822913, at *11 (N.D. Cal. Nov. 20, 2020) (concluding that for purposes of class certification, whether wage statements at issue were legally deficient is a common question of law and fact that predominated over individual issues). Amazon's argument that the wage statements comply with section 226 is a merits question. The Court finds that the question of whether the wage statements at issue, such as those provided in the exemplars from Plaintiff Trevino, complied with section 226 can be determined on a classwide basis. *Arroyo v. Int'l Paper Co.*, 2019 WL 1508457, at *5 (N.D. Cal. Apr. 4, 2019) (finding employer's argument that injury could not be established from wage statement because simple arithmetic allowed the employee to ascertain all of the required information was a merits question, not a class certification determination; concluding plaintiff had presented a claim which was dependent on a common contention with respect to wage statements). It appears that the alleged inaccuracies described by Plaintiff Trevino are limited to a certain subset of wage statements and, at a minimum, do not include wage statements issued beginning January 1, 2019, which displayed a total hours worked line. The class definition will therefore need to be modified to capture wage statements listing shift pay differentials, but not listing a separate line item for "total hours worked," and also limiting the class period through December 31, 2018.

The Court does not find persuasive Amazon's assertions that the class should not be certified because any harm resulting from the alleged wage statement violations would turn on the individual circumstances of each class member and that there is no feasible and manageable mechanism for proving Article III standing for all class members at trial. In *Magadia v. Wal-Mart Associates, Inc.*, ---F.3d---, 2021 WL 2176584, at *8 (9th Cir. May 28, 2021), the Ninth Circuit rejected an identical argument that class members lacked Article III standing for § 226(a) claims. As the Ninth Circuit explained, courts use a two-part inquiry to assess whether a statutory violation causes a concrete injury. *Magadia*, 2021 WL 2176584, at *8. Courts first consider "whether the statutory provisions at issue were established to protect . . . concrete interests (as opposed to purely procedural rights)." *Magadia*, 2021 WL 2176584, at *8 (quoting *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017)). If so, then courts assesses "whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Id.*

Applying the two-part inquiry, the Ninth Circuit in *Magadia* found that "§ 226(a) protects employees' concrete interest in receiving accurate information about their wages in their pay statements." *Id.* Further, the lack of the required information in the wage statement "runs the risk of leaving [plaintiffs] and other employees unable to determine whether" they were underpaid. *Id.* at *9. The Ninth Circuit found that even if an employer "pays its employees all wages owed, those employees suffer a real risk of harm if they cannot access the information required by § 226(a)." *Id.* Therefore, the *Magadia* court concluded that plaintiff had standing to bring his claims under Labor Code § 226(a) and that class members who could establish § 226(a) injuries had standing to collect damages. *Id.*

### 5.  Derivative Classes

**Class 9. Derivative Wage Statement Class**

All members of any of Classes 1 through 7 who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

///

**Class 10. Section 203 Subclass**

All members of any of Classes 1 through 7 who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

**Class 11. UCL Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair.

For purposes of derivative Classes 9 and 10, the Court has found classwide certification appropriate only for Class 6 (Meal Period Waiver). For purposes of derivative Class 11, the Court has found classwide certification appropriate only for Class 6 (Meal Period Waiver) and, as modified, Class 8 (Wage Statements).

### C. Superiority

As stated above, the second part of certification under Rule 23(b)(3) is superiority. The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996). "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior." *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1192 (9th Cir. 2001).

Plaintiffs argue that a class action is the superior method of adjudication because their claims are based on common policies and practices and there is a strong likelihood that putative class members would not bring individual actions. Plaintiffs further argue that calculating damages is easily manageable, relying on the Declaration of Dr. Brian Kriegler. For Class 6 (Meal Period Waivers), the number of second meal periods to which class members were entitled can be established by Amazon's time records. For Class 8 (Wage Statements), statutory penalties recoverable under Section 226(e) can be calculated using the class members wage statements and Amazon's payroll records. For Class 9 (Derivative Wage Statement), the

violations and amount of statutory penalties can be calculated using Amazon's payroll records. For Class 10 (Termination Pay Claims), damages can be calculable from Amazon's payroll records. For Class 11(UCL Claims), the UCL remedy can be calculated using the same methodology used in calculating the damages recoverable for substantive wage claims. (Doc. 110-1).

