1

2

3

4

5

6

7    UNITED STATES DISTRICT COURT

8    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   JUAN TREVINO, CHRISTOPHER
     WARD, LINDA QUINTEROS, ROMEO
11   PALMA, BRITTANY HAGMAN,[1]
     ALBERTO GIANINI, and JUAN C.
12   AVALOS, on behalf of themselves and all
     others similarly situated,
13

14            Plaintiffs,

15        v.

16   GOLDEN STATE FC LLC, a Delaware
     Limited Liability Company;
17   AMAZON.COM INC., a Delaware
     Corporation, AMAZON FULFILLMENT
18   SERVICES, INC., a Delaware Corporation,
19
              Defendants.
20

21

22

23

24

25

26

27

28

|  |  |
|---|---|
|  | **LEAD CASE NO. 1:18-cv-00120-ADA-BAM**<br><br>Member Case No: 1:18-cv-00121-ADA-BAM<br>Member Case No: 1:18-cv-00567-ADA-BAM<br>Member Case No: 1:18-cv-01176-ADA-BAM<br>Member Case No: 1:17-cv-01300-ADA-BAM<br><br>**AMENDED FINDINGS AND RECOMMENDATIONS REGARDING (1) PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND (2) DEFENDANTS' MOTION IN LIMINE**<br><br>(Docs. 96, 98, 125) |

---

[1] On December 9, 2019, pursuant to the parties' stipulation, Plaintiff Brittany Hagman was dismissed from this action as a putative class representative without prejudice.  (Docs. 106, 109.)

**AMENDED**

**Findings and Recommendations**

## I.    INTRODUCTION

Plaintiffs Juan Trevino, Christopher Ward, Linda Quinteros, Romeo Palma, Alberto Gianini and Juan C. Avalos, on behalf of themselves and all others similarly situated, bring this consolidated class action against defendants Golden State FC, LLC (now known as Amazon.com Services LLC), Amazon.com, Inc., and Amazon Fulfillment Services, Inc. (now known as Amazon.com Services LLC) (collectively, "Amazon").  Plaintiffs moved for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  (Docs. 96, 98.) The motion was referred to United States Magistrate Judge Barbara A. McAuliffe for issuance of findings and recommendations in accordance with 28 U.S.C. § 636(b)(1)(B) and (C).  (Doc. 112.)  Amazon relatedly moved to exclude the testimony and opinions of Plaintiffs' expert, Dr. Brian Kriegler, which Plaintiffs had submitted in support of their motion for class certification. (Doc. 125.)  Amazon's motion was heard in conjunction with Plaintiffs' motion for class certification.  (Doc. 126.)

On June 8, 2021, the undersigned issued findings and recommendations, recommending that Plaintiffs' motion for class certification be granted in part and denied in part and that Amazon's motion to exclude plaintiffs' expert Dr. Kriegler be denied as having been rendered moot. (Doc. 166.)  Plaintiffs filed objections on June 22, 2021, and Amazon filed a response to those objections on July 2, 2021. (Docs. 168, 170.) Additionally, Plaintiffs filed a notice of supplemental authority on August 9, 2021, in which they pointed out that on August 3, 2021, the Ninth Circuit vacated its original decision in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021) (*Olean I*) and granted a rehearing *en banc*. (Doc. 171.) Plaintiffs contended that the findings and recommendations relied extensively on the now vacated decision in *Olean I*, which had vacated and remanded the district court's granting of motions for class certification, in recommending the denial of certification as to certain classes in this case. (*Id.*)

On August 27, 2021, the district judge issued an order staying the action pending the final decision from the Ninth Circuit in *Olean*.  (Doc. 173.)  On April 8, 2022, the Ninth Circuit issued the *en banc* opinion *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC* (No. 19-56514) (*Olean II*).  *See Olean Wholesale Grocery v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*).  As a result of the potential changed circumstances stemming from the *Olean II* decision, the district court declined to adopt the findings and recommendations, and instead referred Plaintiffs' motion for class certification and Defendants' motion to exclude the testimony of Dr. Kriegler back to the undersigned for the issuance of amended findings and recommendations in light of the Ninth Circuit's *en banc* decision in *Olean II*.  (Doc. 181.)

On June 2, 2022, Plaintiffs submitted supplemental briefing on the effect of *Olean II* on Plaintiffs' motion for class certification.  (Doc. 185.)  Defendants responded on June 16, 2022, (Doc. 186), and Plaintiffs replied on June 23, 2022, (Doc. 187.)  On June 28, 2022, Defendants requested leave to file a one-paragraph surreply, which was unopposed.   (Doc. 188.)  In the absence of any opposition, and given its limited scope, Defendants' request is GRANTED.

On August 6, 2022, the Court issued a Minute Order noting that a petition for certiorari of the *en banc* decision in *Olean II* was filed with the United States Supreme Court. (Doc. 192.) The Court indicated that it would not address the referral of the motion for class certification until the petition for certiorari was denied or the Supreme Court decided the merits of the case. The parties did not object to waiting for a decision pending the Supreme Court's ruling on the petition for certiorari.  Certiorari was denied on November 14, 2022.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 674 (9th Cir.), cert. denied sub nom. *StarKist Co. v. Olean Wholesale Grocery Coop., Inc.,* 143 S. Ct. 424 , 214 L. Ed. 2d 23, (2022).

Having considered the parties' briefing and arguments, including supplemental briefing following the Ninth Circuit's *en banc* decision in *Olean II*, and for the reasons that follow, it is recommended that Plaintiffs' Motion for Class Certification be granted in part and denied in

part, and that Amazon's motion to exclude the testimony and opinions of Dr. Kriegler be denied as moot.

## II.   BACKGROUND

### A.  Factual and Procedural Background

This matter is a consolidated action comprised of five wage and hour lawsuits originally filed in the Central and Eastern Districts of California.  On March 28, 2019, Plaintiffs filed a First Amended Consolidated Class Action Complaint (the "Complaint") seeking to bring wage and hour claims on behalf of all current and former non-exempt hourly workers employed by Amazon in California for the period of four (4) years prior to July 12, 2017 to the present. (Doc. 65, Complaint at ¶ 21.)

Amazon.com, Inc. ("Amazon.com") is one of the world's largest and well-known on-line retailers. Amazon.com fills customer orders and ships them based out of a network of fulfillment, sorting, distribution, and shipping centers.  (Doc. 98-1 at 6.)[2] According to the allegations in the Complaint, Amazon operates at least nine different fulfillment centers for Amazon.com in California, which are located in San Bernardino, Rialto, Eastvale, Tracy, Moreno Valley, Redlands, and Patterson City.  They are in San Bernardino, Riverside, San Joaquin, Stanislaus, and Riverside counties.  (Complaint at ¶ 17.)

Plaintiff Juan Trevino worked as a Fulfillment Associate in Amazon's fulfillment center located in Tracy, California, from March 14, 2017 through May 6, 2017.  (Complaint at ¶ 8.) Plaintiff Christopher Ward worked in various positions at Amazon's fulfillment center located in San Bernardino, California, from May 24, 2015 to November 23, 2016.  (*Id.* at ¶ 9.)  Plaintiff Linda Quinteros worked in various positions at Amazon's fulfillment center located in Patterson, California, from October 17, 2013 to December 13, 2016.  (*Id.* at ¶ 10.)  At the time of briefing on the certification motion, Plaintiff Romeo Palma was employed at Amazon's fulfillment center in Patterson, California.  (*Id.* at ¶ 11.)  Plaintiff Alberto Gianini worked as a Warehouse Associate in Amazon's fulfillment center located in San Bernardino, California from

---

[2] Page number citation is based on the Court's CM/ECF pagination.

October 2014 through August 2016.[3]  (*Id.* at ¶ 13.)  Plaintiff Juan C. Avalos worked in the outbound department, processing packages that were going to be shipped out in Amazon's fulfillment center located in Moreno Valley, California from July 2016 through May 2017.  (*Id.* at ¶ 14.)

Plaintiffs forward claims for the following wage and hour violations:  (1) failure to pay wages for all hours worked, including overtime, (2) meal period violations, (3) rest period violations, (4) wage statement violations, (5) failure to pay wages under California Labor Code § 203, (6) unfair business practices, and (7) violations of the California Business and Professions Code (Private Attorneys General Act claim). (Doc. 65.)

With regard to the claim for failure to pay for all hours worked, Plaintiffs allege that Amazon instituted a variety of policies resulting in violations.  These policies include:  (1) scheduling employees for 10-hour shifts, but during pre-holiday periods, requiring Plaintiffs and putative class members to work 11 or 12-hour shifts (Complaint at ¶ 31); (2) a uniform policy of rounding actual time entries down to the nearest total one-tenth hour to conform to shift schedule, not actual time worked (*Id.* at ¶ 32); (3) a uniform policy of providing a five-minute grace period excusing an employee who clocks in late for a work shift if he or she clocked in during that five-minute window, but if the employee was more than five minutes late, not compensating the employee for the remainder of the first hour worked and deducting an hour of unpaid time from the employee's accumulated unpaid time hours (*Id.* at ¶ 34); (4) failing to pay shift premiums to all employees who worked shifts eligible to receive them (*Id.*); (5) an alternative workweek and shift scheduling policy and practice that required a four-day workweek and ten-hour workdays that undercompensated employees for two hours of their working time and systematically reflected fewer overtime hours than they worked (*Id.* at ¶ 36); (6) a policy requiring Plaintiffs and putative class members to routinely work shifts over eight (8) hours in a day and over forty (40) hours in a work week, but not paying appropriate overtime

---

[3] The Complaint alleges that Plaintiff Gianini was employed by Amazon "from October 2104." (Complaint at ¶ 13.)  The year "2104" is an apparent typographical error, which the Court construes as "2014."

1    rate for all such hours (*Id.* at ¶ 37); and (7) failing to compensate Plaintiffs and putative class

2    members for time spent going through Amazon's security procedures[4] (*Id.* at ¶ 38).

3         With regard to the claim for failure to provide lawful meal periods, Plaintiffs allege that

4    Amazon engaged in a number of policies and practices that resulted in violations.  These

5    policies and practices include:  (1) requiring fulfillment center employees to work shifts greater

6    than five (5) hours without providing them with timely, uninterrupted duty-free meal periods of

7    not less than thirty (30) minutes because they were required to clock-out at the beginning of

8    their meal periods and were then subject to security procedures both to leave the work site and,

9    if they left the work site, were subject to security procedures to re-enter the work site before

10   they could clock-in (Complaint at ¶ 33); (2) failing to provide Plaintiffs and putative class

11   members with a second 30-minute meal period on the shifts in which they worked over ten (10)

12   hours and being provided with a purported "California Meal Period Waiver Agreement" that did

13   not clearly state the terms and conditions under which the waiver would apply (*Id.* at ¶ 44); (3)

14   shortening of meal periods due to off-the-clock work and rounding and untimely meal periods

15   after the fifth hour of work on shift (*Id.* at ¶ 45); and (4) failing to compensate employees for

16   each meal period not provided or inadequately provided (*Id.* at ¶ 46).