Amazon counters that Plaintiffs have not presented a manageable trial plan, primarily taking issue with Dr. Kriegler's expert report and the purported failure to address how second meal break waiver claims will be tried. Amazon also finds it troubling that Plaintiffs failed to account for Amazon's individual defenses, including whether various iterations of the second meal period waivers were in fact ambiguous and unintelligible and whether an employee was able to determine the total hours worked on his wage statement using simple arithmetic.

Having considered Amazon's arguments, the Court finds that classwide litigation will promote efficiency by addressing potential defenses to liability for the two non-derivative classes--Class 6 (Meal Period Waiver) and Class 8 (Wage Statement). Amazon has asserted defenses to the merits of these claims, arguing that the meal period waivers are valid and that associates could use simple arithmetic to determine the total hours worked on their wage statements. Resolution of such issues may streamline the litigation and potentially resolve the entirety of the class action, including the derivative claims.

## V.     MOTION TO EXCLUDE PLAINTIFFS' EXPERT DR. BRIAN KRIEGLER

Amazon moves to exclude the testimony and opinions of Plaintiffs' expert, Dr. Brian Kriegler, submitted in support of Plaintiffs' motion for class certification. (Doc. 125.) For the majority of proposed classes, the Court will recommend denial of class certification. In reaching that recommendation, the Court did not substantively rely on Dr. Kriegler's testimony to assess whether Plaintiffs' claims were susceptible to classwide resolution or whether individual questions predominated. Therefore, it is unnecessary to address substantial portions of Amazon's motion seeking to exclude Dr. Kriegler's report, particularly with respect to Classes 1 through 5 and Class 7.

As to the remaining classes, Classes 6 (Meal Period Waiver) and 8 (Wage Statement) (and the derivative Classes 9 through 11), it also was unnecessary for the Court to rely on Dr. Kriegler's report for a determination as to whether these classes are susceptible to class wide resolution. Class 6 is premised on the facial validity of specific meal break waiver forms, a legal question that does not require expert testimony. Class 8 is likewise premised on a legal question susceptible to resolution without expert testimony; that is, whether certain wage statements violated Labor Code § 226(a). Accordingly, the Court will recommend that Amazon's motion to exclude Plaintiffs' expert be DENIED as moot.

## IV.    CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED as follows:

1.    Plaintiffs' Motion for Class Certification is GRANTED IN PART and DENIED IN PART as follows:

a.    Plaintiffs' motion for class certification be DENIED as to the following classes:  Class 1 Unpaid Wages Class (Hours Worked Claim Based on Control of Employees through Mandatory Exit Security Procedures); Class 2 Unpaid Wages Class (Controlled Meal Periods); Class 3 Meal Period Violations for Controlled Meal Periods; Class 4 Rest Periods Violations for Controlled Rest Periods; Class 5 Improper Rounding Class; and Class 7 (Third Rest Period Class);

b.    Plaintiffs' motion for class certification be GRANTED as to the following classes:

Class 6 (Invalid Second Meal Period Waiver Class) defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and **December 31, 2018** who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked.

Class 9. Derivative Wage Statement Class defined as:

**All members of Class 6** who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

Class 10. Section 203 Subclass defined as:

**All members of Class 6** who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

Class 11. UCL Class defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair.

2. Defendants' Motion to Exclude Plaintiffs' Expert Dr. Brian Kriegler be DENIED as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these findings and recommendations, the parties may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v.*

*Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**June 7, 2021**__                          /s/ *Barbara A. McAuliffe*
                                          _____
                                          UNITED STATES MAGISTRATE JUDGE