17        With regard to the claim for failure to provide rest periods, Plaintiffs allege that Amazon

18   engaged in a number of policies and practices that resulted in violations.  These policies and

19   practices include:  (1) uniformly failing to authorize and permit Plaintiffs and putative class

20   members to take their required ten (10) minute rest periods for every four (4) hours of work or

21   major fraction thereof or to take a third ten-minute rest break when they worked shifts over ten

22   (10) hours in a day (Complaint at ¶ 48); (2) failing to relieve employees of all duties and

23   relinquish control over how employees spend time during rest periods by requiring them to walk

24   to remote break room locations during rest breaks (*Id.* at ¶ 49); (3) enforcing a uniform policy

25   preventing Plaintiffs and the putative class members from leaving the fulfillment center

26   premises during their rest breaks under a uniformly applied policy that admonished that "leaving

27   _____

28   [4] The Court will refer to Amazon's exit security procedures as both "exit security procedures" and "exit security process," as the parties use these terms interchangeably.

company premises without permission during assigned work hours" is "extremely serious" and may result in "termination of employment" (*Id.* at ¶ 50); and (4) failing to compensate employees with an additional hour of pay for each day Amazon failed to provide them with adequate rest breaks (*Id.* at ¶ 53).

With regard to the claim for wage statement violations, Plaintiffs allege that Amazon violated California Labor Code § 226(a) by failing to provide Plaintiffs and putative class members with wage statements that accurately showed (1) gross wages actually earned, (2) total hours worked, (3) net wages actually earned, and (4) applicable hourly rates and the corresponding number of hours worked at each hourly rate (Complaint at ¶¶ 57-60).

With regard to the claim for failure to timely pay wages due at termination, this is a derivative claim.  Plaintiffs allege that members of the putative class that were terminated during the relevant time period were not timely paid the wages earned and unpaid that were due to them, including wages at the appropriate rate for all hours worked and meal and rest period premiums as alleged in the Complaint.  (Complaint at ¶ 68.)

With regard to the unfair business practices and PAGA claims, these also are derivative claims based on the alleged Labor Code violations.  (Complaint at ¶¶ 74, 80.)

On November 22, 2019, Plaintiffs moved to certify eleven classes pursuant to Fed. R. Civ. P. 23(a) and (b).  (Doc. 96 [Sealed].)  Pursuant to a sealing order, Plaintiffs filed redacted briefing on November 26, 2019, and December 10, 2019. (Docs. 98, 110.)  Amazon opposed the motion by redacted briefing on January 13, 2020, and Plaintiffs replied on January 30, 2020. (Docs. 119, 128.)  On January 24, 2020, Amazon filed a separate motion to exclude the testimony of Plaintiffs' expert witness, Dr. Kriegler.  (Doc. 125.)  Plaintiffs opposed the motion to exclude (Doc. 133), and Amazon replied, (Doc. 135).  Subsequent to the completed briefing, the parties filed notices of new authority addressing various Ninth Circuit and state law decisions. (Doc. 137, 140, 149, 154, 158, 163.)

On June 8, 2021, after a hearing, the undersigned issued findings and recommendations, which recommended that Plaintiffs' Motion for Class Certification be granted in part and denied

in part, and that Amazon's motion to exclude the testimony and opinions of Dr. Kriegler be denied as moot.  (Doc. 166.)

On May 5, 2022, the district judge declined to adopt the findings and recommendations. Instead, the District Court referred the motions back to the undersigned for the issuance of amended findings and recommendations in light of the Ninth Circuit's decision in *Olean II*. (Doc. 181.)

The parties filed supplemental briefing addressing the effect of *Olean II* on Plaintiffs' motion for class certification.  (Docs. 185-188.)  Subsequent to that briefing, the parties filed notices of supplemental authority relating to certification of the exit security screening classes and the rounding classes.  (*See* Docs. 189, 190, 193, 194.)

**B.  Proposed Classes**

As indicated, Plaintiffs seek certification of eleven classes.  They are as follows:

**Class 1. Unpaid Wages Class (Hours Worked Claim Based on Control of Employees through Mandatory Exit Security Procedures)**

All non-exempt employees employed by Amazon.com Services, Inc.[5] or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were required to go through a metal detector security process to exit the facility.  (Doc. 98-1 at 10.)

**Class 2. Unpaid Wages Class (Controlled Meal Periods)**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who took a meal period and who were required to go through a metal detector security process to leave the facility during such meal period and were not paid for the time of such meal period. (Doc. 98-1 at 15.)

**Class 3. Meal Period Violations for Controlled Meal Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as

---

[5]  This class would include Golden State FC, LLC employees as this company merged with Amazon.com Services, Inc.

otherwise determined by the Court who worked a shift longer than six hours and who were required to go through a metal detector security process to leave the facility during such meal periods and were not paid a meal period premium for such shifts.   (*Id.* at 16-17.)

**Class 4. Rest Periods Violations for Controlled Rest Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than three and one-half hours and were subject to a policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination or who were required to go through a metal detector security process to leave the facility during the rest period and were not paid a rest period premium for all such shifts. (*Id.* at 18.)

**Class 5. Improper Rounding Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were subject to a rounding practice that resulted in them being paid less than they would have received had no such rounding practice been utilized for such employees.  (*Id.* at 19.)

**Class 6.  Invalid Second Meal Period Waiver Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.  (*Id.* at 20.)

**Class 7.  Third Rest Period Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were scheduled to work a 10-hour shift and worked more than 10 hours and who were not authorized or permitted to take a third uninterrupted, duty-free, and control-free 10-minute rest period and did not receive one hour of pay at the class member's regular rate of compensation for such day. (*Id.* at 20-21.)

///

**Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked. (*Id.* at 21.)

**Class 9. Derivative Wage Statement Class**

All members of any of Classes 1 through 7 who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

**Class 10. Section 203 Subclass**

All members of any of Classes 1 through 7 who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

**Class 11. UCL Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair. (*Id.* at 24.)

**C. Challenged Policies**

Many of the challenged policies overlap within and among the various classes. The Court provides a summary of the policies along with a reference to the particular class or classes.

**1.      Payment of Lawful Wages**

Exit Security Procedures (Classes 1-4)

1   Plaintiffs contend that Amazon implemented uniform exit security procedures at all the

2   facilities where Plaintiffs and putative class members worked, which required all of the putative

3   class members to pass through metal detectors and undergo security procedures to exit the

4   facilities at the end of their shifts, for their meal periods or to exit for any other reason.

5   Plaintiffs contend that employees were under Amazon's "control" from the time of facility

6   entrance (swipe-in) until the time employees passed through the metal detectors and exited

7   (swipe-out).  Plaintiffs further contend that by Amazon's uniform policy, Amazon failed to pay

8   Plaintiffs and putative class members for all hours worked, including the time they were under

9   Amazon's control after clocking out while they were subjected to Amazon's exit security

10  procedures.

11  <u>Rounding Policy (Classes 5 and 7)</u>

12  ███████████████████████████████████████████

13  ████████████████████████████████████████████

14  ███████████████████████████████████████████

15  ████████████████████████████████████████████

16  ███████████████████████████████████████████

17  ███████████████████████████████████████████

18  ███████████████████████████  Plaintiffs claim that Amazon underpaid putative

19  class members in the aggregate due to rounding.

2.   **Meal and Rest Periods (Classes 3-7)**

21  Plaintiffs contend that by requiring mandatory security screening exit procedures to

22  leave the facilities, Amazon failed to relinquish all control over employees' activities during

23  meal and rest periods, including control over where such breaks are taken. Plaintiffs second

24  theory of liability is that Amazon's written uniform policies prohibit employees from leaving

25  the premises for rest periods without permission.

26  Amazon allegedly also failed to authorize and permit a third, 10-minute rest period for

27  many of the shifts worked over 10 hours. Class members were also not provided with a second

28  30-minute meal period on the shifts they worked over 10 hours. Plaintiffs admit that Amazon

11

obtained meal period waivers from some employees, but claim that certain of those waivers are invalid and unenforceable, as they are ambiguous and self-contradictory, misrepresent and fail to fully disclose class members' rights, and unlawfully purport to waive more than just second meal periods.  (Doc. 98 at 7-8.)

### 3.     Wage Statements (Class 8)

Plaintiffs' claims regarding Amazon's failure to provide accurate wage statements derive both from the face of the wage statements and from Plaintiffs' substantive claims.  As to the wage statements themselves, Plaintiffs assert that Amazon provided wage statements that did not have a line item for "total hours worked" in violation of California Labor Code section 226(a)(2).  As to the derivative claims, they stem from Plaintiffs' assertions of substantive wage violations.

### 4.     Payment of Timely Wages and UCL Claims (Classes 9-11)

Plaintiffs' claims for failure to pay timely wages under Labor Code § 203 at the termination of employment and their claims under the UCL are derivative and based on Amazon's alleged substantive violations.

## III.     MOTION FOR CLASS CERTIFICATION

### A.  Legal Standards

#### 1.  Federal Rule of Civil Procedure 23

Class certification of Plaintiffs' claims is governed by Federal Rule of Civil Procedure 23. Whether or not to certify a class is within the discretion of the Court. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL–CIO CLC v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010).

A class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  These requirements are "commonly referred to as the numerosity, commonality,

1    typicality, and adequacy requirements." *Norris–Wilson v. Delta–T Group, Inc.*, 270 F.R.D. 596,

2    601 (S.D. Cal. 2010).

3          In addition to the requirements imposed by Rule 23(a), Plaintiffs bear the burden of

4    demonstrating that the class is maintainable pursuant to Rule 23(b).  *Narouz v. Charter*

5    *Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  In this case, Plaintiffs seek class

6    certification under Rule 23(b)(3).  To certify a class under Rule 23(b)(3), Plaintiffs must

7    demonstrate: (1) "questions of law or fact common to class members predominate over any

8    questions affecting only individual members," and (2) a class action is "superior to other

9    available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

10   23(b)(3).  Plaintiffs bear the burden of satisfying the elements of Rules 23(a) and 23(b)(3).  *See*

11   *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

12         Rule 23 is not a mere pleading standard.  "A party seeking class certification must

13   affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove

14   that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-*

15   *Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) ("*Dukes*") (emphasis in original).  When

16   considering a motion for class certification, a court must conduct a "rigorous analysis" to

17   determine "the capacity of a class-wide proceeding to generate common *answers* apt to drive the

18   resolution of the litigation."  *Id.* at 350-51 (citation omitted); *Ellis v. Costco Wholesale Corp.,*

19   657 F.3d 970, 980 (9th Cir. 2011). Because the "class determination generally involves

20   considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause

21   of action," this rigorous analysis may include "prob[ing] behind the pleadings" and "overlap

22   with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-

23   34 (2013).

24                          **2.   Wage and Hour Claims**

25         "In California, wage and hour claims are ... governed by two complementary and

26   occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the

27   Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission

28   ("IWC")]." *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 839 (2018), as modified on denial of

                                          13

reh'g (Aug. 29, 2018) (citation and quotation omitted). "The IWC's wage orders are to be accorded the same dignity as statutes. They are presumptively valid legislative regulations of the employment relationship, regulations that must be given independent effect separate and apart from any statutory enactments." *Id.* (citations and quotations omitted).

Relevant here, IWC Order No. 2001-7 ("Wage Order No. 7") defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs., tit. 8, § 11070(2)(G). "Hours worked" by an employee are compensable. *See id.* § 11070(3)(A)(1), 4(B); *see also Troester*, 5 Cal. 5th at 840; *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 587 (2000).

California's compensable-time standard encompasses two categories of time. *Walter v. Leprino Foods Co.*, No. 2:20-CV-00700-AWI-BAM, 2023 WL 3076786, at * 8 (E.D. Cal. Apr. 24, 2023). First, time is compensable if an employee is "under the control" of his or her employer, whether or not he or she is engaging in work activities, such as by being required to remain on the employer's premises or being restricted from engaging in certain personal activities. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1010 (9th Cir. 2018) (citing *Morillion*, 22 Cal. 4th at 579 and *Aguilar v. Assn. of Retarded Citizens*, 234 Cal. App. 3d 21 (1991)); *see also Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1046 (2020). Second, time is compensable if an employee "is suffered or permitted to work, whether or not required to do so." *Sali,* 909 F.3d at 1010 (citing *Morillion*, 22 Cal. 4th at 578). This may include "time an employee is working but *is not* subject to an employer's control," such as "unauthorized overtime, which the employer has not requested or required." *Sali,* 909 F.3d at 1010 (citing *Morillion,* 22 Cal. 4th at 584-85); *see also Frlekin*, 8 Cal. 5th at 1046.

## IV. DISCUSSION

### A. Rule 23(a) Numerosity, Typicality and Adequacy

As a preliminary matter, the parties do not dispute the numerosity, typicality, and adequacy requirements of Rule 23(a). The Court briefly addresses these requirements.

#### 1. **Numerosity**

Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed. R. Civ. P. 23(a). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting *Advert. Specialty Nat'l Ass'n v. Fed. Trade Comm'n*, 238 F.2d 108, 119 (1st Cir.1956)).  The exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir.*, 611 F. Supp. 990, 995 (C.D. Cal. 1984). In general, courts find the numerosity requirement satisfied when a class includes at least 40 members. *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 213 (E.D. Cal. 2015) (citing *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010)); *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011).

For the security screening classes (Classes 1-4), Plaintiffs posit that there are between 70,000 and 80,000 people who worked at Amazon facilities in California that had mandatory metal detector security exit procedures.  (Doc. 98-1 at 26.)  For the wage statement class (Class 8), Plaintiffs have identified hundreds of thousands of wage statements for the relevant time period.  Further, Plaintiffs have identified Amazon's admission that over 40,000 employees' employment ended during the class period.  (*Id.*)  Amazon does not dispute that Plaintiffs have met the numerosity requirement, suggesting that Plaintiffs' proposed classes cover "over 200,000 current and former employees who worked in over fifty facilities of various types throughout California."  (Doc. 119 at 6.)  Absent a substantive, compelling dispute regarding numerosity, the Court finds the numerosity requirement satisfied.

### 2.  Typicality

To meet the typicality requirement, Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3). The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). "The test of typicality 'is whether other members have the same or similar injury, whether the

action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.*

Plaintiffs contend that the typicality requirement is met because Plaintiffs and the putative class seek recovery based upon the same legal theories and Amazon's course of conduct. Plaintiffs have not made claims based on conduct that is alleged to be unique to them. Amazon does not argue that the typicality requirement is not satisfied here. Thus, the Court finds that Plaintiffs' allegations and evidence satisfy the typicality requirement.

### 3.  Adequacy of Representation

Rule 23(a)(4) provides that the court may certify a class only if "the representative parties will fairly and adequately protect the interests of the class." The two key inquiries are whether: (1) the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class. *Ellis*, 657 F.3d at 985.

Plaintiffs contend that the adequacy requirement is met. In particular, Plaintiffs aver that neither they nor their counsel have conflicts of interest with other class members. Plaintiffs also aver that they are fully prepared to take all necessary steps to fairly and adequately represent the classes, and they have agreed to abide by all the necessary duties of class representatives, including assisting counsel in the litigation. (Doc. 98 at 26-27.) Plaintiffs also state that counsel representing the named Plaintiffs are competent and experienced in handling class action lawsuits and have done extensive factual and legal research regarding the asserted claims. (*Id.* at 27.) Amazon does not challenge that the adequacy requirement has been met.

### B.  Rule 23(a) Commonality and Rule 23(b)(3) Commonality - Predominance

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although "any competently crafted class complaint literally raises common questions," commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes,* 564 U.S. at 349-50. As noted, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of

the litigation." *Id.* at 350 (internal citations omitted).  A class claim "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  In assessing commonality, a court's rigorous analysis may entail some overlap with the merits of the plaintiff's underlying claim, and class determinations generally involve "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351.

Under Rule 23(b)(3), the predominance requirement is similar to the Rule 23(a)(2) commonality requirement, but the standard is much higher. *Dukes*, 564 U.S. at 359; *Amchem v. Windsor,* 521 U.S. 591, 624-25 (1997) (predominance criterion far more demanding that Rule 23(a)'s commonality requirement).  "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies . . . the predominance requirement of Rule 23(b)(3)," and must carry their burden of proof "before class certification." *Olean II*, 31 F.4th at 664 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014).)  Plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23, including predominance, are satisfied by a preponderance of the evidence. *Id.* at 665.  For plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim. *Id.*

Here, Plaintiffs present four sets of common questions – one set concerning their exit screening classes (classes 1-4), one set concerning their rounding classes (classes 5 and 7), one set concerning their meal period waiver class (class 6), and one set concerning their wage statement class (class 8).[6] The Court analyzes each in turn below.

### 1. **Exit Screening Classes**

Plaintiffs' proposed classes, 1 through 4, with one limited exception discussed below, are comprised of persons who were subject to a "metal detector security process to exit the

---

[6] The derivative classes, classes 9-11, are not analyzed separately as they are derivatives of classes 1-8.

facility."  The security process, as generally described by Plaintiffs, requires that to gain access to the production area of a facility, employees were required to "swipe-in" at a security turnstile near the entrance to the facility using an ID badge. The entrance to the facility did not have a metal detector to gain entry.  After "swipe-in," employees clocked in by walking to a time clock and clocking in by using their ID badges. After their shifts ended, they were required to clock out and then exit the facility through the mandatory security exit process, which consisted of going through a metal detector and bag check and then "swiping out" at the security turnstile before they could leave the facility.  (*See, e.g.*, Doc. 98-14, Gianini Decl. at ¶ 3; 98-15, Palma Decl. at ¶ 3; 98-18, Ward Decl. at ¶ 4 ("In order to gain access to the production area of the facility, I was required to 'swipe-in' at a security turnstile near the entrance to the facility using my ID badge. To clock in, I went to a timeclock and clocked in using my ID badge. After my shift was over, I was required to clock out and then exit the facility through the mandatory security exit process, which consisted of going through a metal detector and bag check, including standing for a wand scanner and having my pockets checked, then 'swiping out' at the security turnstile before I could leave the facility.").  Similarly, Amazon's expert, Dr. Michael Ward, generally understood the process as follows:

> [A]t the start of the workday employees entering a facility may have their entry arrival time recorded at a turnstile or other sensing device at the entry to the work facility.  They then "punch in" to a separate "clock" that records time for payroll purposes.  At the end of the day, the process is reversed, in that the employee first "punches out" ending their workday.  They then proceed to exit the facility and, if a turnstile exists at the facility, this time is also recorded.

(Doc. 123 at 10, Ex. A, Expert Report of Michael P. Ward, Ph.D. ("Ward Expert Report")).

According to the evidence, Amazon appears to operate two main types of facilities in California with exit security screening in the form of metal detectors:  Sorting Facilities and Fulfillment Centers.[7]  (Doc. 119-4, Declaration of Cody Carr ("Carr Decl.") at ¶ 3.)

---

[7]  Plaintiffs have not clearly identified the total number of facilities at issue for purposes of class certification, and Plaintiffs' counsel was unable to provide such information when questioned at oral argument.  Plaintiffs' expert understood that there were 12 facilities with metal detectors at the security checkpoint:  LGB8, OAK3, OAK4, OAK6, ONT2, ONT3, ONT6, ONT8, ONT9, PCA1, SJC7 and SMF1. (Doc. 107-1 at 13.) Plaintiffs also were unable to account for variations of the exit screening

The Court now turns to the specific proposed exit security screening classes for certification.

**Class 1:  All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were required to go through a metal detector security process to exit the facility.**

For this class, Plaintiffs claim that "whether the time spent by employees after entering the secured premises and before leaving the secured premises constitutes 'hours worked' under California law and whether [Amazon] paid for all hours worked are common issues" that the Court can resolve on a class-wide basis.  (Doc. 98-1 at 11-12.)  Plaintiffs also assert that the issue of whether "off-the-clock" time spent by class members while they were within Amazon's facilities is compensable under the "control" test of Wage Order No. 7 is a common question that can be resolved on a class-wide basis.

Plaintiffs' specific theory of "control" is that after entering the facilities, class members could not choose to leave without exiting through the mandatory security exit procedures, and employees were therefore under Amazon's "control" once they entered the secured facilities until they left the secured facilities after passing through the metal detectors.  Plaintiffs argue they should be compensated for that time under Amazon's "control."  (Doc. 98-1 at 14; Doc. 123 at 10, Ex. A, Ward Expert Report ("plaintiffs maintain that all time spent by employees inside of a facility should be compensated—not just the time that they are clocked into and out of work.").  This would include the time from when employees "swiped in" (entry turnstile or other sensing device) to the time they "swiped out" (exit turnstile).  According to Amazon's evidence, Fulfillment and Sorting Centers, which have metal detectors, use turnstiles to enter and exit the facility.  (Doc. 119-4, Carr Decl. at ¶ 3.)  Plaintiffs contend that whether they were

---

procedures among the facilities, such as variations in the number of lanes, seasonal variations of screening, or which facilities turned off the metal detectors.

1  under Amazon's control "throughout the entirety of time they were on Amazon's premises is a

2  common issue."[8]  (Doc. 98-1 at 12.)

3          Plaintiffs argue that the putative security screening classes are entitled to compensation

4  for all time on the premises after swiping in (entering the facility) and <u>before</u> clocking in, based

5  on the theory that employees could not exit the facility without completing Amazon's

6  mandatory exit screening process.  The Court is not convinced that Plaintiffs' proposed

7  common questions would predominate or that Plaintiffs' claim is even supported by the

8  evidence or record.  (Doc. 98-1 at 10.) The evidence presented shows that Plaintiffs and putative

9  class members could access lockers and main breakrooms located outside security screening

10 areas.  (*See, e.g.*, Doc. 120, Ex. 1, Declaration of Eric Aceves at ¶¶ 1, 31 (Sacramento (SFM1)

11 Fulfillment Center; need to exit security to access main breakroom);  Ex. 2, Declaration of Ana

12 Alcala at ¶¶ 1, 7 (San Bernardino (ONT2) Fulfillment Center; "After putting my personal items

13 and storing my lunch in the cubby area near the Main Breakroom, I walk past the security

14 checkpoint . . . I then immediately walk up to a time clock just past security and check in."); Ex.

15 4, Declaration of Alma Angeles at ¶¶ 1, 8 (Moreno Valley (ONT6) Fulfillment Center; "Once I

16 go through the turnstiles at the entrance . . . , I go straight to the Main Breakroom without

17 clocking in."); Ex. 5, Declaration of Barbara Arana at ¶¶ 1, 29 (San Bernardino (ONT2)

18 Fulfillment Center; lockers and break room near the East doors); Ex. 6 Declaration of Nancy

19 Aviles at ¶¶ 1, 7 (Newark (OAK5) Sorting Facility; "After dropping off my lunch in the Main

20 Breakroom . . . , I go straight to the time clocks to clock in."); Ex. 10, Declaration of Anmol

21 Bhagal at ¶¶ 1, 6-8 (Fresno (FAT1) Fulfillment Center; lockers and Main Breakroom outside of

22 security checkpoint); Ex. 15, Declaration of Suzan Butler at ¶¶ 1, 21, 23 (Tracy (OAK4)

23 Fulfillment Center; "The Main Breakroom is inside the facility, but outside of the security

24 checkpoint in the side of the building.")).  Presumptively, employees could enter and exit the

25 ───────────────────────

26 [8] The Court recognizes that in their objections to the original findings and recommendations, Plaintiffs had withdrawn their request to certify the "hours worked" claims: (1) the time from scanning in at the facility entrance to clock-in and (2) the time from the completion of the security process to scan out.

27 (*See* Doc.168 at p. 9.)  Because that withdrawal occurred in connection with the Court's original findings and recommendations, and in an abundance of caution, the Court, nonetheless, addresses those time

28 periods in these amended findings and recommendations.

1  facilities without completing the exit security screening process if they only accessed the

2  lockers, main breakrooms, or other areas outside of the security checkpoints.

3       In other words, after swiping in at the entrance turnstiles, employees could access the

4  lockers and main breakrooms outside of the security checkpoints and then swipe out and exit

5  the facilities without passing through the metal detectors, so long as they did not enter the

6  secured area beyond the security checkpoints.  As a result, under Plaintiffs' theory of control

7  and proposed class definition, the time period between swiping-in and clocking-in cannot be

8  certified in the absence of any required exit security screening.  Even if employees were

9  required to swipe in and swipe out to access the facilities, such time does not amount to control.

10 *See, e.g., Griffin v. Sachs Elec. Co.*, 390 F. Supp. 3d 1070, 1091 (N.D. Cal. 2019) (finding

11 process requiring workers to badge-in and badge-out at security gate "analogous to scanning or

12 flashing an employee badge to enter a compound or campus" and finding the time spent

13 badging-in and badging-out did not equate to control).  The Court notes this is a claim that

14 Plaintiffs abandoned in their Objections, but has nonetheless analyzed it here for completeness.

15 (Doc. 168, p. 9.)

16      Moreover, the evidence demonstrates that there is no uniformity in employee choices

17 made during the time period after entry and <u>before</u> clocking in that would make Plaintiffs'

18 theory appropriate for resolution on a class-wide basis.  (*See*, *e.g.*, Doc. 120, Ex. 3, Declaration

19 of Michael Allgayer at ¶ 6 ("I usually arrive at ONT8 [Moreno Valley] an hour before my shift

20 starts so I can get a really good parking spot. I usually clock in five minutes before my shift start

21 time. When I arrive early, before I clock in, I hang out in the 'fun zone' in the facility which has

22 ping-pong tables and an arcade with video games." ); Ex. 4, Declaration of Alma Angeles at ¶ 6

23 ("I arrive at Amazon's ONT6 [Moreno Valley] Fulfillment Center parking lot around 5:00 p.m.

24 for my 6:00 p.m. shift. I arrive early because I prefer to have dinner in the breakroom before I

25 clock in for my shift. I also like to sit and talk with my friends before starting work."); Ex. 13,

26 Declaration of Thomas Bowlin at ¶¶ 1, 6 (San Bernardino (ONT5) Sorting Center; "I usually

27 arrive at ONT5 anywhere between one to three hours before my shift starts because I like to be

28

early and use the breakrooms to watch the news on television.  I usually end up clocking in five minutes before my shift start time.").

Similarly, at the end of an employee's workday, the time spent _after_ passing through exit security screening, but prior to swiping out to exit the facility appears to suffer from the same substantive defects.  As explained by Amazon's expert, at the end of the workday, the employee clocks out and then may exit the facility through a turnstile, if one exists, where the exit time is recorded.  (Doc. 123, Ex. A, Ward Expert Report.)  The variability of activities during the time period between completion of the security process and then exiting the facility suggests to the Court that common issues do not predominate.  Amazon has presented evidence that after passing through exit security metal detectors, but before exiting, putative class members engage in a variety of activities.  (*See*, *e.g.*, Doc. 120, Ex. 2, Alcala Decl. at ¶ 14 ("After clocking out [at San Bernardino (ONT2) Fulfillment Center], I walk through security . . . [A]fter going through security, I generally do not go right out the entrance doors. Instead, I go to retrieve my lunch bag and any other personal items near the Main Breakroom just inside the Main Entrance. I then exit the building and go home."); Ex. 8, Declaration of Kenneth Bahena at ¶ 13 ("After clocking out [and going through security screening at Moreno Valley (ONT6) Fulfillment Center], I then go . . .to my locker. Once at my locker, I pick up my keys, cell phone and any other personal items I left and may talk to coworkers. I then exit the building to my car."); Doc. 121, Ex. 43, Declaration of Efrain Gonzalez Decl. ¶ 14 ("After clocking out [at Patterson (OAK3) Fulfillment Center and] . . . after going through security, I generally do not go right out the entrance doors. Instead, I go to the lockers to retrieve my personal belongings. Sometimes, I sit and talk with some co-workers for a few minutes before I leave. I then exit the building and go home."); Doc. 122, Ex. 64, Declaration of Fidel Moya, Jr. at ¶ 17 ("After my work is finished and I clock out [at San Bernardino (ONT2) Fulfillment Center], I usually go the restroom, go through the security area, and then go to the East break room on the other side. In the break room, I talk to a group of friends for a few minutes. Often we wait for our whole group of co-workers to get to the break room, grab our stuff, and then leave the facility together."); Ex. 70, Declaration of Marcus Reed Decl. at ¶¶ 7, 15). (" [O]ften after [clocking out

at Eastvale (LGB3) Fulfillment Center and] going through security instead of going out the front doors, I go to the Main Breakroom and get my personal items . . . I will either sit for a few minutes or just leave through the nearby front entrance to the building.").  The Court also notes this is a claim that Plaintiffs abandoned in their Objections, but has nonetheless analyzed here for completeness.  (Doc. 168, p. 9.)

As to the two time periods addressed above—(1) the time spent after swiping in and before clocking in, and (2) the time spent after passing through exit security screening, but prior to swiping out to exit the premises—Plaintiffs rely on *Morillon*, 22 Cal. 4th 575, and *Ridgeway v. Walmart Inc.*, 946 F.3d 1066 (9th Cir. 2020), to argue that an employee subject to an employer's control does not have to be working during that time to be compensated.  That argument is misplaced.  *Morillon* involved the general question of whether the time agricultural employees were required to spend traveling on their employer's buses was compensable because they were subject to control of their employer.  22 Cal. 4th at 578.  The employees in *Morillon* were required to travel on the buses to and from the fields where they were working and were effectively prohibited from using their travel time for their own purposes.  Unlike *Morillon*, Amazon's employees were not confined to the facilities with metal detectors either prior to clocking in or after passing through the exit security screening while still in Amazon's facilities.  Instead, the evidence suggests that employees could decide what activities to engage in and when to leave at any time while outside of security checkpoints.

*Ridgeway* is similarly unpersuasive for the pre-clock-in and post-security screening periods of time.  *Ridgeway* involved Wal–Mart's written policy requiring its truck drivers to gain preapproval from management before taking a layover at home and subjecting drivers to disciplinary action for taking an unauthorized layover at home. *Ridgeway*, 946 F.3d at 1079. The Ninth Circuit found that because Wal-Mart's policy dictated what drivers could do on layovers and restricted employees from complete freedom of movement during breaks, the policy constituted control under California law.  *Id.* at 1081.  Here, Amazon did not constrain employees' freedom of movement while outside of the security checkpoints and there is no

1  indication that they were required to obtain permission before leaving the premises prior to

2  clocking in or while outside of security checkpoints.

3        With respect to the remaining time period, i.e., time spent <u>after</u> clocking out and then

4  traveling to and passing through metal detectors (but before swiping out), Plaintiffs contend

5  such time constitutes "hours worked" under the "control" and/or "suffered or permitted to work"

6  prongs of the "hours worked" definition in the applicable Wage Order and that the resolution of

7  Plaintiffs' claims presents common, certifiable issues that can be resolved for the entire class.

8        Even if Plaintiffs' proposed exit screening classes were limited to the time spent after

9  clocking out and then traveling to and passing through metal detectors, the Court does not find

10  that the requirements of commonality and predominance have been met.  Plaintiffs have not

11  presented evidence demonstrating a uniform exit security screening.  In contrast, Amazon has

12  presented persuasive evidence that screening varied substantially at facilities with metal

13  detectors depending upon the number of screening lanes, the facility's layout, the procedures

14  during busy periods, and whether metal detectors were even operational.  The absence of a

15  uniform policy consistently applied throughout the class period across the variety of Amazon's

16  facilities precludes resolution of Plaintiffs' claims on a class-wide basis and a class cannot be

17  certified based on exit screening procedures.  *See Heredia v. Eddie Bauer LLC*, No. 16-CV-

18  06236-BLF, 2020 WL 127489, at *4 (N.D. Cal. Jan. 10, 2020) ("It is doubtful that the Court

19  would have certified the class [when it did] had it understood that [Eddie Bauer] did not have a

20  single uniform policy in place" because "[i]t is no longer accurate to say that this case involves

21  'a uniform policy consistently applied' throughout the class period."); *In re Autozone, Inc.,* No.

22  3:20-md-02159-CRB, 2016 WL 4208200, at *10 (N.D. Cal. Aug. 10, 2016) (decertifying class

23  where no uniform policy consistently applied throughout the class period); *see also Hubbs v.*

24  *Big Lots Stores, Inc.*, No. LA CV15-01601 JAK (ASx), 2017 WL 2304754, at *9 (C.D. Cal.

25  May 23, 2017) (denying class certification where plaintiffs failed to present "sufficient evidence

26  to show that there was a common and consistent policy among Defendants to subject all

27  employees at all of their stores to off-the-clock bag checks"); *Quinlan v. Macy's Corp. Servs.,*

28  *Inc.*, No. CV 12-00737 DDP (JCx), 2013 WL 11091572, at *4 (C.D. Cal. Aug. 22, 2013)

1   (denying certification of a class of employees who were subject to off-the-clock searches where

2   plaintiffs had not satisfied the commonality requirement because stores "implement[ed]

3   different strategies," altered their strategies "depending on the time of day, day of the week,

4   season, [and] level of traffic," and some stores had no searches at all).

5          The record includes critical evidence demonstrating that between 2014 through at least

6   January 2020, during the proposed class period, the majority of the Sorting Facilities that

7   operated with metal detectors have since turned off those detectors.  (*See* Doc. 119-4, Carr Decl.

8   at ¶ 3).  The record also includes evidence that there were significant periods of time when the

9   metal detectors at Sorting Facilities in Newark (OAK5) and San Bernardino (ONT5) were not

10  operational.  (*See* Doc. 120, Ex. 6, Aviles Decl. at ¶ 19 ("I do not think the 'metal detectors'

11  even work and may not even be turned [on].  For the entire time I have worked at Amazon

12  [Sorting Facility in Newark (OAK5)], I have never hear [sic] the metal detectors go off and it

13  does not even seem to me that a security person is even watching them.  Nobody checks our

14  bags when we leave the building.");  Ex. 13, Bowlin Decl. at ¶ 12 (beginning two months prior

15  to October 2019 there had been "no security screening to exit ONT5"); Ex. 29, Declaration of

16  Maria Cruz ¶ 18 ("they turned off the metal detectors about one month" prior to October 2019).

17         Even if operational throughout the duration of the proposed class period, Amazon's

18  evidence further demonstrates that there is no uniformity in application of the exit screening

19  process across Amazon's facilities that have metal detectors because the numbers of detectors

20  and lanes vary.  Some facilities have only two lanes and others have as many as ten lanes.  (Doc.

21  119-4, Carr Decl. at ¶ 5.)  For example, Amazon's expert, Dr. Elizabeth Arnold, identified that

22  the OAK3 Fulfillment Center had 5 lanes, the ONT2 Fulfillment Center had 2 entrances with 4

23  lanes each, the LAX5 Sorting Center had 3 lanes, and the OAK5 Sorting Center—with non-

24  operational metal detectors—had 4 lanes.[9]  (Doc. 123, Ex. B, Declaration of Elizabeth Arnold,

25  M.S. ("Arnold Decl."), Table 1.)

26  _____

27  [9] Additional examples: ONT8 Fulfillment Center with 6 lanes (Doc. 120, Ex. 3, Allgayer Decl. at ¶ 16; Ex. 17, Cassino Decl. at ¶ 16); FAT1 Fulfillment Center with at least 8 lanes, some express (Doc. 120, Ex. 10, Bhagal Decl.; Ex. 19. Cathcart Decl. at ¶ 27); and LGB3. Eastvale Fulfillment Center with approximately 10 lanes (Doc.

28  122, Ex. 70, Reed Decl. at ¶ 23; Ex. 72, Robles Decl. at ¶ 22).

Plaintiffs contend that minor variances in how the mandatory screening procedures at facilities with active metal detectors are conducted do not defeat commonality, relying on *Lao v. H&M Hennes & Mauritz, L.P.*, No. 5;16-cv-00333-EJD, 2019 WL 7312623, at *1 (N.D. Cal. 2019). *Lao* involved H&M's "alleged policy of requiring all retail employees to undergo a visual inspection by a manager (or other designated person) after they clock out—either at the end of a shift or at closing—but before they leave the H&M store where they work." *Id.* at *1. H&M reportedly used "two types of security checks: (1) bag inspections, where only retail employees that have a bag must allow a manager to check the bag before leaving, and (2) visual inspections, where every retail employee—regardless of whether they have a bag—must inform a manager of when they leave, allowing the manager to observe their person." *Id.* The plaintiff in *Lao* argued that, under California law, the time taken for the visual inspections and for any waiting prior to the inspections was compensable. H&M argued that the policy's inconsistent application to various class members and across different times precluded a finding of commonality. The district court rejected H&M's argument, finding that whether retail employees were required to tell a manager that they were leaving allowing the manager to see them, to stand in front of a security camera so they could be inspected remotely, or to be escorted to the exit had no material impact on the commonality analysis. The court found that these purported inconsistencies did not negate plaintiff's allegations that, before they are permitted to leave, all class members must (1) inform a manager that they are leaving, and (2) submit to a visual inspection of their person. The court also found that the purported inconsistencies did not suggest that that the visual inspections were not mandatory. *Id.* at *5.

The instant action is distinguishable from *Lao* in two material respects.[10] First, Amazon has presented cogent evidence that there were significant periods of time when the metal detectors at certain facilities were not operational and that multiple facilities ceased using the metal detectors during the proposed class period. Second, Amazon has demonstrated that facilities did not require mandatory screening of employees during certain periods, such as to

---

[10] As discussed *infra*, this action also is distinguishable to the extent Amazon's employees passed through the metal detectors without delay, as if passing through a "doorway."

account for peak seasons when the lanes were subject to "flushing" to prevent long lines to pass through security. (*See* Doc. 119-6, Declaration of Jimmy Oholt Decl. at ¶ 7 (During 'Peak' season . . . at ONT2 and LGB4 there is a 'flush the line' practice . . . "security officers would "flush" the lanes and push associates through the detectors without requiring them to undergo screening.  If associates set off the metal detectors when security was pushing people through, those associates did not have to go through secondary screening.")  In short, there were periods of time in which the screening process was not mandatory, did not occur, or was not applied to all putative class members.  Unlike in *Lao*, the absence of any exit security screening is an inconsistency in substance, not form.

It appears from their reply that Plaintiffs attempt to account for the cessation in the use of metal detectors—at least for the Sorting Facilities—by arguing that "Defendants do not dispute that employees were required to pass through the security to leave the building at the end of their shifts, during meal periods, or during rest periods at facilities with **working exit metal detectors**." (Doc. 128 at 5) (emphasis added).  The Court construes the phrase "facilities with working exit metal detectors" as a proposed modification of the class definition for Classes 1 through 4.  The Court may consider class definitions first raised in a plaintiff's reply brief. *See, e.g., Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 161 n. 1 (C.D. Cal. 2002) (court considered amended definition proposed reply brief).  Moreover, the Court has the authority to redefine a class, and there is no reason the Court should not consider the amended definition arguably proposed by the Plaintiffs.  *See Garcia v. Schlumberger Lift Sols.*, No. 1:18-cv-01261-DAD JLT, 2021 WL 1259737, at *18 (E.D. Cal. Apr. 6, 2021).  Nevertheless, the Court finds that the proposed amended definition does not account for variations in the exit security screening procedures, including variations across facilities, such as the number of  detectors and lanes, and across time, such as when lanes were "flushed" or when detectors were non-operational.   The Court cannot construe these differences as insignificant or, as Plaintiffs argue, related only to "damages issues," because these differences go to the very nature, scope, and breath of the challenged policy itself.

Amazon also suggests that the proposed exit screening classes (even as amended) cannot be certified because employees were not required to bring anything that needed screening onto the floor.  Amazon argues that this fact matters because whether an associate had a choice in dictating the amount of time spent in screening is highly relevant to, if not dispositive of, the control inquiry.  The Court does not find this argument wholly persuasive.  In *Frlekin*, 8 Cal. 5th 1038, the California Supreme Court, at the request of the Ninth Circuit, decided the following question of California law:  "Is time spent on the employer's premises waiting for, and undergoing, required exit searches of packages, bags, or personal technology devices voluntarily brought to work purely for personal convenience by employees compensable as 'hours worked' within the meaning of Wage Order 7?"  *Frlekin,* 8 Cal. 5th at 1042.  The California Supreme Court concluded that the answer to this certified question was yes.  *Id.*  At issue was Apple's policy, which required all employees to undergo searches of their personal packages and bags by a manager or security team member, having employees remove any type of item sold by Apple, and verification of their personal technology with a personal technology log before leaving the premises for any reason, including break, lunch, and end of shift.  *Frlekin*, 8 Cal. 5th at 1044.

After the California Supreme Court answered the certified question, the Ninth Circuit held that time spent by class members waiting for and undergoing exit searches pursuant to Apple's policy was compensable as "hours worked" under California law.  *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020).  The Ninth Circuit also indicated that disputed facts regarding whether some class members did not bring bags or devices to work, were never required to participate in checks, or worked in stores with remote break rooms where they stored their belongings "pertain solely to individual remedies, not to the main legal question as to class-wide relief."  *Id.*; *see also Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1232695, at *4 (N.D. Cal. Mar. 30, 2021) (same). *Frlekin* suggests that the voluntary actions of employees to avoid extensive screening is not dispositive of the main legal question.

To the extent Plaintiffs rely on the *Frlekin* rulings to contend that time spent waiting for and undergoing exit security procedures is compensable under California law, the Court finds

the Ninth Circuit's decision in *Frlekin* distinguishable in the current context because individualized questions, including those involving "time spent," will predominate over common ones.  In particular, as to time spent, Amazon argues that predominance cannot be met because the bulk of the putative class are uninjured given that their exit screening experience consisted of walking through a metal detector, as if through a doorway, with virtually no delay.  For those facilities with operational metal detectors, Plaintiffs submitted declarations detailing their own individualized experiences with exit screening, but failed to provide the Court with representative or statistical evidence demonstrating that all or nearly all putative class members were injured or suffered any delay.  Plaintiffs' declarations are not sufficiently specific to support their theory of injury resulting from any waiting time or actual time spent going through the screening process.  Instead, Plaintiffs' statements are ambiguous, referring generally to "minutes" spent from clock out through exit security, not the time waiting at the metal detectors.  Plaintiffs Avalos, Gianini, Palma, Trevino and Ward each declared: "I estimate that it took a few minutes from the time I clocked out until I [went] through the exit security process depending on the lines at the metal detectors."  (Doc. 98-13, Avalos Decl. at ¶ 6; 98-14, Gianini Decl. at ¶ 6; 98-15, Palma Decl. at ¶ 6; 98-17, Trevino Decl. at ¶ 6; 98-18, Ward Decl. at ¶ 6.)  Plaintiff Quinteros' declaration is equally unavailing because in alleging that the exit security process "usually took a couple minutes to complete," she lumps together all time spent exiting the facility, including passing through the metal detectors and then proceeding to the break room and lockers, picking up her items and then leaving the facility.  (Doc. 98-16, Quinteros Decl. at ¶ 5.)  She also vaguely alleged that the security screening process "generally took at least two to three minutes to complete." (*Id.* at ¶ 6.)  This anecdotal evidence does not support she waited any amount of time at the metal detectors before exiting the premises. Plaintiffs' expert, Dr. Kriegler, also provides no representative or statistical evidence reflecting time spent in exit security screening, envisioning only that a sampling of historical surveillance footage could be used to measure how long it takes people to go through the mandatory security check process. (Doc. 107-1, Kriegler Decl. at ¶¶ 53, 54.)  He did not see surveillance footage of the facilities. (*Id.* at ¶ 67.)

In contrast, Amazon's expert, Dr. Ward, analyzed the time between clocking out and exiting facilities and found that, over the period from July 12, 2013 to August 11, 2019, 89.5% of all associates had a "minimum exit interval time . . . less than one minute." (Doc. 123 at 14 and Table 5, Ex. A, Ward Expert Report.)  Similarly, Amazon's expert, Elizabeth Arnold, following studies of a representative sample of the facilities, found that 81% of the employees walked through the metal detectors with no delay," and the "majority of time, passing through the metal detectors takes seconds."  (Doc. 123, Ex. B, Arnold Decl. at ¶¶ 129, 133).

The parties dispute whether an exit security screening experience consisting of walking through a metal detector, as if through a doorway, is an issue of liability or an issue of damages. Plaintiffs contend that it is a question of damages such that individualized inquiries will not defeat class certification.  Yet, any contention that class members whose exit screening experience consisted of simply walking through a metal detector without stopping are injured makes little sense to the Court.  The evidence presented to the Court is that only a few people waited at the metal detectors and there is <u>no</u> evidence, as discussed above, that all or nearly all putative class members waited to pass through exit security screening. Thus, whether there is sufficient evidence that putative class members waited at the metal detectors or suffered any delay passing through the metal detectors goes to the very heart of liability, and is not a damages issue.

Moreover, "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean II*, 31 F.4th at 668.  A district court is in the best position to determine whether individualized questions, including those regarding class members' injury, "will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).  *Id.* at 669.

Having conducted a rigorous analysis of the evidence, the Court finds that individualized inquiries about the injury status of class members passing through the metal detectors would predominate over common questions.  Amazon's evidence alone suggests that *nearly all* of purported class members experienced <u>no</u> delay – as if walking through a doorway – making it

clear that individualized inquiries would be required to identify the injury status of class

members, including at different times and different facilities.  The Court finds that such

inquiries would overwhelm any common question concerning exit security screening.

///

**Class 2. Unpaid Wages Class (Controlled Meal Periods)**

> All non-exempt employees employed by Amazon.com Services, Inc. or
> Amazon.com, Inc. at any of Defendants' facilities in California at any time during
> the period from July 12, 2014 and ending on the date of certification or as
> otherwise determined by the Court who took a meal period and who were
> required to go through a metal detector security process to leave the facility
> during such meal period and were not paid for the time of such meal period.

Plaintiffs contend that during their meal periods, Amazon did not relinquish all control

over their activities because Amazon restrained employees from leaving the work premises

without passing through the mandatory security exit procedures.  (Doc. 98-1 at 15.)  Plaintiffs

rely on *Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968, 968-72 (1995), to support

their position.  In *Bono*, the court considered a policy where temporary workers were not given

a security clearance and were required to remain on the plant premises during their 30-minute

lunch period unless they made prior arrangements to reenter the plant after leaving for lunch. *Id.*

at 972. The court determined that "[w]hen an employer directs, commands or restrains an

employee from leaving the work place during his or her lunch hour and thus prevents the

employee from using the time effectively for his or her own purposes, that employee remains

subject to the employer's control . . . [and] must be paid." *Id.* at 975.

*Bono* is distinguishable from the instant case.  According to the record, Amazon

associates clock out for meal breaks, cannot clock back in until 30 minutes have passed, and

have a three-minute grace period to clock back in. (Doc. 123, Ex. D, Carr Tr. 67:13–68:6; Ex. C,

Frauson Tr. 20:1–17.)  Amazon's policies also prohibit "off-the-clock" work by associates.

(Doc. 119-2, Ex. Y [Sealed].)

Additionally, there is no evidence that Amazon requires employees to remain within its

facilities during meal breaks or otherwise restrict whether those breaks can be taken outside of

the facility.  Anecdotal evidence bears this out.  (*See*, *e.g.*, Doc. 120, Ex. 1., Aceves Decl. at ¶ 25 ("I normally eat my lunch outside . . . I can leave the facility during my meal break if I want to . . . .); Ex. 5, Arana Decl. at ¶ 25 ("many times I will go to my car and go buy food nearby . . . and come back.  Sometimes I just go sit outside."); Doc. 121, Ex. 35, Dominguez Decl. at ¶ 13 ("I pick up my lunch from the Break Room where I keep my backpack, heat it up in one of the microwaves, and head outside to the smoking and seating area which right outside the building."); Ex. 36, Dunn Decl. at ¶ 25 ("For my meal break, I spend it outside at the tables . . . ."); Ex. 41, Garay Decl. at ¶ 14 ("I usually grab a snack from the Main Breakroom and take it to my car or hang out outside on the steps and socialize.").  Further, Amazon's expert, Dr. Ward, provided evidence that Amazon's associates take fully compliant meal breaks after passing through screening. (Doc. 123 at 430, Ex. A, Ward Expert Report.) Almost all employees exited the facility at least once during lunch, and more than half of the employees in the data had exited the facility for "a full 30 minutes" during at least one of their meal breaks. (*Id.*)

The Court finds that Plaintiffs have not met their burden of demonstrating common questions predominate for controlled meal period claims premised on exit security screening. Amazon's policy is facially compliant, Amazon authorizes 30 minutes for meal breaks, there is no indication that the proffered 3-minute grace period would not account for any "exit screening," and it is not evident that associates were required to remain on the premises during their meal period.  The Court finds that individualized inquiries would be required to determine which employees (associates) were not provided with compliant meal periods and that such individualized inquiries would predominate over any common questions.

**Class 3. Meal Period Violations for Controlled Meal Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than six hours and who were required to go through a metal detector security process to leave the facility during such meal periods and were not paid a meal period premium for such shifts.

Plaintiffs allege Amazon is liable for meal period premiums for each shift for which a meal period was required under Labor Code § 226.7, i.e., shifts over six hours, by restraining class members from leaving the premises for meal periods without first going through the mandatory exit security screening and limiting where they can take a meal break.

For the reasons discussed above with respect to Class 1 and Class 2, the Court finds that this class cannot be certified.

**Class 4. Rest Periods Violations for Controlled Rest Periods**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who worked a shift longer than three and one-half hours and were subject to a policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination or who were required to go through a metal detector security process to leave the facility during the rest period and were not paid a rest period premium for all such shifts.

The parties do not dispute that under California law, an employer must authorize and permit each non-exempt employee a 10-minute rest period for each four hours of work. Plaintiffs contend, however, that Amazon's use of mandatory security exit procedures prevented employees from taking their rest periods off premises without going through mandatory security exit procedures.   Plaintiffs further contend that Amazon uniformly applied a policy and practice of limiting where an employee can take a rest break and requiring employees to remain on premises.  Plaintiffs rely on *Augustus v. ABM Security Services, Inc.*, 2 Cal. 5th 257, 269 (2016), as modified on denial of reh'g (March 15, 2017), for the proposition that during rest periods employers must relieve employees of all duties and relinquish control over how employees spend their time.  (Doc. 98-1 at 18.)

Plaintiffs' arguments are not persuasive.  First, representative evidence from Amazon's expert, Elizabeth Arnold, demonstrated that the majority of time passing through the metal detectors takes seconds.  (Doc. 123, Ex. B, Arnold Decl. at ¶ 133.)  Plaintiffs also do not allege that this process took more than "a few minutes" from the time they clocked out until they went through the exit security process, which included time to walk to the metal detectors.  (Doc. 98-

13, Avalos Decl. at ¶ 6 ("a few minutes"); 98-14, Gianini Decl. at ¶ 6 (same); 98-15 Palma Decl. at ¶ 6 (same); 98-16, Quinteros Decl. at ¶ ¶ 5 ("couple minutes;" "two to three minutes"); 98-17, Trevino Decl. at ¶ 6 ("a few minutes"); 98-18, Ward Decl. at ¶ 6 ("a few minutes").  This general information, along with the undisputed fact that Amazon's policies provided for 15-minute rest breaks undercuts any inference that its exit security screening resulted in liability for failing to provide fully compliant 10-minute rest periods.  *See Figueroa*, 2021 WL 1232695, at *6. The Court finds that even if associates were subject to brief delays while leaving the facility for breaks, individualized questions about which employees did not in fact receive a full rest break would predominate over any common question.

Second, Plaintiffs' reliance on *Augustus* is misdirected.  *Augustus* involved security guards who were required to remain on call even during rest periods.  2 Cal. 5th at 260.  Unlike the security guards in *Augustus,* and as noted, Amazon provides longer rest breaks than required by California law, authorizing 15 minutes for rest breaks, (Doc. 123, Ex. D, Carr Tr. 67:7– 9), there is no evidence that Amazon employees were required to remain on call, and as discussed below, rest breaks could be taken outside the facility.  As Amazon argues, even if associates were genuinely limited in what they could do for their breaks, individualized questions predominate over any common questions.

The Court recognizes, however, that the proposed rest break class is alternatively premised on a purported "policy that leaving company premises without permission during assigned work hours was a serious infraction that subjected them to termination."  Although Plaintiffs claim that Amazon has not disputed the existence of such a policy, with the exception of Plaintiff Linda Quinteros, the declarations submitted by Plaintiffs do not indicate that employees were required to ask permission to leave the premises during rest periods, only that they had to go through exit security screening.[11] (*See generally* Doc. 98-13, Avalos Decl.; 98-14, Gianini Decl.; 98-15, Palma Decl.; 98-17, Trevino Decl.; 98-18, Ward Decl.).

---

[11] Plaintiff Quinteros, who worked at Amazon's Patterson facility (OAK3), claims she was not permitted to leave the facility during rest breaks.  (Doc. 98-16, Quinteros Decl. at ¶ 13 ("we were not permitted to leave the facility premises during rest breaks").

Plaintiffs have not presented evidence that employees were terminated or otherwise subject to disciplinary action if they left to take their rest breaks outside the facility without first seeking permission.  In other words, Plaintiffs have not persuasively demonstrated that any such policy was enforced.  At oral argument, Plaintiffs represented that Amazon's person most knowledgeable, Michele Frauson, testified that Amazon's policies were provided to employees during the on-boarding process, including its policy that leaving the premises without permission was a serious infraction, and that employees were required to comply with those policies.  A review of the relevant testimony does not support Plaintiffs' underlying contention that Amazon's policy regarding leaving the premises without permission was, in fact, enforced for rest breaks.  Rather, Ms. Frauson testified only generally that Amazon expects its employees to adhere to its policies.  (Doc. 98-3 at 51, Exhibit 4 to Dion-Kindem Decl., Frauson Tr. 62:17-19.)

Critically, Amazon has submitted evidence from putative class members who left the facility during rest breaks with no mention of permission being required or that they were terminated or disciplined for doing so.  (*See generally* Doc. 123, Ex. GG.)  Amazon also has submitted declarations from putative class members from the Patterson facility (OAK3), where Plaintiff Quinteros worked, who indicated that they could leave the facility during rest breaks with no mention of permission.  (*See, e.g.,* Doc. 121, Jensen Decl. at ¶ 16 ("I can also go outside . . . .); 122, Ex. 83, Valencia Decl. at ¶ 16 ("I could also leave the facility for my breaks and go outside and/or to my car, if I wanted to."); Ex. 91, Zamarron Decl. at ¶ 14 ("For my [rest] breaks, I either go to the locker room at the entrance of OAK3 or my car, depending on if I drove or not").  Amazon's expert, Dr. Ward, found evidence that 51.3% of all employees exited the facility outside of meal times for at least 10 minutes and, for those employees with 50 shifts or more, 73.7% of those employees exited for at least 10 minutes at some time during their employment over the period July 12, 2013 through August 11, 2019.  Doc. 123 at 16-17, Ex. A, Ward Expert Report).

In the absence of evidence that Amazon uniformly enforced any policy requiring permission to leave the facility during rest breaks, there does not appear to be a question that

requires common resolution by the Court.  "[T]he mere existence of a facially defective written policy—without any evidence that it was implemented in an unlawful manner—does not constitute significant proof ... that a class of employees was subject to an unlawful practice." *Davidson v. O'Reilly Auto Enterprises, LLC*, 968 F.3d 955, 968 (9th Cir. 2020) (internal quotation marks and citation omitted).  Any suggestion that requiring employees to pass through metal detectors equates with requiring employees to obtain permission before leaving the premises is not persuasive.

### 2.  Rounding Classes (5 & 7)

**Class 5. Improper Rounding Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were subject to a rounding practice that resulted in them being paid less than they would have received had no such rounding practice been utilized for such employees.

**Class 7.  Third Rest Period Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who were scheduled to work a 10-hour shift and worked more than 10 hours and who were not authorized or permitted to take a third uninterrupted, duty-free, and control-free 10-minute rest period and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Plaintiffs contend that Amazon implemented a uniform policy and practice of automatically rounding time-keeping entries, generally to conform to shift schedules, and that such policy resulted in class members being paid less than all hours they worked (Class 5) and denied class members who were scheduled to work 10-hour shifts, but in reality, worked more than 10 hours, a third rest period (Class 7).

California does not have a statute or regulation expressly addressing the permissibility of using a rounding policy, but state courts have followed the federal regulatory standard. *See See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 903 (2012) ("The policies

36

underlying the federal regulation—recognizing that time rounding is a practical method for calculating work time and can be a neutral calculation tool for providing full payment to employees—apply equally to employee-protective policies embodied in California Labor law."). The relevant regulation states:

> It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b). "[A]n employer's rounding practices comply with § 785.48(b) if the employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." *Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1126 (C.D. Cal. 2011) (citations omitted).  Under California law, an employer is permitted to adopt a rounding policy so long as it is "fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'" *See's Candy*, 210 Cal. App. 4th at 907 (quoting 29 C.F.R. § 785.48); *see also Sali*, 909 F.3d at 1009; *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1076 (9th Cir. 2016).

Plaintiffs acknowledge that Amazon rounds time punches up and down, which allows associates to both punch in late and punch out early. (Doc. 110-1 at 7).  Plaintiffs essentially contend, however, that this rounding policy underpays employees and, in certain instances, deprives employees of a third rest break.  Plaintiffs provide a declaration from Brian Kriegler, Ph.D., opining that 88.0% of putative class members had fewer hours on the clock based on rounded timestamps and were potentially underpaid due to rounding (60.1% of employee shifts, 71.4% of employee workweeks, and 88.0% of employees had fewer hours on the clock using rounded timestamps) and that 28.6% of putative class members had a shift length over 10 hours

1    based on unrounded timestamps, but was less than or equal to 10 hours based on rounded time

2    stamps.  (Doc. 107-1 at 20-21, 23.)

3         Amazon does not dispute the existence of its rounding policy and instead points out that

4    Plaintiffs' rounding classes (Classes 5 and 7) rely on an assumption that Amazon's "uniform

5    rounding policy" resulted in employees being "routinely underpaid," and deprived of a third rest

6    break when their shift exceeded 10 hours. (Doc. 119 at 21-22.)  Citing *See's Candy*, Amazon

7    argues that it is only liable if its policy consistently deprived employees of pay for "time they

8    have actually worked."  (*Id.*)  Amazon urges that the existence of an unlawful rounding policy

9    requires "foundational evidence" that employees were actually working when they were clocked

10   in and were not being paid due to rounding, thus requiring individualized inquiries.  (*Id.* at 22.)

11   Amazon provides evidence that some employees clocked in early, but spent that time engaging

12   in non-work activities, such as socializing, getting coffee, grabbing a snack or using the

13   restroom.  Similarly, Amazon provides evidence that some employees engaged in a variety of

14   non-work activities at the end of their shifts, but before clocking out, such as socializing or

15   visiting the breakrooms.   (*Id.* at 23.)

16        Amazon asserts that district courts within this Circuit have denied certification of classes

17   that require similar individualized inquiries.  For example, *In Pryor v. Aerotek Scientific, LLC*,

18   278 F.R.D. 516 (C.D. Cal. 2011), the court concluded that individual questions predominated

19   where the evidence showed that associates would log in to their work computers upon arriving

20   at work, but then spend time eating or socializing before accepting calls. *Id.* at 535–36. The

21   *Pryor* court found there appeared to be too many variations to determine if an employee was

22   paid for fewer hours than actually worked, including whether they performed non-work

23   activities.  *Id.* at 536.  Likewise, in *Shiferaw v. Sunrise Senior Living Management, Inc*., 2014

24   WL 12585796, at *9–11 (C.D. Cal. June 11, 2014), the court denied certification of a rounding

25   class where variation existed as to whether employees were actually working when they had

26   clocked in before their shifts started or had clocked out after their shifts ended, where evidence

27   showed that some employees clocked in early, but spent that time talking to co-workers,

28   drinking coffee, talking on the phone, or waiting for their shifts to start.  *Id.* at *9.

Plaintiffs contend that the Ninth Circuit in *Sali*, 909 F.3d 996, rejected an argument similar to Amazon's that employees are not working when engaging in personal activities. (Doc. 128 at 13.)  In *Sali*, the Ninth Circuit considered certification of a rounding-time class and found that the district court erred by assuming that the only question to be decided was whether employees engaged in work activities even if they were not required to do so.  *Id.* at 1010.  The *Sali* court identified that under California law, time is compensable when an employee is working *or* under the control of his or employer.  Accordingly, employees were also actually working if they were subject to the employer's control even if they were not engaging in work activities.  In so identifying, the *Sali* court determined that the district court failed to consider whether the employees could establish on a class-wide basis that they were subject to the employer's control, such as if they were required to remain on premises during the grace period, even if they were not always engaged in work-related activities during that time.  *Id.*  The Ninth Circuit indicated that the "employer control" question required "an employer-focused inquiry into whether [the employer] had a policy or practice that restricted [employees] in a manner that amounted to employer control during the period between their clock-in and clock-out times and their rounded shift-start and shift-end times" and that determination of this question did not depend on individualized factual questions.  *Id.* at 1010-11.

As to the question of whether employees were actually working, the Court finds that Amazon has demonstrated that individualized inquiries would be required to determine whether its employees were actually working during those times when they clocked-in early or clocked-out late.  *See Shiferaw*, 2014 WL 12585796, at *9.  Plaintiffs attempt to distinguish *Shiferaw* by asserting that the court found common questions as to rounding.  (Doc. 128 at 15.)  While Plaintiffs are correct, the *Shiferaw* court ultimately found that individualized inquiries predominated in resolving the claims of the rounding class and denied certification on that basis.  *Shiferaw*, 2014 WL 12585796, at *9.  Furthermore, in this case, Plaintiffs have not demonstrated that the putative class members were working or expected to be working during the time they were clocked in before their shifts began.  Indeed, Plaintiffs' own declarations do not provide affirmative evidence that they were working after clocking-in, but before shift start.

39

(See Doc. 98-13, Avalos Decl. at ¶ 4; 98-14, Gianini Decl. at ¶ 3; 98-15, Palma Decl. at ¶ 3; 98-16, Quinteros Decl. at ¶ 4 (indicating that after clocking-in, it would then take "at least five more minutes to walk to my work location and prepare for the shift start-up meeting at the scheduled shift start time"); 98-17, Trevino Decl. at ¶ 3; 98-18, Ward Decl. at ¶ 8 ("In order to be on time for my shift start up meeting, or stand-up meeting, I would have to arrive at the facility early so I could go through the above process [swiping badge to pass through the turnstile to get to the production floor in the facility] and clock in and then walk to my assigned work location.  Amazon would not record this at time worked, as my time punches for before my scheduled shift time would be rounded forward to reflect the scheduled shift start time.").

Additionally, record evidence undermines assertions that employees who clocked-in early were in fact working.  Associates testified that they could not begin work until after the stand-up meeting at shift start because the conveyor belts only begin moving after the meeting, (Doc. 121. Ex. 37, Flores Decl. ¶ 12 ("I do not work before the stand-up starts and we cannot do any because the conveyer belts are not functioning."), or they do not receive their assignment for the day, or receive their scanner, until the stand-up, (Doc.122, Ex. 84, Vazquez Decl. ¶ 6 ("There is no work for me to do until after the stand-up, because my work assignment is posted on a board in the area where the stand-up meeting is held."); Ex. 81, Tilley Decl. ¶ 6 ("There is no work for me to do until after the stand-up, because at the beginning of my shift, I am supposed to go to stand-up first . . . to get my scanner.").  The time entries proffered by Plaintiffs are not sufficient on their own to demonstrate that the proposed class members must be paid between timestamps.  *Shiferaw* 2014 WL 12585796, at *10 (finding "time entries by themselves do not demonstrate that proposed subclass members must be paid for the time spent between the time punch and the employee's scheduled start time").  The evidence and statements evince individual actions by putative class members, indicating that the Court would need to make individualized inquiries to determine whether the putative class acquired compensable time from the time they clocked in up to their shift start times.  *See Walter*, 2023 WL 3076786, at *10 (declining to certify pre-shift rounding class where evidence demonstrated, among other issues, that "employees clocked in and spent the time up until the start of their

shifts as they pleased, such as by chatting with others, heating up their breakfast, getting coffee, going to the restroom, or simply waiting for their pre-shift meetings to commence").

As to compensable time based on the "employer control" theory, this case is distinct from the example of control cited in *Sali*, i.e., employees required to remain on the premises during the grace period.  909 F.3d at 1010.  Here, there is no evidence that employees could not leave during the grace period or were otherwise prevented from using the grace period to clock-in late or clock-out early and leave the premises.[12]  Amazon also has presented evidence that employees used the five-minute rounded grace period to clock in late or clock out early without consequence. (*See, e.g.*, Doc. 122, Ex. 73, Rocha Decl. ¶ 8 (clocking in after shift start "does not affect my pay"); Ex. 92, Zarate Decl. ¶ 6 ("Even though I typically clock in after my 6:30 a.m. shift start time, it is not a big deal.  Nobody cares."); Doc.120, Ex. 18, Castelan Decl. ¶ 9 (despite arriving early, "sit in my car until" after shift start)) or to leave early (*See* Doc. 120, Ex. 4, Angeles Decl. ¶ 14 ("My shift officially ends at 4:30 a.m.  I almost always leave early." "Because of the 5 minute grace period, I can clock out at 4:25 a.m. and still get credit to working to 4:30 a.m.").  In short, there is no indication that Amazon uniformly exercises control over employees during the grace periods or that the rounding policy had a uniform impact on employees. Accordingly, determination of the employer-control question is not readily capable of class wide resolution and would instead require individualized inquiries.

For these reasons, the Court finds that Plaintiffs have not met their burden of demonstrating common questions predominate for claims premised rounding.

### 3.  **Meal Break Waiver Class**

### Class 6.  **Invalid Second Meal Period Waiver Class**

---

[12] There also is no evidence that Amazon prevented its associates from clocking out, leaving the premises, and clocking back in prior to the start of their shifts.  This relates to the question of whether putative class members were under Amazon's control.  *See, e.g.*, *Walter*, 2023 WL 3076786, at *10 (finding unclear whether all putative class members were under employer's control where no evidence presented that employer prohibited individuals during rounding period from clocking out, leaving the premises, and clocking back in by the start of their shifts).

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Plaintiffs seek to certify the subclass of employees who executed specific meal break waiver forms and who worked more than 10 hours a day and were not provided with a second 30-minute meal period. (Doc. 98-1 at 20.) The specific meal break waiver forms at issue are attached as Exhibit 12 to the declaration of Peter Dion-Kindem in support of the class certification motion, one signed in 2017 and one signed in 2018. (Doc. 98-3, Ex. 12.) Plaintiffs contend that these meal break waiver forms are facially invalid and unenforceable because, in addition to being ambiguous and self-contradictory, they fail to accurately disclose employees' meal break rights and also purport to waive rights which cannot be waived. (Doc. 128 at 15.) Plaintiffs assert that whether such waivers are legally effective is a legal issue that the Court can resolve on a class-wide basis simply by examining the waivers and applying applicable meal period waiver requirements.

Amazon counters that whether a waiver is "ambiguous" requires an individualized assessment of the waiver and each associate's interpretation and understanding of it, citing California Labor Code § 512. Because California law requires only "mutual consent"—not a writing—to waive a meal period, Amazon asserts that determining whether consent was given would necessitate individualized, associate-by-associate and shift-by-shift inquiries. Amazon further asserts that determining the validity of the waiver is only the first step, and Plaintiffs "must also show that they can prove on a classwide basis who was entitled to, but did not receive, a second meal break—which Plaintiffs do not even attempt to do." (Doc. 119 at 26.) Amazon therefore concludes that these individualized issues preclude certification.

The issue of whether these specific meal break waiver forms are facially valid presents a common question capable of class-wide resolution. *See Garcia v. Wal-Mart Stores, Inc.*, No.

CV 16-01645 TJH (ROAx), 2018 WL 4959824, at *2 (C.D. Cal. Sept. 28, 2018) (granting certification of class composed of employees who worked a 10-hour shift but were not given a second meal period based on an invalid meal waiver form; "overarching question of law is whether the meal waiver form was valid"); *Saechao v. Landry's Inc*, No. C 15-00815 WHA, 2016 WL 1029479, at *4 (N.D. Cal Mar. 15, 2016) (rejecting defendant's argument that meal break waiver theory relied on individual questions regarding each employee's understanding of the effect of the meal-break waiver where theory turns on "the facial validity of the meal-break waiver form – a question of law capable of resolution on a class-wide basis."); *cf. Clark v. QG Printing II, LLC,* No. 1:18-cv-00899-AWI-EPG, 2020 WL 5604290, at *16 (E.D. Cal. Sept. 18, 2020) ("it appears that determinations as to the validity of QG Printing's prospective waivers and QG Printing's failure to provide premium pay automatically will drive resolution of most—if not all—claims for the Meal Break Waiver Subclass and that any individualized inquiries would pertain primarily to damages (based on the number of meal breaks missed based on invalid waivers and the amount of premium payment improperly withheld")).  The limited question of facial validity does not depend upon an individualized assessment of each employee's understanding of the waiver form and any individualized inquiries would pertain primarily to damages.

### 4.  Wage Statement Class

**Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class**

> All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked.

California Labor Code section 226(a) requires an employer to provide his or her employee with an accurate itemized statement in writing showing total hours worked by the employee.  Cal. Labor Code § 226(a)(2).  An employee who is injured as a result of the

employer's "knowing and intentional failure" to comply with these requirements may recover civil penalties. Id. § 226(e). An employee is deemed to suffer injury if the employer fails to provide the required information and the employee cannot "promptly and easily determine" the total amount of hours worked. Id. § 226(e)(2)(B)(i).

Plaintiffs allege that Amazon violated section 226(a)(2) by failing to provide Plaintiffs and other class members with wage statements that accurately listed the total hours worked. (Doc. 98-1 at 22.)  Plaintiff Trevino provides an exemplar:  his 4/21/2017 wage statement shows 70 regular hours, 11.53 overtime hours, and 2.6 double time hours. It also reflects that every recorded hour of work qualified for a shift differential. Plaintiffs assert that although Plaintiff Trevino worked a total of 84.13 hours during this pay period, when the hours listed are added together, they add up to 168.26 hours. (Doc. 98-17 at 9, Trevino Decl., Ex. 2.)  Plaintiffs argue that the wage statement effectively "double-counted" the total hours worked when it reflected shift pay hours and shift pay overtime hours in addition to regular and overtime hours.  (Doc. 98-1 at 23.)  Plaintiffs assert that whether Amazon's wage statements comply with Section 226(a)(2) requirements is a legal issue that does not involve individualized issues but can be resolved as a matter of law through an examination of the wage statements.

Amazon counters that Plaintiffs cannot establish commonality and predominance on this claim.  First, Amazon asserts that Plaintiffs' bid to certify this class rests on a false presumption that every class member suffered an injury because some wage statements did not include a "total hours worked" line item.  According to Amazon, many associates received wage statements that explicitly listed total hours worked and, as of January 1, 2019, all Amazon wage statements displayed a total hours worked line.  (Doc. 119 at 28; Doc. 119-3, Osborne Decl. at ¶ 5.)

The Court agrees and finds that the alleged inaccuracies described by Plaintiff Trevino are limited to a certain subset of wage statements and, at a minimum, do not include wage statements issued beginning January 1, 2019, as those statements displayed a total hours worked line.  Thus, the proposed class definition would need to be modified to capture wage statements

listing shift pay differentials, but not listing a separate line item for "total hours worked," and also limiting the class period through December 31, 2018.

For those subset of wage statements that did not explicitly list total hours worked (based on the above modification of the class definition), Amazon next asserts that Labor Code section 226(e)(2)(B) presumes injury only if the employee cannot "promptly and easily" determine from the wage statement the total hours worked.  Amazon avers that associates could use simple arithmetic to determine the total hours worked and thus injury cannot be established.  (Doc. 119 at 27.)

To the extent Amazon relies on this argument to challenge class certification, the Court does not find it persuasive.  Whether Amazon's wage statements comply with § 226(a) is a merits question, not a class certification question.  *See Arroyo v. Int'l Paper Co.*, No. 17-cv-06211-BLF, 2019 WL 1508457, at *5 (N.D. Cal. Apr. 4, 2019) (finding employer's argument that injury could not be established from wage statement because simple arithmetic allowed the employee to ascertain all of the required information was a merits question, not a class certification determination).  It may be determined on a classwide basis whether the statements complied with § 226(a). *Id.; see also Flores v. Dart Container Corp.*, No. 2:19-cv-0083 WBS JDP, 2021 WL 107239, at *3, *6 (E.D. Cal. Jan. 12, 2021) (finding class shared common legal questions, including whether defendants' policy of failing to provide wage statements that accurately identified the total hours worked during the pay period violated California Labor Code section 226 and this question predominated over questions affecting only individual class members); *Parker v. Cherne Contracting Corp.*, No. 18-cv-01912-HSG, 2020 WL 6822913, at *11 (N.D. Cal. Nov. 20, 2020) (concluding for purposes of class certification that whether wage statements at issue were legally deficient was a common question of law and fact that predominated over individual issues).

As a final matter, Amazon asserts that even if entitled to a presumption of injury under section 226, Plaintiffs must prove that all class members were actually injured for purposes of Article III standing and that determining whether any class member suffered injury would require individualized questioning.  (Doc. 119 at p. 28.)  However, whether Amazon provided

accurate and complete wage statements, and whether putative class members could promptly and easily determine information from them, are common questions with a common form of proof.  *See, e.g., Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 633 (N.D. Cal. 2022) (rejecting employer's argument that individualized issues over whether employees suffered actual injuries would predominate over any common questions).  The Court finds that individualized inquiries into standing would not predominate over common questions for this circumscribed class as those class members not entitled to damages may be "weeded out" at the claims phase.  *See Utne v. Home Depot U.S.A., Inc.*, No. 16-cv-01854-RS, 2022 WL 1443338, at *8 (N.D. Cal. May 6, 2022) (citing *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 n.4 (2021) ("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class.").

### 5.  Derivative Classes

**Class 9. Derivative Wage Statement Class**

All members of any of Classes 1 through 7 who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

**Class 10. Section 203 Subclass**

All members of any of Classes 1 through 7 who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

**Class 11. UCL Class**

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair.

For purposes of derivative Classes 9 and 10, the Court has found class certification appropriate only for Class 6 (Meal Period Waiver).  For purposes of derivative Class 11, the

1    Court has found class certification appropriate only for Class 6 (Meal Period Waiver) and, as

2    modified, Class 8 (Wage Statements).

3        **C. Superiority**

4        As stated above, the second part of certification under Rule 23(b)(3) is superiority.  The

5    superiority requirement tests whether "classwide litigation of common issues will reduce

6    litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d

7    1227, 1234 (9th Cir. 1996).  "If each class member has to litigate numerous and substantial

8    separate issues to establish his or her right to recover individually a class action is not superior."

9    *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1192 (9th Cir. 2001).

10        Plaintiffs argue that a class action is the superior method of adjudication because their

11    claims are based on common policies and practices and there is a strong likelihood that putative

12    class members would not bring individual actions.  Plaintiffs further argue that calculating

13    damages is easily manageable, relying on the Declaration of Dr. Brian Kriegler.  For Class 6

14    (Meal Period Waivers), the number of second meal periods to which class members were

15    entitled can be established by Amazon's time records.  For Class 8 (Wage Statements), statutory

16    penalties recoverable under Section 226(e) can be calculated using the class members wage

17    statements and Amazon's payroll records.  For Class 9 (Derivative Wage Statement), the

18    violations and amount of statutory penalties can be calculated using Amazon's payroll records.

19    For Class 10 (Termination Pay Claims), damages can be calculated from Amazon's payroll

20    records.  For Class 11(UCL Claims), the UCL remedy can be calculated using the same

21    methodology used in calculating the damages recoverable for substantive wage claims.  (Doc.

22    110-1).

23        Amazon counters that Plaintiffs have not presented a manageable trial plan, primarily

24    taking issue with Dr. Kriegler's expert report and the purported failure to address how second

25    meal break waiver claims will be tried.  Amazon also finds it troubling that Plaintiffs failed to

26    account for Amazon's individual defenses, including whether various iterations of the second

27    meal period waivers were in fact ambiguous and unintelligible and whether an employee was

28    able to determine the total hours worked on his wage statement using simple arithmetic.

Having considered Amazon's arguments, the Court finds that class wide litigation will promote efficiency by addressing potential defenses to liability for the two non-derivative classes--Class 6 (Meal Period Waiver) and Class 8 (Wage Statement).  Amazon has asserted defenses to the merits of these claims, arguing that the meal period waivers are valid and that associates could use simple arithmetic to determine the total hours worked on their wage statements.  Resolution of such issues may streamline the litigation and potentially resolve the entirety of the class action, including the derivative claims.

///

///

## V.      MOTION TO EXCLUDE PLAINTIFFS' EXPERT DR. BRIAN KRIEGLER

Amazon moves to exclude the testimony and opinions of Plaintiffs' expert, Dr. Brian Kriegler, submitted in support of Plaintiffs' motion for class certification.  (Doc. 125.)  For the majority of proposed classes, the Court will recommend denial of class certification.  In reaching that recommendation, the Court did not substantively rely on Dr. Kriegler's testimony to assess whether Plaintiffs' claims were susceptible to class-wide resolution or whether individual questions predominated.  Therefore, it is unnecessary to address substantial portions of Amazon's motion seeking to exclude Dr. Kriegler's report, particularly with respect to Classes 1 through 5 and Class 7.

As to the remaining classes, Classes 6 (Meal Period Waiver) and 8 (Wage Statement) (and the derivative Classes 9 through 11), it also was unnecessary for the Court to rely on Dr. Kriegler's report for a determination as to whether these classes are susceptible to class wide resolution.  Class 6 is premised on the facial validity of specific meal break waiver forms, a legal question that does not require expert testimony.  Class 8 is likewise premised on a legal question susceptible to resolution without expert testimony; that is, whether certain wage statements violated Labor Code § 226(a).  Accordingly, the Court will recommend that Amazon's motion to exclude Plaintiffs' expert be DENIED as moot.

## IV.      CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED as follows:

1. Plaintiffs' Motion for Class Certification is GRANTED IN PART and DENIED IN PART as follows:

    a.  Plaintiffs' motion for class certification be DENIED as to the following classes:  Class 1 Unpaid Wages Class (Hours Worked Claim Based on Control of Employees through Mandatory Exit Security Procedures); Class 2 Unpaid Wages Class (Controlled Meal Periods); Class 3 Meal Period Violations for Controlled Meal Periods; Class 4 Rest Periods Violations for Controlled Rest Periods; Class 5 Improper Rounding Class; and Class 7 (Third Rest Period Class);

    b.  Plaintiffs' motion for class certification be GRANTED as to the following classes:

Class 6 (Invalid Second Meal Period Waiver Class) defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court who signed any meal period waiver in the forms attached as Exhibit 12 to the Declaration of Peter R. Dion-Kindem in Support of Motion for Class Certification and worked more than 10 hours in a day, did not receive a second 30 minute meal period, and did not receive one hour of pay at the class member's regular rate of compensation for such day.

Class 8. Direct Violation of Section 226(a)(2) Wage Statement Class defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. in California at any time during the period from July 12, 2016 and **December 31, 2018** who did not receive an itemized statement in writing accurately showing the total hours worked by the employee where the wage statements reflect a line item for regular hours worked and at least one other line item for other types of hours worked other than regular overtime or double time, such as shift differential hours worked.

Class 9. Derivative Wage Statement Class defined as:

**All members of Class 6** who, during the period from July 12, 2016 and ending on the date of certification or as otherwise determined by the Court, were not provided with accurate itemized wage statements with all the information required by Labor Code Section 226(a)(1), (2), (5) and (9).

Class 10. Section 203 Subclass defined as:

**All members of Class 6** who, during the period from July 12, 2014 and ending on the date of certification or as otherwise determined by the Court, were either voluntarily or involuntarily separated from their employment and did not timely receive all wages owing pursuant to Labor Code Section 201 or 202.

Class 11. UCL Class defined as:

All non-exempt employees employed by Amazon.com Services, Inc. or Amazon.com, Inc. at any of Defendants' facilities in California at any time during the period from July 12, 2013 and ending on the date of certification or as otherwise determined by the Court who are owed restitution as a result of Defendants' business acts and practices that are found to be unlawful, deceptive, and/or unfair.

2. Defendants' Motion to Exclude Plaintiffs' Expert Dr. Brian Kriegler be DENIED as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these findings and recommendations, the parties may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **May 26, 2023**            /s/ *Barbara A. McAuliffe*
                                    UNITED STATES MAGISTRATE JUDGE